# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

Lawrence E. Tannas, Jr., an individual   )    Case No. 05-1866 (RWR)
dba Tannas Electronics; Tannas            )
Electronic Displays, Inc., a California     )    **MOTION FOR SUMMARY JUDGMENT RE:**
corporation                        )    **DISCLOSURE OF BEST MODE**
            Plaintiffs,        )
                v.              )
BAE Systems Avionics Limited, a       )    **Hon. Richard W. Roberts**
British Corporation; BAE Systems       )
Electronics Limited, a British         )
corporation                        )
            Defendants.      )

Pursuant to F.R.Civ.P. 56 and Local Rules 7 and 56.1, Plaintiff LAWRENCE E.

TANNAS, JR., by counsel, hereby moves for summary judgment finding a disclosure of the best

mode in U.S. Patent Nos. 6,204,906 and 6,380,999 for applying a seal between the plates, in

accordance with 35 U.S.C. § 112.

## STATEMENT OF POINTS AND AUTHORITIES

Lawrence E. Tannas, Jr., by counsel, hereby submits the attached declarations of

Lawrence E. Tannas, Jr. and William A. English, the Exhibits filed herewith, and the Statement

of Material Facts below in support of this motion.  Authority supporting this motion is also

provided in the Memorandum of Points and Authorities below.

## STATEMENT OF MATERIAL FACTS

1.      Lawrence E. Tannas, Jr. is the inventor named on U.S. Patent Nos. 6,204,906

("the '906 patent") and 6,380,999 ("the '999 patent") (collectively, "the Tannas patents").  The

- 1 -

'906 patent is based upon application Serial No. 09/274,427, filed March 22, 1999 ("the '427 application"). The '999 patent is a continuation of the '906 patent. *English Decl.* ¶ 1; *Tannas Decl.* ¶ 4.

2.     The Tannas patents concern a method for customizing a commercial "off-the-shelf" electronic display, particularly a liquid crystal display ("LCD"), by modifying the size and/or shape of the display to meet the requirements of a target application (referred to generally as "resizing LCDs"). *Tannas Decl.* ¶ 4.

3.     Between December 1998 and October 1999, the only method for resizing LCDs that Mr. Tannas practiced was one of the methods described in the '427 application. This method included cutting the plates of an LCD to create a retained portion having a cut edge, and applying a seal between the plates along the cut edge. To apply the seal between the plates, Mr. Tannas wiped a cotton swab along the cut edge to wick liquid crystal ("LC") material from between the plates and create a void between the plates along the cut edge, and then he applied a low viscosity adhesive to the cut edge and allowed the adhesive to flow in between the plates to fill the void between the plates (generally referred to herein as the "wicking process"). The method for applying the adhesive between the plates is described in the '906 patent at column 7, lines 23-45. *Tannas Decl.* ¶ 6. (See also Section B.b. below.)

4.     The Tannas patents were the subject of Interference No. 105,096 ("the Interference") at the Board of Patent Appeals and Interferences ("the Board") in the U.S. Patent and Trademark Office ("USPTO") between Mr. Tannas and David S. Watson ("Watson"), the inventor named on U.S. Application No. 09/529,201, wherein BAE Systems PLC ("BAE") was the real party in interest (i.e., owner) of the Watson application. *English Decl.* ¶ 4.

5.      During the Interference, based upon a motion filed by Watson ("Preliminary Motion 8"), the Board concluded that claims 1, 26, 29-32, and 36-43 of the '906 patent and claims 1-7 of the '999 patent were unpatentable for failing to comply with the best mode requirement of 35 U.S.C. § 112.  Specifically, the Board concluded that the claims at issue were invalid for failing to describe the best mode for "applying a first seal between the plates along an exposed edge" and "applying a first seal along an exposed edge … between the plates," as recited in the '906 patent claims, and "applying a first seal along an exposed edge," as recited in the '999 patent claims.  *English Decl.* ¶ 8, Exhibit 4, pages 55-62.  After this decision, Mr. Tannas filed a motion for reconsideration, which the Board denied.  *English Decl.* ¶¶ 9-10, Exhibits 5, 6.

6.      During the Interference, Mr. Tannas provided testimony and evidence that he disclosed the best mode he knew at the time of filing the '427 application for applying a seal between the plates.  *Tannas Decl.* ¶¶ 6,7, 11;  English Decl. ¶¶ 11-16.

7.      Because the Board would not issue a protective order, certain documents provided by Mr. Tannas relating to the best mode issue were partially redacted in order to protect trade secrets and other confidential information maintained by Mr. Tannas.  *English Decl.* ¶ 16; *Tannas Decl.* ¶ 21.

8.      During the Interference, Mr. Tannas was deposed on September 16-17, 2003 and questioned at length about his knowledge of the electronic display field and the Tannas patents' disclosure.  *English Decl.* ¶¶ 11-12; *Tannas Decl.* ¶ 21.

9.      Mr. Tannas was not asked any specific questions about his knowledge of any best mode at the time the Tannas patent applications were filed for applying a first seal between the plates until the second day of the deposition.  Then, when Mr. Tannas was asked about his

- 3 -

knowledge regarding the best mode at the time he filed the '427 application, Mr. Tannas testified

the application described what he knew at the time to be the best mode:

> Q: ... So as we sit here today, do you believe as the inventor of the 906 – of the invention
>
> described in the 906 patent that you described in your patent application when it was filed
>
> the best mode for making and using your invention?
>
> [Objection omitted.]
>
> Q: Mr. Tannas, what is your answer?
>
> MR. TANNAS: Yes, I do.

*English Decl.* ¶ 12, Exhibit 8, pp. 41:21 – 42:9.  Mr. Tannas then referred to "column 7, line 23

through 49" as a section in the '906 patent that described a method to apply the first seal between

the plates. *English Decl.* ¶ 12, Exhibit 8, pp. 43:20-44:8.

      10.     Column 7, lines 27-30 of the '906 patent states, "Liquid crystal material is then

drained or wicked out of the cell to allow for a replacement seal line 115 to be placed along the

then newly-exposed and newly-unsealed plates edges." *English Decl.* ¶ 2.  At the time Mr.

Tannas filed the '427 application, Mr. Tannas used a cotton swab to wick liquid crystal from

between the plates before applying a first seal between the plates. *Tannas Decl.* ¶ 6.

      11.     Column 7, lines 30-38 of the '906 patent also states "The replacement seal 115 is

installed by applying an adhesive along the cut edge and preferably in between the plates 20 to

reseal the display 10'. . . .  The adhesive should also have a proper viscosity to allow it to flow

inwardly sufficiently to fill any void in the cell between the plates 20 and the liquid crystal

material." *English Decl.* ¶ 2.  At the time the '427 application was filed, the only method for

applying a seal between the plates that Mr. Tannas was able to successfully complete involved

wicking liquid crystal material from between the plates along the cut edge and applying a low-viscosity adhesive along the cut edge that flowed easily between the LCD plates. *Tannas Decl.* ¶¶ 6, 11.

12.    During a subsequent deposition during the Interference, Mr. Tannas testified that, when the '427 application was filed, the process of applying a low-viscosity adhesive that would flow in between LCD plates worked effectively based on his testing:

MR. TANNAS: And that worked the best and had the least ramifications, and it appeared to be the golden moment. . . . It was the golden moment to me because the adhesive went in orderly, and I didn't have the same problem with the bubbles getting in.

*English Decl.* ¶ 13, Exhibit 9, pp. 82:22-83:4

13.    Mr. Tannas also testified that, before filing the '427 application, he had tested an alternative method to apply a seal between LCD plates by applying and releasing pressure the plates to draw adhesive between the plates.  However, Mr. Tannas stated he was not satisfied with the results of this method, and his laboratory experiments showed the better method for applying a seal between the plates was to apply the adhesive along a cut edge of the plates:

Q: And did you -- in the course of your laboratory experience did you apply the adhesive seal and release the pressure on the vise to see what would happen?

MR. TANNAS: In one of these combinations I did that, yes.

Q: What was the result?

MR. TANNAS: It was kind of out of control.  I couldn't keep the meniscus uniform, and I couldn't draw in the adhesive without drawing in air bubbles, and I tried degassing the air bubbles, and that didn't work.

Q: So as far as you were concerned -- I mean at that point in time the best way that you knew of was to place the plates between a fixture of some kind like a vise or these clamps that you mentioned and to apply the adhesive along the cut edge and to allow that adhesive to go into the gap between the plates by capillary action. . . . Is that a fair summary of what you discovered. . . ?

MR. TANNAS: . . . that sounds like a fair summary, yes.

*English Decl.* ¶ 13, Exhibit 9, pp. 89:14-90:11.

14.    Mr. Tannas' expert also testified the preferred method to apply an adhesive between LCD plates would be to use the method described in the '906 patent:

Q: Would it be possible in your view then in order to ensure that the adhesive sealant material for the new cut edges goes in between the plates that you would release some of those compression forces and allow the sealing material to be sucked into the edge as opposed to relying strictly on the wicking?

DR. SCHEFFER: I wouldn't want to do that. That would increase the cell gap.

Q: And so in your view a person skilled in this particular art would rely strictly on the lower viscosity of the adhesive material and the fact that it can penetrate the cell spacing and flow along the cut by essentially surface attraction. You would agree we have talked about that?

DR. SCHEFFER: Yes.

*English Decl.* ¶ 14, Exhibit 10, pp. 54:16-55:5.

15.    About a year after filing the '427 application, Mr. Tannas developed an improved process for resizing LCDs. This improved process included applying pressure to the plates of an

LCD using a set of pressure plates to force liquid crystal out from between the plates along a cut edge of the LCD, applying an adhesive along the cut edge, and then releasing the pressure to draw the adhesive between the LCD plates (referred to generally herein as the "squeeze and release process"). *Tannas Decl.* ¶¶ 12-19.

16.    Mr. Tannas maintained drawings of the plates used for his improved process and had the plates machined by Deanza Tooling in early 2000. Mr. Tannas did not start using the new method for sizing LCDs until Deanza finished machining the parts in April 2000. *Tannas Decl.* ¶¶ 14, 15; Exhibit 13.

17.    At that time, Mr. Tannas initially considered preparing a patent application for his improved process, and prepared a patent application disclosure explaining his improved process. *Tannas Decl.* ¶ 20. After discussing the disclosure with his patent attorney, he decided not to file a new patent application so and instead to maintain the process as his trade secret. *Tannas Decl.* ¶ 20, English Decl. ¶¶ 5-7.

18.    On the first day of one of his depositions during the Interference, Mr. Tannas was asked to explain processes for cutting and resizing LCDs. *English Decl.* ¶ 11, Exhibit 7, pp. 53:8-57:7. According to Mr. Tannas, in response to the questions posed of him, he described both general practices and his own past and then-current practices, including the processes disclosed in the Tannas patents, because he could not distinguish the particular process about which he was being questioned. *Tannas Decl.* ¶¶ 21-24; *English Decl.* ¶ 11, Exhibit 7, pp. 57:18-59:15; 60:13-25.

19.    After describing what Mr. Tannas thought to be both general practices and practices described in the '906 patent specification, Mr. Tannas was asked generally how to get

- 7 -

the adhesive between the plates. Again, Mr. Tannas did not distinguish whether he was being

questioned about general practices, his own then-current practices, or the practices used at the

time of filing the '427 application, as he perceived no distinction made by opposing counsel.

*Tannas Decl.* ¶¶ 21-24. Mr. Tannas, however, was guarded about his then-current practices, i.e.,

his improved "squeeze and release process," because there was no protective order in place, and

defendant BAE was perceived by Mr. Tannas as one of Mr. Tannas' competitors. *Tannas Decl.* ¶

25. Mr. Tannas thus responded in a protective manner: "The way I do it is my way, and I'd just

as soon keep it a trade secret." *English Decl.* ¶ 11, Exhibit 7, p. 61:10-11.

      20.     Immediately after this statement, Mr. Tannas again received additional questions

that, based on apparent hypotheticals posed by the deposing attorney, Mr. Tannas did not

distinguish as general practice questions, questions about his current practices, or questions

related to the '906 patent specification. *Tannas Decl.* ¶¶ 21-24, 26. As examples:

      Q: Let's assume we have a square plate and we cut off one edge ... what is the relative

      orientation of the spacing of the plates after you cut the side. . . ."

*English Decl.* ¶ 11, Exhibit 7, pp. 61:23-62:1.

      Q: But the gap throughout the rest of the plate over in the other sections of the plate

      would be relatively uniform and as originally manufactured?"

*English Decl.* ¶ 11, Exhibit 7, p. 62:14-16. Thus, because Mr. Tannas was not oriented as to the

exact nature of the questions and he continued to be guarded about revealing proprietary

information, Mr. Tannas repeated his response that some answers to the questions constituted his

"trade secret":

      Q: What is it that you do in order to make sure that you maintain that uniform spacing

- 8 -

between the plate all the way across as you apply the adhesive and seal it in order to create a new plate?

MR. TANNAS:  Well, that's my trade secret.

*English Decl.* ¶ 11, Exhibit 7, p. 62:18-23.

21.    Also, when Mr. Tannas was asked about a figure in the '906 patent and how it operated in conjunction with "the assumption that the adhesive is applied along the cut edge that we spoke of earlier" (*English Decl.* ¶ 11, Exhibit 7, 71:2-3), Mr. Tannas again became confused as to whether the "assumption" referred to general practices, his then-current practices, or the practices disclosed in the '906 patent, based on previous questioning. *Tannas Decl.* ¶ 24.  As a result, Mr. Tannas reacted in a protective manner:  "I don't think I explain or give a teaching of how that's done in the patent. . . .  I didn't intend to." *English Decl.* ¶ 11, Exhibit 7, p. 71:4-7.

22.    When Mr. Tannas was asked additional questions about applying a seal between the plates, Mr. Tannas acknowledged one possible method of applying a first seal between the plates could include applying a seal with the plates under compression and then separating the plates:

Q:  Would it be possible to ... place the plates under compression, under pressures again as you did before and to monitor the space between the plates to be absolutely sure that they were exactly as you wanted them to be before you applied the adhesive?

MR. TANNAS: That's possible.

*English Decl.* ¶ 11, Exhibit 7, p. 63:16-22.

Q:  [L]et's assume that at that point before I cure the adhesive that I release the pressure on the plates ever so slightly.

- 9 -

MR. TANNAS: Yes.

Q: In your experience … what will the adhesive do relative to the two plates along that edge?

MR. TANNAS: The speculation is not very much. If you release the pressure, the plates are going to start separating and the fluid, the liquid crystal, and the adhesive will move.

*English Decl.* ¶ 11, Exhibit 7, p. 65:4-12.

23.    Shortly after these responses, and based on hypothetical propositions made by the deposing attorney, Mr. Tannas again did not distinguish whether he was being asked questions about general practices, his own then-current practices, or the '906 patent, and thus clarified that he did not want to disclose any trade secrets to the defendant BAE:

Q: I've drawn a little picture here.

MR. TANNAS: Well, we're running into a situation here, James, you're going to ask me a bunch of questions, and you have to respect my right that my process is a trade secret.

Q: I understand.

MR. TANNAS: … I'm not claiming that I have knowledge that no one else could have, but the steps in my process, to me, are important.

Q: I understand.

MR. TANNAS: And I do not want BAE to know what they are.

Q: I understand. And if we cross that line beyond a hypothetical and it gets into a trade secret area, we can either take a break and talk about it and try to avoid that. . . . I'm just trying to understand the basics of how some of the repairs and resizing might be done.

I've drawn a little picture here. . . .

- 10 -

*English Decl.* ¶ 11, Exhibit 7, p. 66:1-23; *Tannas Decl.* ¶ ¶ 24.

24.    It was not until later in the deposition that the deposing counsel specifically directed Mr. Tannas to explain portions of the '906 patent relating to applying a seal between the plates:

Q:  Okay.  Looking at figure 4B [in the '906 patent], what is item 115?

MR. TANNAS:  That is the seal between the plates.  115 did you say?

Q:  Right.

MR. TANNAS:  Yeah.

Q:  And the plates, let's identify those.

MR. TANNAS:  20F and 20B.

*English Decl.* ¶ 11, Exhibit 7, p. 69:19-25.

25.    After Mr. Tannas was specifically referred to the '906 patent, Mr. Tannas asserted the '906 patent described how to apply a seal between LCD plates, even though Mr. Tannas was not asked about the best mode for doing so at the time the Tannas patent applications were filed:

Q (read from the record):  As you read your patent as we sit here today, do you find any description in the patent that teaches someone how they would specifically insert the adhesive between the plates?

MR. TANNAS:  Yes, I do.

Q:  Could you tell me where that is?

MR. TANNAS:  Column 7, line 23 to approximately line 55.

*English Decl.* ¶ 11, Exhibit 7, pp. 75:23-76:6.

- 11 -

## MEMORANDUM OF POINTS AND AUTHORITIES

Mr. Tannas requests the Court issue an order finding the Tannas patents satisfy the best mode requirement of 35 U.S.C. § 112.  Specifically, Mr. Tannas requests the Court issue an order finding that the Board of Patent Appeals and Interferences erroneously concluded that Mr. Tannas concealed the best mode of applying the adhesive seal between the plates.  As explained below, the Board based its decision on an incomplete record and by erroneously relying only on certain portions of Mr. Tannas' deposition testimony.

A thorough review of the evidence supporting this motion will confirm that the best mode for applying a seal between the plates during a process for resizing an LCD, known to Mr. Tannas at the time of filing the '427 application, is indeed described in the Tannas patents. Therefore, as shown by the facts set forth above and the following remarks, there is no material issue of fact, such that it is proper to rule for summary judgment finding the § 112 best mode requirement is satisfied in the Tannas patents.

**A.    Summary Judgment Standard**

Summary judgment is proper when the pleadings and evidence show that no genuine issue exists as to any material fact, and the moving party is entitled to judgment as a matter of law.  F.R.Civ.P. 56(c).  A movant for summary judgment makes such a showing by informing the court of the basis of its motion and by identifying the portions of the record that reveal there are no genuine material fact issues to support the nonmovant's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

In addition, as this action stems from a patent interference action under 35 U.S.C. § 146, this Court has "quasi-de novo review" over the Board's decision.  *Cell Genesys, Inc. v. Applied*

*Resrch. Systs.*, 74 U.S.P.Q.2D (BNA) 1464 (Dist. D.C. 2005). In other words, the Court can

consider evidence before the Board as well as evidence that was not before the Board. *Id.*; see

also *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1345 (Fed. Cir. 2000). Because a

Protective Order has been issued in this action, while no such order was in place during the

interference before the Board, new evidence showing Mr. Tannas disclosed the best mode in

accordance with 35 U.S.C. § 112 is provided herein.

**B.    The Best Mode For Carrying Out the Invention Is Disclosed in the Tannas Patents
In Accordance With 35 U.S.C. § 112.**

In applying the best mode standard in accordance with 35 U.S.C. § 112, the Court must

first determine "whether, at the time the patent application was filed, the inventor had a best

mode of practicing the claimed invention." *AllVoice Computing PLC v. Nuance Communs., Inc.*,

2007 U.S. App. LEXIS 23949, *20-21 (Fed. Cir. 2007) citing U.S. *Gypsum Co. v. Nat'l Gypsum

Co.*, 74 F.3d 1209, 1212 (Fed. Cir. 1996). This determination "turns on the inventor's own

subjective beliefs." *Id.* Next, the Court determines whether "the inventor 'concealed' his

preferred mode from the 'public.'" *AllVoice Computing*, 2007 U.S. App. LEXIS at *21, citing

*Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 928 (Fed. Cir. 1990).

Thus, in the present case, the relevant questions are: a) whether, at the time of filing the

'427 application on March 22, 1999, Mr. Tannas had a best mode for applying a seal between the

plates, and b) whether Mr. Tannas concealed this best mode or whether it was, in fact, disclosed

in the Tannas patents.

**a.    At the Time of Filing the '427 Application, Mr. Tannas Knew of Only One
Method for Successfully "Applying a Seal Between the Plates."**

Because a best mode inquiry is based upon knowledge of the inventor ***at the time of***

*filing*, timing is an essential consideration. In the present case, the knowledge and activities of Mr. Tannas both before and after filing the '427 application on March 22, 1999 will now be explained. This will demonstrate that the best way known by Mr. Tannas for applying the seal between the plates at the time of filing the '427 application was wicking liquid crystal material from between the plates to create a void and applying a low viscosity adhesive to the exposed edge such that the adhesive flowed between the plates to fill the void.

Initially, at least as early as May 1993, Mr. Tannas conceived of a process for changing the size of LCDs or other electronic displays. *Tannas Decl.* ¶ 27. This method for "resizing LCDs" included cutting a display along a target dimension to separate a target portion from an unused portion, and applying a first seal along the exposed edge of the target portion. *Id.* At that time, Mr. Tannas envisioned two methods for applying the seal: "A low viscosity fluid adhesive can penetrate the cell spacing and could flow into the cell along the cut [edge] by surface attraction forces or as by suction as the compression for [sic-force] on the cell is reduced." *Id.* "Surface attraction forces" referred to the ability of a low-viscosity adhesive to flow between the plates along a cut edge, e.g., by capillary action, while "suction" refers to the ability to pull adhesive between the adhesive between the plates by squeezing and releasing the plates. *Id.*

Before filing the '427 application, in February 1998, Mr. Tannas conducted experiments to test how to resize LCDs. *Id.* ¶¶ 8-11. One of the methods he attempted included cutting the plates of an LCD to create a retained portion having a cut edge, and applying a seal between the plates along the cut edge. *Id.* ¶ 8. To apply the seal between the plates, Mr. Tannas wiped a cotton swab along the cut edge to wick liquid crystal ("LC") material from between the plates and create a void between the plates along the cut edge, as conceived in 1993. He then applied a

- 14 -

low viscosity adhesive to the cut edge and allowed the adhesive to flow in between the plates to fill the void between the plates. *Id.* ¶¶ 6-9. Between December 1998 and October 1999, this was the only method for resizing LCDs that Mr. Tannas practiced. *Id.* ¶ 6.

In addition, in February 1998, Mr. Tannas tested the other method that he had conceived in 1993. *Id.* ¶ 9. Specifically, he tested applying pressure to the cut LCD plates to force LC material out from between the plates along the exposed edge, wiping the exposed LC material away, applying an adhesive along the exposed edge, and then releasing the pressure to draw the adhesive between the plates. *Id.* During these experiments, however, he was not satisfied with this "squeeze and release" process, because he found it unreliable and the quality of the resulting resized LCD was unacceptable. *Id.* ¶ 10. Consequently, at that time, Mr. Tannas concluded that it was better to maintain the original spacing of the plates during the resizing process, and use the "wicking process," rather than attempting to squeeze the plates. *Id.* Importantly, the original spacing of the plates, which is on the order of several microns, must be retained after resizing if the LCD is to operate properly. *Id.*; *English Decl.* ¶ 14, Exhibit 10, pp. 54:16-55:5.

Therefore, at the time of filing the '427 application, the only method Mr. Tannas knew for ***successfully*** applying a seal between LCD plates was wicking liquid crystal material from a cut edge of an LCD, and applying a low-viscosity seal along the edge that would flow in between the plates.

About a year after filing the '427 application, around April to August 2000, Mr. Tannas developed an improved process for resizing LCDs because he recognized that the process he had been using would not lead to a commercial process. *Tannas Decl.* ¶ 12. This improved process included mounting the LCD within pressure plates, applying pressure to the cut LCD with the

pressure plates to force liquid crystal out from between the plates along the cut edge of the LCD, applying an adhesive along the cut edge, and then releasing the pressure to draw the adhesive between the plates. Thus, this was a "squeeze and release" process.

While this process included some of the steps Mr. Tannas had previously tested and had found unreliable in February 1998, the special tooling he developed improved the reliability and consistency of the process, which he could not achieve previously. Once an LCD was secured within the pressure plates and cut for resizing, Mr. Tannas could readily control the pressure that the plates applied to the LCD to force LC material from between the plates and to draw the adhesive between the plates. Because the pressure changes involved amounted to only a few pounds per square inch difference, the pressure plates provided the degree of control necessary that he could not achieve with the previous experimental process.

The determination of whether the inventor had a best mode turns on the inventor's subjective beliefs. *AllVoice Computing PLC* 2007 U.S. App. LEXIS at *20-21, *supra*. As explained above, at the time of filing the '427 application on March 22, 1999, Mr. Tannas believed the best method for applying a first seal between LCD plates was to wick liquid crystal material from between the plates along the cut edge to create a void, and apply a low-viscosity adhesive along the cut edge that flowed between the plates to fill the void. *Tannas Decl.* ¶ 11. At the time of filing the '427 application, Tannas had been unable to perform a "squeeze and release" process successfully for applying a seal between the plates. It wasn't until a year later that he developed tooling that allowed him to successfully perform such a process.

Accordingly, because Mr. Tannas was unable to use a squeeze and release process for applying a seal before filing the '427 application, it could not possibly have been his best mode,

1    even though he subsequently developed an improved process that, in fact, was a squeeze and

2    release process.

3        During the Interference, the Board, based on Preliminary Motion 8 filed by Watson,

4    concluded that Tannas failed to disclose the best mode for applying the seal between the plates

5    (which the Board had determined was the "squeeze and release" process). The Board's decision,

6    however, was based upon an incomplete record. Because the Board would not enter a protective

7    order to protect Mr. Tannas' trade secrets and other confidential information, in his opposition to

8    Preliminary Motion 8, Mr. Tannas chose to provide the Board only minimal information

9    regarding his improved "squeeze and release" process, knowing that any information he provided

10    would be available to the public. Consequently, Mr. Tannas redacted some of the information

11    from the documents supporting his opposition. *English Decl.* ¶ 16; Exhibit 12. In his supporting

12    declaration, Mr. Tannas only described the improved process in general terms. *Id.*

13        Now that the Protective Order has issued in the present case, unredacted copies of these

14    documents have been filed with the present motion as Exhibits 3 and 13-15. *Tannas Decl.* ¶¶ 15-

15    17, 20, *English Decl.* ¶ 5. Further, because Mr. Tannas has the freedom to be candid, he has

16    provided substantially more information regarding the improved process in his new declaration

17    supporting the present motion. Thus, the Court, in its de novo review, has before it evidence that

18    was not available to the Board when it made its decision during the Interference.

19        In addition, in its Decision on Preliminary Motions, the Board did not properly consider

20    some of the evidence before it, either in the first instance or because the evidence was introduced

21    for the first time in Tannas' Motion for Reconsideration. For example, the Board apparently

22    dismissed the declaration of Mr. Thomas Muir who testified on Mr. Tannas' behalf to support

- 17 -

that Mr. Tannas was not practicing a squeeze and release process at the time of filing the '427 application. Specifically, Mr. Muir stated that Mr. Tannas visited his facility to cut and resize LCDs between December 1998 and April 1999, i.e., before and after the '427 application was filed. Mr. Muir testified that, during these visits, he never saw any pressure plates or special tooling used by Mr. Tannas. Rather than accept this as evidence that Mr. Tannas was not practicing a squeeze and release process at the time of filing the '427 application, the Board instead speculated that Mr. Tannas could have used "some other means for squeezing the cells, e.g., his hands or a clip." *English Decl.* ¶ 8; Exhibit 4, page 61. However, there is no evidence of record now or during the Interference to support the Board's conclusion such other means existed. Rather, Mr. Tannas expressly stated that the experiments before filing the '427 application in which he attempted a squeeze and release process using his hands and binder clips did not work. Thus, the Board did not properly consider this evidence in its decision.

The Board, in its Decision on Rehearing, considered Mr. Tannas' explanation in his Request for Reconsideration inconsistent with his arguments opposing Preliminary Motion 8. The Board placed substantial weight on the statement in Tannas' opposition that "the only modes *known* to Mr. Tannas at the time of filing the '427 application were expressly disclosed in the Tannas patents," i.e., the wicking process. The Board concluded that this statement contradicted his 1993 conception document, which disclosed both a squeeze and release process as well as a wicking process. The Board rejected Mr. Tannas' explanation that the statement meant that the only *successful* process known by him was the wicking process. The Board, however, did not fully consider the statement in Mr. Tannas' original declaration filed with Tannas' opposition that "the only method for resizing liquid crystal displays ("LCDs") of which I knew *and which I*

- 18 -

*practiced* was the method described in the original Tannas application." *English Decl.* ¶ 16,

Exhibit 12.  This was Mr. Tannas' original statement included to support the argument.  Instead,

the Board relied upon the subsequent statement in Tannas' opposition and ultimately

misconstrued Mr. Tannas' true knowledge, by concluding Mr. Tannas knew of something that he

did not.  When Mr. Tannas tried to explain this further in his Request for Reconsideration, the

Board was merely dismissive, stating Mr. Tannas' "explanation however comes too late."

*English Decl.* ¶ 10, Exhibit 6, p. 13:16.

     In addition, the Board erroneously concluded that statements made by Mr. Tannas during

his deposition related to the Tannas patents, rather than to his subsequently developed improved

process.  *Tannas Decl.* ¶ 26.  Mr. Tannas provided ample explanation regarding his "trade secret"

comments to the Board, based on his extreme sensitivity to his then-current improved process

and his confusion with the deposing attorney switching between general practices, his own then-

current practices, and the process disclosed in the '906 patent.  *English Decl.* ¶ 9, 16, Exhibits 5,

12.  The Board's failure to consider Mr. Tannas' explanation amounted to a significant omission

of facts that clarified Mr. Tannas' deposition testimony and showed that Mr. Tannas disclosed

the best mode he knew at the time of filing the '906 patent application.

     Thus, the Court may now properly consider this evidence, particularly the unredacted

evidence submitted herein under the Protective Order.  As explained above, this original

evidence supports that Mr. Tannas did not conceal the best mode.

     Further, the timing of Mr. Tannas' development of his squeeze and release process has

been corroborated by his patent attorney, who did not provide any testimony during the

Interference due to the Board's refusal to enter a protective order.  *English Decl.* ¶ 5-7.  Thus,

based upon the record now before the Court, including the additional evidence and testimony provided with the present motion, the Court can review the complete record de novo. For each of the reasons given herein, the Court should conclude that the best mode known to Mr. Tannas at the time of filing the '427 application for applying the seal between the plates is wicking liquid material from the exposed edge to create a void, and applying a low viscosity that flows into the exposed edge to fill the void.

### b. The Tannas Patents Explicitly Set Forth the Best Mode At the Time of Filing the '427 Application For Applying a Seal Between the Plates.

Mr. Tannas did not conceal the best mode known to him at the time of filing the '427 application for applying a first seal between the LCD plates. Mr. Tannas' process of wicking liquid crystal material and applying a low-viscosity adhesive along the cut edge of an LCD, which he believed to be the best mode (*Tannas Decl.* ¶¶ 6-8, 11), is described at column 7, lines 30-45 of the '906 patent:

> The replacement seal is installed by applying an adhesive along the cut edge and preferably in between the plates 20 to reseal the display 10'... The adhesive should also have a proper viscosity to allow it to flow inwardly sufficiently to fill any void in the cell between the plates 20 and the liquid crystal material. Low-viscosity UV curing urethane of the methacrylate family have been shown to have the desired characteristics ... Curing time of approximately five minutes has been shown to be sufficient.

*English Decl.* ¶ 2.

Mr. Tannas believed this wicking and applying a low-viscosity adhesive process was the best mode because other methods he had tested led to unreliable results. *Tannas Decl.* ¶¶ 9-10. Not until about a year after filing the '906 application did Mr. Tannas adopt his improved method for applying a seal between LCD plates that differed from the method described in the '906 patent. *Tannas Decl.* ¶¶ 12-13. Specifically, Mr. Tannas improved upon the method of applying

- 20 -

and releasing pressure on LCD plates to draw an adhesive between the plates only after developing special tooling, i.e., pressure plates.  *Id.*  This improved process is not disclosed in the Tannas patents, because the process was not known to Tannas at the time the '427 application was filed.  *Tannas Decl.* ¶¶ 8-11.

When Mr. Tannas was deposed during the Interference, Mr. Tannas was asked repeatedly about processes for cutting and resizing LCDs.  *Tannas Decl.* ¶¶ 21-24.  Many of the questions did not specify whether they related to general practices, Mr. Tannas' then-current proprietary practices, or the processes described in the '906 patent.  *Id.*  Thus, Mr. Tannas could not distinguish the nature of many of the questions, and often alternated between discussing general practices and the method disclosed in the '906 patent.  *Id.*

During his depositions, Mr. Tannas was also sensitive to the fact that no protective order was in place for the Interference, and he did not want to disclose any information relating to his then-current practices of resizing displays, which he had decided to maintain as a trade secret.  *Tannas Decl.* ¶ 25.  These then-current practices included the steps of applying and releasing pressure to LCD plates to draw an adhesive between the plates.  *Tannas Decl.* ¶¶ 9, 10.  Therefore, when Mr. Tannas believed he was being questioned about his then-current proprietary practices, Mr. Tannas responded by asserting trade secret protection.  *Tannas Decl.* ¶¶ 23, 24.  Both Watson and the Board characterized such comments as evidence that Mr. Tannas had concealed the best mode in the Tannas patents for applying a first seal between two plates.  *Tannas Decl.* ¶ 26; *English Decl.* ¶ 8, Exhibit 4.

However, viewing Mr. Tannas' deposition testimony in its proper, broader context, Mr. Tannas only raised the issue of trade secrets when he was concerned that a line of questioning

related to his then-current proprietary practices. *Tannas Decl.* ¶¶ 23-25. When Mr. Tannas was specifically directed to discuss the Tannas patents, Mr. Tannas pointed out the best mode at the time the '906 patent application was filed for applying a first seal between LCD plates was disclosed in column 7 of the '906 patent. *English Decl.* ¶ 12, Exhibit 8, pp. 41:21–42:9. Additionally, Mr. Tannas' expert testified about the process for applying a seal between LCD plates that was disclosed in the '906 patent. *English Decl.* ¶ 14, Exhibit 10, pp. 54:16-55:5.

Because Mr. Tannas did not conceal the best mode he knew at the time of filing the '427 application for applying a first seal between the plates, the best mode analysis herein confirms the Tannas patents meet the best mode requirement of 35 U.S.C. § 112. Therefore, Mr. Tannas respectfully requests the Court to issue the Proposed Order attached herewith finding the claims at issue are valid in view of 35 U.S.C. § 112.

Respectfully submitted,

Dated: 12/3/07        Vista IP Law Group LLP

By:
William A. English
Attorneys for Plaintiffs

Dated: 12/3/07        Birch Stewart Kolasch & Birch LLP

By:
Quentin R. Corrie
Attorneys for Plaintiffs