The opinion in support of the decision being
entered today is not binding precedent of the Board.

Filed by: Trial Section Merits Panel
    Mail Stop Interference
    P.O. Box 1450
    Alexandria, Va. 22313-1450
    Tel: 703-308-9797
    Fax: 703-305-0942

Paper 141

Filed
24 June 2004

## UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE BOARD OF PATENT APPEALS AND INTERFERENCES

LAWRENCE E. TANNAS, JR.

Junior Party,
(Patents 6,204,906 and 6,380,999),

v.

DAVID S. WATSON
Senior Party,
(Application 09/529,201).

> MAILED
>
> JUN 2 4 2004
>
> PAT & T.M OFFICE
> BOARD OF PATENT APPEALS
> AND INTERFERENCES

Patent Interference No. 105,096

Before SCHAFER, MEDLEY, and POTEATE, Administrative Patent Judges.

MEDLEY, Administrative Patent Judge.

### DECISION ON PRELIMINARY MOTIONS

#### A. Introduction

This interference was declared on 14 April 2003. Watson filed a preliminary motion to

add claims 103 and 104 to its application (Watson preliminary motion 1), to designate claim 103

to count 1 (Watson preliminary motion 3), to designate claim 104 to count 2 (Watson preliminary



motion 4), and to be accorded the benefit of earlier Watson applications in connection with the added claims 103 and 104 (Watson preliminary motion 2) (Papers 42-45). In Watson preliminary motion 5, Watson seeks to designate Tannas '906 claims 2-25 and 28-35 as corresponding to Count 1 (Paper 46). In its preliminary motion 6, Watson seeks to designate Tannas '906 claims 27 and 39-41 as corresponding to count 2 (Paper 47). Watson filed a responsive preliminary motion 7 to be accorded the benefit of earlier Watson applications for Tannas' proposed count (Paper 52). Watson filed its preliminary motion 8 for judgment against Tannas on the ground that Tannas' claims are unpatentable under 35 U.S.C. §112, ¶ 1 for failing to disclose the best mode and are nonenabling (Paper 71).

In its preliminary motion 1, Tannas seeks to add proposed count 3 and to designate Tannas claims 1, 26, 39, 40, 42, and 43 and Watson claims 53, 78, 91, 92, 94, and 95 as corresponding to the proposed count 3 (Paper 25). Tannas moves for judgment against Watson on the grounds that several of Watson's claims are unpatentable based on 35 U.S.C. §112, ¶ 1 for lack of written description support for certain claim terms (Paper 30 - Tannas preliminary motion 2). In its preliminary motion 3, Tannas moves for judgment against Watson on the ground that Watson claim 96 is unpatentable based on 35 U.S.C. §§ 102/103 (Paper 67).

Oral argument was held on 22 April 2004. During oral argument counsel for Watson withdrew Watson preliminary motion 2.

For the reasons that follow, Tannas preliminary motions 1-3 are <u>denied</u>. Watson preliminary motions 1-4 and 7 are <u>dismissed</u>. Watson preliminary motions 5 and 6 are <u>granted-in-part</u>. Watson preliminary motion 8 is <u>granted</u> with respect to the best mode violation and is otherwise <u>dismissed</u>.

**B. Findings of fact[1]**

1. Tannas is involved on the basis of Patent 6,204,906 ('906), granted 20 March 2001, based on application 09/274,427, filed 22 March 1999, and Patent 6,380,999 ('999), granted 30 April 2002, based on application 09/812,370, filed 16 March 2001.

2. Tannas has been accorded benefit for the purpose of priority of 6,204,906 ('906), granted 20 March 2001, based on application 09/274,427, filed 22 March 1999 for its involved '999 patent.

3. Watson is involved on the basis of application 09/529,201, filed 18 May 2000.

4. Watson has been accorded benefit for the purpose of priority of PCT/GB98/02586, filed 27 August 1998, GB 9721804.4, filed 15 October 1997, and GB 9814577.4, filed 7 July 1998.

5. Tannas real party in interest is Lawrence E. Tannas, Jr. (Paper 17).

6. Watson real party in interest is Bae Systems Avionics Limited (Paper 3).

7. Count 1 is as follows:

Claim 96 of Application 09/529,201

or

Claim 1 of Patent No. 6,204,906

or

Claim 53 of Application 09/529,201

or

---

[1] The following findings of fact as well as those contained elsewhere in this opinion are supported by a preponderance of the evidence.

Claim 1 of Patent No. 6,380,999

8. Tannas '906 claim 1 is identical to Watson claim 53 and is as follows:

A method of changing the physical shape of an electronic display, wherein the display comprises a front plate, a back plate, and a perimeter seal spacing apart the plates, and wherein image-generating medium is sealed in an area between the plates and within the borders of the perimeter seal, the method comprising the steps of:

cutting the display along desired dimensions resulting in a target display portion and an excess display portion, thereby breaking the perimeter seal of the display; and

applying a first seal between the plates along an exposed edge of the target display portion, the first seal creating a barrier to prevent the image-generating medium from escaping out of the area between the plates, the first seal comprising an adhesive having mechanical properties for preserving cell spacing between the front and back plates.

9. Tannas '999 claim 1 is identical to Watson claim 96 and is as follows:

A method for changing the physical shape of an electronic display, wherein the display comprises a front plate, a back plate, and a perimeter seal spacing apart the plates, and wherein image-generating medium is sealed in an area between the plates and within the borders of the perimeter seal, the method comprising the steps of:

cutting the display along desired dimensions resulting in a target display portion and an excess display portion, thereby breaking the perimeter seal of the display; and

applying a first seal along an exposed edge of the target display portion, the first seal creating a barrier to prevent the image-generating medium from escaping out of the area between the plates.

10. Count 2 is as follows:

Claim 100 of Application 09/529,201

or

Claim 26 of Patent No. 6,204,906

or

Claim 78 of Application 09/529,201

or

Claim 5 of Patent No. 6,380,999

11.  Tannas '906 claim 26 is identical to Watson claim 78 and is as follows:

A method of changing the physical shape of an electronic display, wherein the display comprises a front plate, a back plate, and a perimeter seal spacing apart the plates, and wherein image-generating medium is contained in an area between the plates and within the borders of the perimeter seal, the  display further comprising electronic circuits for operating the display, the method comprising the steps:

cutting the display along desired dimensions resulting in a target display portion and an excess display portion, thereby cutting at least some of the electronic circuits; and

applying a first seal between the plates along an exposed edge of the target display portion;

wherein the target display portion retains the basic functionality of the display.

12.  Tannas '999 claim 5 is identical to Watson claim 100 and is as follows:

A method for changing the physical shape of an electronic display, wherein the display comprises a front plate, a back plate, and a perimeter seal spacing apart the plates, and wherein image-generating medium is sealed in an area between the plates and within the borders of the perimeter seal, the  display further comprising electronic circuits for operating the display, the method comprising the steps:

cutting the display along desired dimensions resulting in a target display portion and an excess display portion, thereby cutting at least some of the electronic circuits; and

applying a first seal along an exposed edge of the target display portion.

13.  The claims of the parties are:

| | |
|---|---|
| Tannas '906: | 1-43 |
| Tannas '999: | 1-7 |
| Watson: | 53, 78, 88-92 and 94-102 |

14.  The claims of the parties which correspond to Count 1 are:

| | |
|---|---|
| Tannas '906: | 1, 36-38 |
| Tannas '999: | 1 and 2 |

- 5 -

| | |
|---|---|
| Watson: | 53, 88-90, 96 and 97 |

15. The claims of the parties which correspond to Count 2 are:

| | |
|---|---|
| Tannas '906: | 26, 42 and 43 |
| Tannas '999: | 3-7 |
| Watson: | 78, 91, 92, 94, 95 and 98-102 |

16. The claims of the parties which do not correspond to Count 1 or Count 2 are:

| | |
|---|---|
| Tannas '906: | 2-25, 27-35 and 39-41 |
| Tannas '999: | none |
| Watson: | none |

17. The level of ordinary skill in the art is defined by the prior art of record.

<u>Tannas preliminary motion 1</u>

18. Tannas moves to add to the interference proposed count 3 and to designate Tannas '906 claims 1, 26, 39, 40, 42, and 43 and Watson claims 53, 78, 91, 92, 94, and 95 as corresponding to count 3 and not to count 1 (Paper 25).

19. Proposed count 3 is as follows:

A method of changing the physical shape of an electronic display, wherein the display comprises a front plate, a back plate, and a perimeter seal spacing apart the plates, and wherein image-generating medium is contained in an area between the plates and within the borders of the perimeter seal, the display further comprising electronic circuits for operating the display, the method comprising the steps:

cutting the display along desired dimensions resulting in a target display portion and an excess display portion, thereby cutting at least some of the electronic circuits; and

applying a first seal between the plates along an exposed edge of the target display portion.

- 6 -

Tannas preliminary motion 2

20.  Tannas seeks judgment against Watson on the ground that Watson claims 53, 78, 91, 92, 94, 95, 101 and 102 are unpatentable under 35 U.S.C. § 112, ¶ 1, or under 35 U.S.C. § 132 (Paper 30).

21.  Watson independent method claims 53 and 78 recite the step of "applying a first seal between the plates."

22.  Tannas argues that Watson's involved specification does not provide support for a "first seal between the plates" (Paper 30 at 4).

23.  Tannas relies on the declarations of Dr. James L. Fergason and inventor Lawrence E. Tannas, Jr. to interpret Watson's claims 53 and 78.

24.  Both Dr. Fergason and Mr. Tannas look to Tannas '906 for the meaning of "applying a seal between the plates."

25.  Dr. Fergason states:

Based upon my review of the claim language, the specifications, and file histories of the Tannas patents, a person of ordinary skill in the art would understand the phrase "applying a first seal between the plates" to mean that a seal is applied that is located between the front and back glass plates of a LCD and within the perimeter of the outer edges of the glass plates" (Tannas Ex. 1005[2], ¶ 11).

26.  Mr. Tannas states:

Based upon my review of the claim language, the specifications, and file histories of the Tannas patents, a person of ordinary skill in the art would understand the phrase "applying a first seal between the plates" to mean that a seal is applied in the space between the glass plates and not simply along the fractured edges of the plates (Tannas Ex. 1009, ¶ 10).

---

[2] Tannas has mislabeled its exhibits.  See Paper 1, Standing Order ¶39.

27. Watson's involved specification describes the following with respect to applying a seal to the plates:

> [t]he gap between the plates 12 and 13 is then sealed either by applying a bead of ultra-violet curing sealant adhesive and curing under ultra-violet light conditions, or applying a glass frit or using the laser to weld the plates 12 and 13 together. (Tannas 1003, at 15, lines 6-8).

28. Tannas also argues that Watson does not have support for reestablishing continuity of electrical circuits that are cut when the LCD is resized as claimed in Watson claims 92, 101 and 102 (Paper 30 at 6).

29. Watson's specification, in general, describes re-manufacturing a liquid crystal display (LCD) to form an alternative shaped LCD by cutting the existing display to a desired shape.

30. Not only is the LCD display cut, but driver cards, driver connections, and light polarizer substrates may also be removed or cut (Tannas 1003 at 5, lines 13-18, at 10, lines 6-7, line 15, at 13, lines 20-22, at 14, lines 16-17).

31. The Watson specification further explains that "where more complex circuitry exists and the card drivers cannot simply be cut ... the driver cards [can be] ... re-engineered or repositioned using flexible circuit extensions" (Tannas 1003 at 16, lines 17-20).

32. Throughout the Watson specification, the "new" display is referred to as an operative display, such as: "[t]his process provides a liquid crystal display 10 having a reduced operative region 24 without the need to commission the production of a custom display manufacturer" (Tannas 1003 at 13, lines 7-9).

33. Watson Figure 8 shows "sealing of cut edges formed in pre-manufactured liquid crystal display" (Tannas 1003 at 8, lines 19-20).

34. The description of Fig. 8 in the Watson specification is as follows:

In Figure 8, the glass plates 12 and 13 can be welded to one another by applying a laser beam B in direction D along the cut edge thereby melting the glass plates 12 and 13 and forming a seal between the plated 12 and 13. <u>To aid clarity of Figure 8, the light polarizing substrates and the conductive layers are not shown and the card drivers and associated TAB's have also been omitted.</u>" (Emphasis added). (At 15, lines 10-14).

<u>Tannas preliminary motion 3</u>

35. Tannas moves for judgment against Watson on the basis that Watson claim 96 is unpatentable under 35 U.S.C. §102(b) or §103(a) in view of various prior art (Paper 67).

36. Tannas concedes that if its preliminary motion 3 is granted that judgment should also be entered against Tannas on the ground that its '906 claim 1 is also unpatentable based on the same prior art (Paper 67 at 14).

37. The two primary references that Tannas rely upon are the (1) "Doyle SID Article"[3] and (2) "Doyle Meeting Minutes"[4].

38. Either of these standing alone, Tannas argues, anticipates Watson claim 96 (Paper 67 at 9).

39. Alternatively, Tannas argues that either of the Doyle references combined with admissions against interest made by Watson, and JP published application 8-146444 (JP '444, published 7 June 1996, would render Watson claim 96 obvious.

---

[3] J.J. Doyle, et al., "Unexplained Voids in LCDs," Society of Information Display International Symposium Digest of Applications Papers Volume XXVI (May 23-25, 1995), pages 24-27. (Tannas 1018).

[4] J. Doyle, "ARC-164 Liquid Crystal Display Module Void Investigation Meeting Minutes 11, 12 August 1994" (September 7, 1994). (Tannas 1019).

40. Tannas directs our attention to page 26, column 1, lines 46-49 in the Doyle SID article that states: "NAWC cut a cell and measured the glass spacing. Interior cell spacing was measured as well as exterior spacing at the seal. The cell was resealed, refilled and cycled in solar testing and heat."

41. Tannas directs our attention to page 7, lines 1-3 of the Doyle Meeting Minutes that states: "Also, one corner had been cut and resealed to be used as the test vehicle."

42. Tannas argues that either passage, standing alone, anticipates Watson claim 96 (Paper 67, Appendix 1 and Appendix 2).

43. Watson claim 96 is as follows:

> A method for changing the physical shape of an electronic display, wherein the display comprises a front plate, a back plate, and a perimeter seal spacing apart the plates, and wherein image-generating medium is sealed in an area between the plates and within the borders of the perimeter seal, the method comprising the steps of:

> cutting the display along desired dimensions resulting in a target display portion and an excess display portion, thereby breaking the perimeter seal of the display; and

> applying a first seal along an exposed edge of the target display portion, the first seal creating a barrier to prevent the image-generating medium from escaping out of the area between the plates.

44. Terry Scheffer, Tannas' expert states that given the disclosure of either article, that

> [A] person of ordinary skill would appreciate that a seal was applied along the exposed edge to create a barrier to prevent the image-generating medium (liquid crystal) from escaping. Such a seal would be necessary in order to subject the LCD to subsequent testing (Tannas 1021, ¶19).

45. Watson claim 96, and subsequently Tannas '906 claim 1 recite "a method for changing the physical shape of an electronic display."

- 10 -

46. An electronic display is defined as "an electronic component used to convert electric signals into visual imagery in real time suitable for direct interpretation by a human operator" McGraw-Hill Dictionary of Scientific and Technical Terms, Fifth Edition, 1994[5].

47. An electronic display is one that is operative, e.g., one that is suitable for direct interpretation by an operator.

48. The preamble recites changing the physical shape of an electronic display.

49. Inherent to the claimed method is that the display remain operative once its physical shape has been changed.

50. This claim interpretation is consistent with both the Tannas and Watson disclosures.

51. Both disclosures discuss changing the physical shape of an electronic display, resulting in an operative electronic display (Tannas 1003 at 2, lines 1-6; lines 13-24, page 3, lines 1-6; Tannas 1004, col. 2-col. 3, lines 66-2).

52. Tannas fails to direct our attention to sufficient evidence that suggests that the Doyle SID article or Doyle Meeting Minutes describe subsequent operability testing of the altered LCDs.

<u>Watson preliminary motions 1-4</u>

53. Watson seeks to add to its application claims 103 and 104 (Watson preliminary motion 1, Paper 42).

54. Watson filed a separate preliminary motion 3 to designate its proposed claim 103 to count 1 and a separate preliminary motion 4 to designate its claim 104 to count 2 (Papers 44 and 45).

---

[5] A copy of the definition is attached.

55.  During oral argument, counsel for Watson withdrew from consideration Watson preliminary motion 2, seeking benefit for the newly added claims under Rule 633(f).

56.  Watson proposed claim 103 depends from already designated claim 53 and proposed claim 104 depends from already designated claim 78.

57.  Proposed claim 103 recites "comprising the additional step of outgasing the electronic display after the step of applying the first seal to remove trapped gases and voids from the area between the plates."

58.  Proposed claim 104 recites "wherein the electronic circuits comprise at least one of a circuit board, a TAB, and a COG disposed along an outer edge of the display, and wherein the step of cutting the display comprises cutting through at least one of the circuit board, TAB, or COG."

## Watson preliminary motions 5 and 6

59.  Watson seeks to designate Tannas '906 claims 2-25 and 28-35 as corresponding to Count 1 (Watson preliminary motion 5, Paper 46).

60.  Watson seeks to designate Tannas '906 claims 27 and 39-41 as corresponding to count 2 (Watson preliminary motion 6, Paper 47).

61.  Independent claims 2, 4, 6, 9, 12, 15, 18, 23, 28, 35 and dependent claim 27 recite applying a second seal along or over the exposed edge of the target display portion, or over the first (perimeter) seal.

62.  Watson relies on the declaration of Michael Wiltshire to demonstrate that the claims reciting a "second seal" would have been obvious in view of any of the claims designated as corresponding to the count.

- 12 -

63. Wiltshire's declaration is essentially the same as Watson's claim chart starting on page 4 of its fact section of preliminary motion 5 and page 5 of the fact section of preliminary motion 6.

64. With respect to the second seal recited in claim 2, Watson makes the following statement (the same statement is found in Wiltshire's declaration):

WATSON Exhibit 1006 (page 2 middle column, page 3 left column, and page 4) shows the standard use of a "Moisture Barrier Sealant" as a second humidity seal. See also WATSON Exhibit 1007 (page 185; list item 2) disclosing ruggedizing a COTS LCD including [second] Sealing of the LCD sandwich and polarizers for survivability in a harsh environment. WATSON Exhibit 1015 (page 323, first column) teaches the need for a good sealant as a barrier against moisture, and WATSON Exhibit 1016 (page 191, figure 10a) shows the use of silicone resin as a protective sealing agent. In view of WATSON Exhibits 1006 and 1007, and WATSON Exhibits 1015 and 1016, it would have been obvious to apply a second humidity seal over the first seal. Thus, claim 2 covers the same patentable invention as claim 1, which has been designated as corresponding to proposed Count 1 (Paper 46 at 4-5).

65. And with respect to claim 3 which recites that the second seal comprises silicone, Watson states:

WATSON Exhibit 1008 (item #4) teaches silicone is a known material for Moisture Protection [second] seals for LCDs. In view of WATSON Exhibit 1008, it would have been obvious to use silicone for the second seal. Thus, claim 3 covers the same patentable invention as claim 1, which corresponds to proposed Count 1 (Paper 46 at 5).

66. Watson makes essentially the same argument with respect to all other claims that are directed to a second [silicone] seal.

67. For example, with respect to independent claim 4, Watson argues "It would be obvious to apply a second, silicone seal in view of WATSON Exhibits 1006, 1007, 1015 or 1016, and 1008 as applied to claims 2-3, above" (Paper 46 at 6).

68. Watson's statement of reasons why it should be granted relief is as follows:

Claims 2-25 and 28-35 define (cover) the same patentable invention as claims 1, 36, 37, and/or 38 because the subject matter of Claims 2-25 and 28-35 would have been obvious to the skilled artisan from the subject matter of claim 1, 36, 37, and/or 38, which have been designated as corresponding to Proposed Count 1[6], and which designation the party WATSON does not dispute. Accordingly, Claims 2-25 and 28-35 should be designated as corresponding to Proposed Count 1. (37 CFR § 1.637(c)(3)(I); 37 CFR § 1.637(c)(3)(ii)).

In view of the above, requirements of 37 CFR § 1.633(c)(3) and 37 CFR § 1.637(c)(3) have been satisfied. Grant of the present Motion and designation of Claims 2-25 and 28-35 of TANNAS '906 as corresponding to Proposed Count 1 is accordingly respectively requested (Paper 46 at 25).

69.  Already designated Tannas '906 claim 36 recites a film on an outer surface of at least one of the front and back plates, and the step of removing at least a portion of the film from the front or back plate.

70.  Already designated Tannas '906 claim 38 recites scoring the film and peeling off the excess portions of the film.

71.  Tannas '906 claims 29-32 are similar to claims 36 and 38, but instead of referring to a single film recite a plurality of films.

72.  Tannas '906 claim 33 recites "wherein the first seal comprises microspheres or beads mixed in the adhesive for preserving the cell spacing between the front and back plates."

73.  Tannas '906 claim 34 recites "the step of outgasing the electronic display after the step of applying the first seal to remove trapped gases and voids from the area between the plates."

---

[6] Throughout its motion papers, Watson refers to Count 1 and Count 2 as "Proposed Count 1" and "Proposed Count 2." The term "proposed" count generally refers to a count that a party is moving to add or substitute, and not to an existing count.

- 14 -

74. Tannas claim 39 depends on already designated claim 26 and recites "modifying the electronic circuits on the target display portion to retain the basic functionality of the display."

75. Claim 40 depends on claim 39 and recites "the electronic circuits comprise internal electronics, and wherein the modifying step comprises reestablishing continuity of the internal circuits."

76. Claim 41 depends on claim 26 and recites "the electronic circuits comprise at least one of a circuit board, a TAB, and a COG disposed along an outer edge of the display, and wherein the step of cutting the display comprises cutting through at least one of the circuit board, TAB, or COG."

<u>Watson preliminary motion 8</u>

77. Watson moves for judgment against Tannas on the basis that Tannas' involved patents are invalid under 35 U.S.C. § 112, ¶ 1 (Paper 71).

78. Watson argues that Tannas failed to disclose the best mode at the time of filing its '427 application.

79. Watson also argues that Tannas' claims are not enabled.

<u>Best mode</u>

80. Tannas relies upon Mr. Tannas' declaration in support of its preliminary motions 1 and 2.

81. In his declaration, Mr. Tannas testified as to the meaning of "applying a first seal between the plates" (Tannas 1009 ¶ 10).

82. Mr. Tannas further testified that the involved Tannas patents described a first seal between the plates (Tannas 1009 ¶ 11).

- 15 -

83. Counsel for Watson cross examined Mr. Tannas regarding his declaration, and asked specific questions as to Tannas' own disclosure with respect to "applying a first seal between the plates."

84. Specifically, counsel for Watson asked Mr. Tannas whether the Tannas '906 patent described how to apply a first seal between the plates.

85. Watson relies on alleged admissions made by Mr. Tannas during his cross examination, that he concealed his best mode for (1) wicking the liquid crystal out of the space between the plates; (2) locating the adhesive (seal) between the plates; and (3) assuring uniform spacing between the plates, which, Watson argues are all part of the step of "applying a first seal."

86. The step of "applying the seal" is described in Tannas '906, column 7, lines 23-44 (Tannas 1004) which is reproduced as follows:

> The newly-exposed plate edges are then cleaned and wiped dry of any excess liquid crystal material using, for example, a dry cotton swab. Care should be taken to not use fluids, as fluids might contaminate the liquid crystal material. Liquid crystal material is then drained or wicked out of the cell to allow for a replacement seal line 115 to be placed along the then newly-exposed and newly-unsealed plate edges. The replacement seal 115 is installed by applying an adhesive along the cut edge and preferably in between the plates 20 to reseal the display 10'. The adhesive is preferably chosen to have proper mechanical properties to preserve the cell spacing. For example, precision microspheres may be mixed into the adhesive to ensure spacing. The adhesive should also have a proper viscosity to allow it to flow inwardly sufficiently to fill any void in the cell between the plates 20 and the liquid crystal material. Low-viscosity UV curing urethane of the methacrylate family have been shown to have the desired characteristics. A wetting and/or thinning agent may be used as needed. In addition, these urethanes interface with the liquid crystal material without adverse effects, as is well-known in the field of PDLCs. Curing time of approximately five minutes has been shown to be sufficient.

<u>Wicking the liquid crystal</u>

87.  Watson argues that the above passage omits Tannas' best mode of how to wick the

excess liquid crystal material, which as allegedly admitted by Mr. Tannas, includes the step of

<u>squeezing the glass plates</u> (Paper 71 at 15).

88.  The alleged admission is as follows:

Q    Is that wicking technique something that is known to a person skilled in the art, as
     far as you know?

A    Not of average skill, but there are people that do that.

Q    Would you describe for us in your own words what that wicking technique
     involves?

A    It involves squeezing the cell and using an absorbent to absorb what comes out so
     that when you let loose the pressure, it won't get sucked back in again.  So you
     keep doing that, and in the cell you push the liquid crystal around, and then you
     get the liquid crystal between the hole and the void that you've now started, and
     then you squeeze on the void and push out the rest and then absorb it as it comes
     out.  So you're using the cell itself as kind of a – what do you call when you clean
     a baby's nose?  (Watson Exhibit 1018, page 90, line 22 to page 91, line 13).

<u>Maintaining uniform spacing between the plates</u>

89.  Watson further argues that Mr. Tannas knew, at the time of the filing of '427, a best

mode for maintaining uniform spacing between the glass plates when the seal was applied

between the plates directing us to the following portions in the Tannas transcript:

Q    But the gap throughout the rest of the plate over in the other sections of the plate
     would be relatively uniform and as originally manufactured?

A    No, not necessarily.

Q    Not necessarily.  What is it that you do in order to make sure that you maintain
     that uniform spacing between the plate [sic] all the way across as you apply the
     adhesive and seal it in order to create a new plate [sic]?

A       Well, that's my trade secret (Watson Ex. 1018, page 62, lines 14-22).

90. The section of the transcript just prior to the above question/answer exchange is as

follows:

Q       Okay. That's very interesting the way you describe it. Let's assume that we have
a square plate and we cut off one edge. Okay? The other three sides of the plate,
what is the relative orientation of the spacing of the plates after you cut the side?
Does it change or does it stay the same?

A       If I understand your finger-drawing on the table, it's the same.

Q       What about the spacing right at the point at which the cut was made?

A       It has freedom to move, to change now, particularly get wider.

Q       When you say "change," you're talking about the relative vertical distance
between the plates, not necessarily the distance laterally, but you're talking about
the vertical distance might change along the edge?

A       The gap, right.

91. Watson also directs our attention to the following exchange in support of its

contention that Tannas failed to disclose the best mode for maintaining uniform spacing between

the glass plates.

Q       So it would be important to somehow, some way be assured that the spacing
between the plates as you apply the new adhesive and sealed it was returned to its
original configuration as close as possible and you stay within a tenth of a
micron?

A       It's necessary.

Q       It's necessary. It's essential?

A       Yes.

Q       Otherwise, the LCD may not perform adequately?

- 18 -

A       Right.

## Locating the adhesive between the plates

92. Watson argues that Mr. Tannas concealed the best mode of locating the adhesive between the plates (Paper 71 at 16).

93. The following questions and answers were made in accordance with what Tannas '906 describes after cleaning liquid crystal material from the cut edge of an LCD:

Q       Assuming its clean, then you apply the adhesive along that same cut edge?

A       Yes.

Q       And then what? After you apply the adhesive, what do you do?

A       Then I get the adhesive between the plates.

Q       How is that accomplished?

A       That is a trade secret, but one skilled in the industry could probably – to those who know how to seal, they could find a way.  The way I do it is my way, and I'd just as soon keep that a trade secret.  (Watson 1018 at 61, lines 1-11).

94. The following questions and answers were made regarding how Tannas '906 teaches getting the adhesive between the plates:

Q       Sure.  I'm trying to understand – looking at figure 4B, I'm trying to understand how the patent teaches one skilled in the art here how you would get the adhesive 115 in the position shown in the figure, namely in between the plates there, and we're beginning with the assumption that the adhesive is applied along the cut edge that we spoke of earlier.

A       Right.  I don't think I explain or give a teaching of how that's done in the patent.

Q       You do not.

A       I do not.  I didn't intend to.  (Watson 1018 at 71, lines 1-7).

- 19 -

95. And further:

Q    And in your view, someone who had the skill in this particular art to be able to apply the adhesive according to the teachings that we see in your patent could do so without necessarily knowing exactly how to get it in between the plates?

A    No, not quite, This is not one of ordinary skill.  A senior person who I – you know, if I were talking to this person, I would have to tell them how much I would have to tell them, and I would select a senior person who had some skill in this area that knew about sealants more than just general manufacturing of liquid crystal, who knew about sealants and knew the theory of the cell and had senior experience level.

Q    Although you did –

A    And I would tell them to seal the cell up.  In this case, you have to do more than just put the bead along the edge.

Q    You need to do something else?

A    You need to put it between the plates.

Q    And the description of how to get it between the plates is not necessarily here, but in your view, a skilled artisan could figure out how to do that?

A    Yes.  (Watson 1018 at 74, lines 1-23).


96.  Mr. Tannas further testified as follows:

[Mr. Tannas reading from column 7 of his '906 involved patent]:

A    Okay.  "Care should be taken to not use fluids, as fluids might contaminate the liquid crystal."  I'm reading from line 25.

Q    Right.  And then it goes on?

A    "Liquid crystal material is then drained or wicked out of the cell to allow for a replacement seal line to be placed along the then newly-exposed and newly-sealed plate edges."

Q    And to you, that teaches the technique that we spoke of, placing the plates under pressure, wicking off the excess liquid crystal material, applying the epoxy adhesive, releasing the pressure, drawing in the adhesive?

A    No.

Q    It does not?

A    No.  To me, this tells you how to get liquid crystal material out and where to put the adhesive.

Q    The rest of it would be something that a person skilled in the art would know how to do; is that right?

A    A person of ordinary skill would always know that if I squeeze something, something would go out, if I release the pressure, something would come back in again, yes.  We talked about that earlier.  That's first principles.  So you add the first principles to a way to get liquid crystal out and where to put the adhesive, then you can get adhesive in, but that's not sufficient.  The adhesive has to be a certain way and you have to allow time and you have to have some dexterity if you're doing it with your hands and you would have to have special tooling if you're doing it with tooling, so I don't purposefully go into any further detail because I consider that my trade secrets.

Q    Not within the skill of the art but a trade secret?

MR. COHEN [counsel for Tannas]: Objection; ambiguous.

THE WITNESS: Ask me again

BY MR. HOSMER [counsel for Watson]:

Q    It sounded like you were saying that the methodology that I just described was within the skill of someone in the art in order to get the adhesive between the plates, and now I hear you say that that may be a trade secret.  So my question --

A    That is a way to get the adhesive between the plates.  If that's all you had to do, it's over.  But you have to get the adhesive between the plates in the right way.  And you have to do other things, such as have the proper adhesive, you have to allow time, and when you get the adhesive in there, then you've got to seal it, and when you're all done, it has to have the right thickness because I can squeeze it and force liquid crystal out and I can

- 21 -

then release it and draw liquid crystal in, but it may be too thick now. And then by the time I cure the adhesive, the adhesive may shrink and changes thickness again. When I squeeze it, it may be the right thickness, but I have to release the pressure to get the liquid crystal in, but when I release the pressure, it may now be too wide, so it's a much more complicated task to achieve what needs to be done than the first principles that we talked about. (Watson Ex. 1018, page 95, line 19 to page 98, line 2). (Emphasis added).

97. And further:

Q        You have no answer beyond what you've already testified?

A        I'll repeat my answer.

Q        Okay.

A        And that is that it does not tell you how to get it between the plates, that that is my trade secret, how to actually get it in there precisely. But for ordinary skill, press on it, squeeze fluid out, release it, suck things in is known from first principles. Everybody knows that. I mean, that's kind of the background for engineers that might read this and for mothers who suck snot out of babies' noses. So I purposefully do not want to describe the trade secret part. (Watson 1018 at 105, line 22 to 106, line 10).

### Tannas opposition 8

98. In essence, Tannas argues that Mr. Tannas' statements regarding trade secrets were to those trade secrets developed after Mr. Tannas filed his '427 application which involved squeezing cells (Paper 84 at 1).

99. Tannas made corrections to the transcript of Mr. Tannas' cross examination deposition.

100. One of the corrections made, with added text underlined, is as follows: "I don't purposefully **want to** go into any further detail because I consider that my trade secrets" (change in bold underline) (Watson 1025).

- 22 -

101.  Tannas relies on the declarations of Mr. Tannas (Tannas 2024), and Mr. Thomas Muir (Tannas 2023) in support of its argument that Mr. Tannas developed the method of squeezing the cell after Tannas filed the '427 application.

102.  In his declaration, found in the following paragraphs in Tannas 2025, Mr. Tannas testified that:

(a) between December 1998 and October 1999, he disclosed the only method for resizing LCDs known and practiced by him in the '427 application (¶ 4).

(b) he made several trips to Arizona to practice his method for resizing, and there he used glass cutting equipment of Villa Precision International (VPI) to cut an LCD during the time frame between December 1998 and October 1999 (¶ 4).

(c) while practicing his method for resizing, he used a UV curing adhesive which flowed easily between the plates when applying a seal between the plates and wicked the liquid crystal material using a q-tip (¶ 4).

(d) he developed his trade secrets for squeezing the plates to remove excess liquid crystal material and to get the adhesive between the plates, about a year after he filed his '427 application (¶ 6).

(e) the new method included using special tooling and equipment, including using glass pressure plates, weighing approximately 50 pounds used to squeeze the resized LCD (¶ 6).

(f) he drafted a patent application covering the new method of squeezing and sent a copy to his patent attorney, but decided to maintain the new tooling and method as a trade secret (¶ 10).

103. In his declaration, found in the following paragraphs in Tannas 2023, Mr. Muir testified that:

(a) he is the Managing Director of VPI.

(b) that VPI is a manufacturer of Precision Glass Scribing and Breaking equipment (¶ 2).

(c) Mr. Tannas contacted Mr. Muir on or about December 7, 1998 and asked whether he could use VPI's equipment to cut liquid crystal displays (¶ 3).

- 23 -

(d) several times between December 1998 and October 1999, Mr. Tannas came to Arizona to use VPI's cutting equipment (¶¶ 4-6).

(e) during those visits, VPI allowed Mr. Tannas to use various glass cutting machines and carbide wheels used to affect the cutting, but that VPI did not provide Mr. Tannas with any pressure plates or other tooling (¶¶ 4-6)

(f) he had walked into the lab where Mr. Tannas was using the glass cutting equipment, but never observed Mr. Tannas using pressure plates  (¶ 8).

(g) Mr. Tannas' had told Mr. Muir that other than using VPI's glass cutting equipment, he was performing a manual procedure for resizing LCDs (¶ 8)

(h) he had on occasion held Mr. Tannas' briefcase upon his arrival to town, and recalls that the briefcase was very light and that he did not see Mr. Tannas bring any pressure plates or other special tooling with him (¶ 7).

104.  Tannas exhibits 2026-2029 contain pages with "redacted" and/or "confidential" marked on them.

105.  Tannas submits 2026 as demonstrative of redacted drawings of pressure plates and a cutting head that Mr. Tannas allegedly developed after he filed the '427 application (Tannas 2025 ¶ 7).

106.  Tannas submits exhibit 2027 as allegedly showing redacted copies of invoices that Mr. Tannas received from Deanza Tooling (Deanza), a company Mr. Tannas relied upon to make his tooling needed to practice his new method of squeezing the plates (Tannas 2025 ¶ 8).

107.  Tannas submits exhibit 2028 into evidence as allegedly showing redacted copies of invoices from Mr. Nobile and parts lists for parts that he purchased from Cladan Technologies between April 2000 and July 2000.  The parts were incorporated into the tooling that Mr. Tannas developed (Tannas 2025 ¶ 9).

108. Tannas submits exhibit 2029 into evidence as allegedly showing redacted pages from a draft of a patent application for the new tooling and method of using the new tooling (Tannas 2025 ¶10).

109. Tannas submitted, along with its preliminary statement, an attachment "A" to demonstrate "the first written description of the invention" he made on 22 May 1993.

110. The attachment "A" includes the following passage:

> The display cell can be compressed to force out voids that may occur when the cell is reopened. A low viscosity fluid adhesive can penetrate the cell spacing and could flow into the cell along the cut by surface attraction forces or as by suction as the compression for [sic - force] on the cell is reduced (Paper 37).

**C. Decision**

<u>Watson preliminary motions 1-4</u>

Watson filed a preliminary motion under 37 CFR § 1.633(c)(2) to add to its application claims 103 and 104. Watson filed a separate preliminary motion 3 to designate its proposed claim 103 to count 1 and a separate preliminary motion 4 to designate its claim 104 to count 2. During oral argument, counsel for Watson withdrew from consideration Watson preliminary motion 2, seeking priority benefit for the newly added claims.

A party filing a motion must provide a full statement of the reasons why the relief requested should be granted. 37 CFR § 1.637. Watson has failed to provide a reason for adding to the interference its proposed claims 103 and 104. Watson proposed claim 103 depends from already designated claim 53 and proposed claim 104 depends from already designated claim 78. Proposed claim 103 recites "comprising the additional step of outgasing the electronic display after the step of applying the first seal to remove trapped gases and voids from the area between

the plates." Proposed claim 104 recites "wherein the electronic circuits comprise at least one of a circuit board, a TAB, and a COG disposed along an outer edge of the display, and wherein the step of cutting the display comprises cutting through at least one of the circuit board, TAB, or COG." The proposed claims 103 and 104 are narrower in scope than Watson claims that are already designated as corresponding to the counts. As far as we know, Watson proposed claims 103 and 104 have not been examined by an examiner and determined to be patentable to Watson.

While 37 CFR § 1.633(c)(2) provides for a preliminary motion to add a claim in a moving party's involved application, the motion can be dismissed independently of the requirements of 37 CFR § 1.633(c)(2), if addition of the claim would serve no meaningful purpose in the furtherance of the interference proceeding. For example, addition of a claim to an application which is (1) the same scope as or narrower than a claim already in the application and (2) designated as corresponding to the count, does not affect the scope of the count. Addition of such a claim does not enlarge or restrict the scope of admissible evidence as to priority. There is no reason to burden the interference with consideration of claims to the same invention as the count which will not affect the scope of the count. That is the situation here. Watson's proposed new claims 103 and 104 are of substantially narrower scope as Watson's allowed claims 53 and 78 that are already involved in this interference.

If addition of claims to a party's involved application does not further the prosecution of the interference in any meaningful way, dismissing the motion is appropriate. The dismissal, of course, would be without prejudice to Watson attempting in the future, before an examiner, to add these claims once the interference terminates, provided Watson emerges as the prevailing party.

Here, because the claims Watson seeks to add are narrower in scope than Watson's allowed claims 53 and 78, there is no reason to burden the interference with consideration of such claims. Accordingly, Watson preliminary motions 1-4 are dismissed.

Tannas preliminary motion 2

Tannas preliminary motion 2 is for judgment against Watson on the basis that Watson claims 53, 78, 91, 92, 94, 95, 101 and 102 are unpatentable under 35 U.S.C. § 112, ¶ 1, or under 35 U.S.C. § 132.

Tannas argues that Watson's involved application, and earlier priority applications[7], fail to provide support for (1) applying a first seal between the plates, and (2) for reestablishing electrical continuity for the circuits that are cut (Paper 30 at 4 and 6).

Tannas has not articulated a theory upon which it may be granted relief with respect to the earlier Watson priority applications. Throughout its motion, Tannas argues that Watson does not provide written descriptive support in its earlier applications for certain terms in Watson's claims, and therefore Watson's claims are unpatentable. Tannas does not argue that Tannas is prior art to Watson, nor does Tannas attack the benefit granted Watson for priority purposes. To the extent that Tannas is relying on the specification of Watson's parent applications to make the argument that the involved Watson specification does not provide written description support for Watson claims 53, 78, 91, 92, 94, 95, 101 and 102 under 35 U.S.C. 112, first paragraph, that is improper. See Reiffin v. Microsoft, 214 F.3d 1342, 1346, 54 USPQ2d 1915, 1918 (Fed. Cir. 2000). Since Tannas has failed to set forth a legal theory upon which relief could be granted

---

[7] Watson has been granted priority, under 35 U.S.C. § 119, to British patent application 9721804.4 and to British patent GB 2,330,423. Watson has also been granted, for the purpose of priority, benefit to the same applications. See Notice Declaring Interference (Paper 1).

- 27 -

with respect to Watson's earlier applications, we dismiss the motion with respect to the priority applications and only address whether Watson's involved specification describes what Watson claims[8].

### Applying a first seal between the plates

Watson independent method claims 53 and 78 recite the step of "applying a first seal between the plates" (ff[9] 8 and 11). Tannas argues that Watson's involved specification does not provide support for a first seal between the plates. For the reasons that follow, Tannas has improperly interpreted the language in Watson's claims in light of Tannas' specification, and has improperly imported limitations into Watson claims 53 and 78. Still further, even if Tannas is correct in its interpretation of the limitation "seal between the plates," Tannas has failed to sufficiently demonstrate that Watson's specification fails to provide support for Tannas' interpretation.

Tannas looks to its involved '906 specification[10] to arrive at an understanding of what is meant by "applying a first seal between the plates." Tannas argues that the phrase means that the seal "is located between the front and back glass plates of an LCD and within the perimeter of the

---

[8] Tannas also argues that new matter has been improperly added to the Watson application under 35 U.S.C. § 132. Tannas' new matter arguments are merged with those arguments made with respect to the written description issue. Accordingly, our discussion is with respect to whether Watson's specification describes the disputed limitations in Watson claims 53, 78, 91, 92, 94, 95, 101 and 102.

[9] ff is finding of fact.

[10] Both Watson and Tannas submit that the Tannas '999 and '906 disclosures are nearly identical. The parties' discussions with respect to what Tannas teaches, suggests or describes is with respect to Tannas '906. Accordingly, our discussion is also based on what the Tannas '906 disclosure describes.

outer edges of the glass plates" (Paper 30). Tannas has adopted a definition for "applying a seal between the plates" that is narrow and that would apply specifically to Tannas' specification. In essence, Tannas' proposed definition of "applying a seal between the plates" is derived by impermissibly viewing the term in light of Tannas' specification.

Tannas is apparently under the notion that since Watson copied claims from Tannas, then the Watson claims must be viewed in light of Tannas' specification. Note, however, that Rule 633(a) expressly provides that "[i]n deciding an issue raised in a motion filed under this paragraph (a), a claim will be construed in light of the specification of the application or patent in which it appears." Rule 633(a) is a procedural rule and governs this interference. In Rowe v. Dror, 112 F.3d 473, 42 USPQ2d 1550 (Fed. Cir. 1997), the court distinguished an earlier decision[11] in light of Rule 633(a) as follows:

> [T]he PTO had good reason to promulgate a new rule in light of the new practice in which patentability of claims can be considered during the motion period of an interference. See 37 C.F.R. 1.633(a) (effective date February 11, 1985). Earlier case law did not deal with such a situation. Moreover, Spina did not involve a Rule 633(a) motion. Thus, the PTO was writing on a clean slate, not flouting judicial precedent.

Rowe, 112 F.3d at 479 n.2, 42 USPQ2d at 1554 n.2. See also, Cultor Corp. v. A.E. Staley Manufacturing Co., 224 F.3d 1328, 1332, 56 USPQ2d 1208, 1211 (Fed. Cir. 2000) (Copied claims construed in light of specification of which they are apart). Since Tannas has looked to its own specification to interpret Watson's claims that include "applying a seal between the plates" in violation of Rule 633(a), that part of Tannas' preliminary motion 2 directed to whether Watson describes "applying a first seal between the plates" is denied. Although unnecessary to our

---

[11] In re Spina, 975 F.2d 854, 24 USPQ2d 1142 (Fed. Cir. 1992).

decision, we make the following comments regarding Tannas' interpretation of "applying a seal between the plates."

Tannas relies on the declarations of Dr. James L. Fergason and the inventor Lawrence E. Tannas, Jr. to interpret Watson claims 53 and 78. Dr. Fergason states:

> Based upon my review of the claim language, the specifications, and file histories of the Tannas patents, a person of ordinary skill in the art would understand the phrase "applying a first seal between the plates" to mean that a seal is applied that is located between the front and back glass plates of a LCD and within the perimeter of the outer edges of the glass plates." (Tannas Ex. 1005, ¶ 11).

Tannas declares:

> Based upon my review of the claim language, the specifications, and file histories of the Tannas patents, a person of ordinary skill in the art would understand the phrase "applying a first seal between the plates" to mean that a seal is applied in the space between the glass plates and not simply along the fractured edges of the plates. (Tannas Ex. 1009, ¶ 10).

Besides improperly looking to the Tannas' '906 specification, Tannas' experts also suggest adding limitations to Watson's claims that are not there. Neither Watson claim 53 or 78 recite applying a seal within the perimeter of the outer edges of the glass plates. Applying a seal between the plates does not necessarily mean that the seal must be between the plates <u>and</u> within the perimeter of the outer edges of the plates as suggested. Applying a seal between the plates is broad enough to mean that the seal lie along the same plane as the cut edges of the plates, and nothing more.

In any event, Tannas has failed to sufficiently demonstrate that Watson does not meet Tannas' narrow interpretation of the disputed language. Tannas argues that:

> A person of ordinary skill in the art would understand that the bead of sealant described in the Watson applications would not constitute "a first seal between the plates." (Exhibit

1005, ¶¶ 14-15, and Exhibit 1009 ¶¶ 13-14).  The glass plates of an LCD are typically only a few microns apart, while the glass plates themselves are thousands of microns thick.  Exhibit 1005, ¶ 14-15.  Thus, a bead of sealant applied along "the fractured edges of the glass plates" would bond only to the fractured edges of the glass plates, and would not penetrate the plane of the cut edges to penetrate between the plates.  Exhibit 1009 § 14.  If there were any penetration of the bead between the plates, it would be inconsequential and would not constitute a seal between the plates to a person of ordinary skill in the art.  Exhibit 1005 ¶ 14-15 (Paper 30 at 5-6).

Watson's involved specification states that "[t]he gap between the plates 12 and 13 is then sealed either by applying a bead of ultra-violet curing sealant adhesive and curing under ultra-violet light conditions, or applying a glass frit or using the laser to weld the plates 12 and 13 together." (At 15).  Tannas fails to address the Watson description that states that the gap between the plates is sealed.  Instead, Tannas focuses on those portions in Watson's earlier applications and in Watson's involved application that states that a bead of sealant is applied along the fractured edges of the glass plates.

Watson describes a gap between the cut plates and sealing that gap.  Even if we were to adopt Tannas' narrow interpretation of "applying a first seal between the plates," which we will not, Tannas has failed to address why sealing a gap between the plates does not include applying the seal within the perimeter of the outer edges of the glass plates.  A gap is defined as an opening in a solid structure or surface.  The American Heritage Dictionary of the English Language, Fourth Edition, 2000[12].  Watson describes the gap as being between the plates.  It would logically follow that the gap and the adhesive applied to seal the gap are within the perimeter of the outer edges of the glass plates, and meets Tannas' narrow interpretation of the disputed claim language.  Tannas has failed to suggest otherwise.

___

[12] A copy of the definition is attached.

Reestablishing electrical continuity

Watson claim 92 depends on dependent claim 91.  Claim 91, which depends on claim 78,

recites "modifying the electronic circuits on the target display portion to retain the basic

functionality of the display."  Claim 92 recites "[t]he method of claim 91, wherein the electronic

circuits comprise internal electronics, and wherein the modifying step comprises reestablishing

continuity of the internal electronics."  Watson claim 101 depends on independent claim 100 and

recites "[t]he method of claim 100, further comprising reestablishing electrical continuity for the

electronic circuits that are cut."  Watson claim 102 depends on claim 101 and recites "[t]he

method of claim 101, wherein the reestablishing electrical continuity step comprises attaching

new COGS, TABS, or VLSI circuits to the display."

Tannas argues that:

> A person of ordinary skill in the art would understand that there is also no disclosure in
> the '201 application or the Watson priority applications for reestablishing continuity of
> electrical circuits that are cut when the LCD is resized.  Exhibit 1009 ¶ 15.  In fact, the
> Watson applications mention nothing about the electrical circuits of the LCD except that
> the 'cut must be beyond any tracking associated with connections to the operative region
> 24 that is to be retained.'  Exhibit 1001, p. 7, lines 12-13, and Exhibit 1009 ¶ 15 (Paper
> 30 at 6).

Tannas has failed to discuss in any meaningful way why the Watson disclosure as a whole

fails to provide a description of reestablishing continuity of electrical circuits that are cut once

the LCD is resized.  Whether Watson has provided adequate written description, either explicitly

or inherently, must be determined from the disclosure considered as a whole.  Reiffin v.

Microsoft Corp., 214 F.3d 1342, 1345, 54 USPQ2d 1915, 1917 (Fed. Cir. 2000).  Satisfaction of

the written description requirement does not require the description of claim terms to be ipsis

- 32 -

verbis antecedence in the originally filed application. In re Lukach, 442 F.2d 967, 969, 169

USPQ 795, 796 (CCPA 1971). Furthermore, the written description requirement may be

satisfied if the descriptive matter must necessarily be present in the specification such that one

skilled in the art would recognize such a disclosure. Tronzo v. Biomet, Inc., 156 F.3d 1154,

1159, 47 USPQ2d 1829, 1834 (Fed. Cir. 1998).

Watson's specification, in general, describes re-manufacturing a liquid crystal display

(LCD) to form an alternative shaped LCD by cutting the existing display to a desired shape. Not

only is the LCD display cut, but driver cards, driver connections, and light polarizer substrates

may also be removed or cut (ff 30).

The Watson specification further explains that "[w]here more complex circuitry exists

and the card drivers cannot simply be cut ... the driver cards [can be] ... re-engineered or

repositioned using flexible circuit extensions" (ff 31).

Throughout the Watson specification, the "new" display is referred to as an operative

display, such as: "[t]his process provides a liquid crystal display 10 having a reduced operative

region 24 without the need to commission the production of a custom display by a manufacturer"

(Tannas 1003, at 13, lines 7-9).

Watson Figure 8 shows "sealing of cut edges formed in pre-manufactured liquid crystal

display" (Tannas 1003 at 8, lines 19-20). The description of Fig. 8 in the Watson specification is

as follows:

> In Figure 8, the glass plates 12 and 13 can be welded to one another by applying a laser
> beam B in direction D along the cut edge thereby melting the glass plates 12 and 13 and
> forming a seal between the plated 12 and 13. To aid clarity of Figure 8, the light
> polarizing substrates and the conductive layers are not shown and the card drivers and
> associated TAB's have also been omitted." (Emphasis added). (At 15, lines 10-14).

- 33 -

From the above passages it becomes apparent that continuity is reestablished to the circuits associated with the modified LCD, including those circuits that were cut. One of ordinary skill in the art would understand that by reengineering or repositioning driver cards and their extensions, that the circuits originally disconnected (i.e. cut) are reconnected to form an operative LCD as described with respect to Fig. 8 and would necessarily mean that electrical continuity was reestablished to the modified LCD. Tannas has failed to discuss any of the above mentioned passages found in the Watson application that support the disputed claim language. Tannas' failure to do so is fatal to its argument. It is not enough to merely argue that an opponent fails to describe some specific, quoted language from a given claim. Rather, the movant must consider what one of ordinary skill in the art would understand the applicant to be in possession of at the time of the invention, by considering the application as a whole. The written description requirement does not require that the exact words of a claim be found in the specification, nor is it necessary that the specification describe features that are inherent to that which is described.

For all of these reasons, Tannas preliminary motion 2 is denied.

Tannas preliminary motion 1

In its preliminary motion 1, Tannas moves to redefine the interfering subject matter by adding proposed count 3 (ff 19) to the interference and designating Tannas claims 1, 26, 39, 40, 42, and 43 and Watson claims 53, 78, 91, 92, 94, and 95 as corresponding to count 3 and not to count 1.

Tannas argues that its proposed count 3 with the limitation "applying a first seal between the plates along an exposed edge of the target display portion" is separately patentable from count 1 that includes the limitation "applying a first seal along an exposed edge of the target display portion" (Paper 25 at 8). Count 1 is the disjunctive alternative of Tannas '906 claim 1, Tannas '999 claim 1, Watson claim 96 and Watson claim 53 (ff 7). Count 2 is the disjunctive alternative of Watson claim 78, Watson claim 100, Tannas '906 claim 26, and Tannas '999 claim 5 (ff 10). Tannas, as the movant must demonstrate that its proposed count 3 is separately patentable from every other count proposed to remain in the interference. 37 CFR § 1.637(c)(1)(v).

Tannas does not apparently dispute that counts 1 and 2 should remain in the interference. Accordingly, Tannas must demonstrate that its proposed count 3 is separately patentable from count 1 and count 2. In doing so, Tannas must demonstrate that its proposed count 3 is separately patentable from every alternative of each of count 1 and count 2. Tannas cannot do so, however, since an alternative of each of count 1 and count 2 includes the limitation that Tannas argues distinguishes its proposed count 3 from count 1[13]. Accordingly, we see no reason to add to the interference a count that is essentially identical to one of the alternatives of an existing count. For these reasons, Tannas preliminary motion 1 is denied.

Since we deny Tannas preliminary motion 1, we need not consider whether the claims that include the limitation "applying a first seal between the plates along an exposed edge of the

---

[13] Compare Tannas '906 claim 1 (ff 8), which forms part of count 1, and Tannas '906 claim 26 (ff 11) which forms part of count 2 with proposed count 3 (ff 19). Tannas '906 claim 1 and Tannas '906 claim 26 include the limitation "applying a first seal between the plates along an exposed edge of the target display portion," the limitation that Tannas argues distinguishes its proposed count 3 from count 1.

target display portion" are separately patentable from those claims that include the limitation "applying a first seal along an exposed edge of the target display portion."

In any event, we make the following observations. Tannas has narrowly interpreted the term applying a seal between two plates, as discussed supra in connection with Tannas preliminary motion 2. As discussed there, applying a seal between the plates is broad enough to include a seal that lie along the same plane as the cut edges of the plates, and does not necessarily require that the seal also lie within the parameter of the glass plates. Given that interpretation there is no apparent patentable distinction between a seal that lie along the same plane as the cut edge and a seal that is along the cut edge. Tannas' proposed count 3 is anticipated by a claim that includes applying a seal along an exposed edge.

Tannas preliminary motion 3

Tannas seeks judgment against Watson under 37 CFR § 1.633(a) on the ground that Watson claim 96 is unpatentable under 35 U.S.C. § 102(b)/103(b) in view of various prior art. Tannas also concedes that if its preliminary motion 3 is granted that judgment should also be entered against Tannas on the ground that its '906 claim 1 is also unpatentable based on the same prior art (Paper 67 at 14). As Tannas' discussion is with respect to Watson claim 96, and not directly to Tannas '906 claim 1, so is ours.

Tannas argues that either the Doyle SID Article (ff 37) or the Doyle Minute Meetings (ff 37) anticipates Watson claim 96 (Paper 67 at 9). Alternatively, Tannas argues that either of the Doyle references combined with admissions against interest made by Watson, and JP '444 (ff 39) would render Watson claim 96 obvious.

- 36 -

Anticipation

Tannas directs our attention to page 26, column 1, lines 46-49 in the Doyle SID article that states: "NAWC cut a cell and measured the glass spacing. Interior cell spacing was measured as well as exterior spacing at the seal. The cell was resealed, refilled and cycled in solar testing and heat." Tannas directs our attention to page 7, lines 1-3 of the Doyle Meeting Minutes that states: "Also, one corner had been cut and resealed to be used as the test vehicle."

Tannas submits that either reference, through the cited passages above, anticipates Watson claim 96 and thus the step of "applying a first seal along an exposed edge of the target display portion, the first seal creating a barrier to prevent the image-generating medium from escaping out of the area between the plates" (ff 42). Tannas's declarant, Terry Scheffer states that given the disclosure of either article, that "a person of ordinary skill would appreciate that a seal was applied along the exposed edge to create a barrier to prevent the image-generating medium (liquid crystal) from escaping. Such a seal would be necessary in order to subject the LCD to subsequent testing" (ff 44).

Scheffer does not present facts to support his conclusion that one of ordinary skill in the art would understand either of the Doyle references to teach applying a first seal along the exposed edge as claimed. The references state that "the cell was resealed" and that "one corner had been cut and resealed." Scheffer does not explain why the reseal is necessarily along the exposed edge of the target display portion, as opposed to, for example, a resealing of the two pieces that were severed. Nothing in the Federal Rules of Evidence (applicable to patent interference cases) or Federal Circuit jurisprudence requires a fact finder to credit the

unsupported assertions of an expert witness. <u>Rohm and Haas Co. v. Brotech Corp.</u>, 127 F.3d 1089, 1092, 44 USPQ2d 1459, 1462 (Fed. Cir. 1997).

Moreover, Watson claim 96, and subsequently Tannas '906 claim 1 recite "a method for changing the physical shape of an electronic display." An electronic display is defined as "an electronic component used to convert electric signals into visual imagery in real time suitable for direct interpretation by a human operator" (ff 46). By this definition, an electronic display is one that is operative, e.g., one that is suitable for direct interpretation by an operator. The preamble of Watson claim 96 recites changing the physical shape of an electronic display. Inherent to the claimed method is that the display remain operative once its physical shape has been changed. Indeed, this interpretation is consistent with both the Tannas and Watson disclosures. Both disclosures discuss changing the physical shape of an electronic display, resulting in an operative electronic display (ff 51).

However, here, during this proceeding, Tannas fails to address this language in its motion. Tannas fails to direct our attention to where in either of the Doyle references that the method of changing the physical shape of an electronic display, results in an electronic display (e.g., one that is operative).

Although Scheffer states that a seal would be necessary to subject the LCD to subsequent testing, neither Scheffer nor Tannas discuss or direct our attention to the type of subsequent testing to which the LCD is exposed. The testing that is discussed in the Doyle references is directed to physical testing and not operability testing. For example, the Doyle SID article states that the cell was resealed, refilled and cycled <u>in solar testing and heat</u> (ff 40). The Doyle SID article describes solar and heat testing as, for example, an LCD exposed to a Xenon, 1000W

- 38 -

source in an ambient temperature of 49 degrees Celsius, followed by exposure to a 500W, 70 degree celsius ultrasonic bath at 40 KHZ operation (Tannas 1018 at 26). The Doyle SID article describes physical testing of LCDs, not operability testing. Likewise, the Doyle Meeting Minutes appears to discuss only physical testing of LCDs and not operability testing of the cut and sealed LCDs. The Doyle references do not describe a changed electronic display, e.g., one that is operative after the LCD is resized. Tannas has failed to direct our attention to evidence that would suggest otherwise.

Obviousness

Tannas alternatively argues that Watson claim 96 is obvious over either of the Doyle references in view of Watson's admissions against interest and further in view of JP '444. Tannas argues that the Doyle references do not describe the details of the actual process used to reseal the cells, but that they would provide motivation to seek known methods for sealing the corner of a cut LCD (Paper 67 at 14), and that such methods of sealing are known. We understand Tannas to argue that neither the Doyle references are enabling, such that one of ordinary skill in the art would know how to reseal the cut LCD. Apparently, then, Tannas relies on alleged admissions made by the party Watson in connection with Watson preliminary motion 5 that a person of ordinary skill in the art would know how to apply seals to LCDs.

Tannas' reliance on Watson's alleged admissions fails for two reasons. First, the admissions that Watson allegedly makes are with respect to whether certain Tannas claims, reciting a second seal, would have been obvious in light of Tannas claims designated as corresponding to the count that already claim sealing a target display. Watson's alleged admissions are with respect to whether it was known in the art to provide a second seal, not how

to seal, along an exposed edge, a target display.  More importantly, the alleged admissions do not

make up for the deficiencies of how Tannas applies the teachings of the Doyle references.  That

is, the alleged admissions do not make up for the Doyle references lacking in teaching that the

resealed target electronic display portion is operative.  Nor do the admissions make up for the

deficiencies of sealing a target display portion.  As discussed above, Tannas has failed to

sufficiently demonstrate that either of the Doyle references teach resealing the target display

portion, as opposed to, for example resealing the two severed pieces.

Tannas' reliance on the JP document to teach "known methods for cutting LCDs" also

does not make up for the deficiencies of the Doyle references as applied by Tannas.  For these

reasons, Tannas has failed to make out a prima facie case of anticipation or obviousness.  Thus,

we need not consider whether the Doyle Meeting Minutes is a printed publication under 35

U.S.C. § 102(b).  Furthermore, we need not and have not considered Watson's opposition to

Tannas preliminary motion 3.  Tannas preliminary motion 3 is <u>denied</u>.

<u>Watson preliminary motions 5 and 6</u>

In Watson preliminary motion 5, Watson moves under 37 CFR § 1.633(c)(3) to designate

Tannas '906  claims 2-25 and 28-35 as corresponding to count 1.  In its preliminary motion 6,

Watson moves to designate Tannas '906 claims 27 and 39-41 as corresponding to count 2.

<u>A second seal</u>

Independent claims 2, 4, 6, 9, 12, 15, 18, 23, 28, 35 and dependent claim 27 recite

applying a second seal along or over the exposed edge of the target display portion, or over the

first (perimeter) seal.

Watson relies on the declaration of Michael Wiltshire to demonstrate that the claims reciting a second seal would have been obvious in view of any of the claims designated as corresponding to the count. Wiltshire's declaration is essentially the same as Watson's claim chart starting on page 4 of its fact section of preliminary motion 5 and page 5 of the fact section of preliminary motion 6. With respect to the second seal recited in claim 2, Watson makes the following statement (the same statement is found in Wiltshire's declaration):

> WATSON Exhibit 1006 (page 2 middle column, page 3 left column, and page 4) shows the standard use of a "Moisture Barrier Sealant" as a second humidity seal. See also WATSON Exhibit 1007 (page 185; list item 2) disclosing ruggedizing a COTS LCD including [second] Sealing of the LCD sandwich and polarizers for survivability in a harsh environment. WATSON Exhibit 1015 (page 323, first column) teaches the need for a good sealant as a barrier against moisture, and WATSON Exhibit 1016 (page 191, figure 10a) shows the use of silicone resin as a protective sealing agent. In view of WATSON Exhibits 1006 and 1007, and WATSON Exhibits 1015 and 1016, it would have been obvious to apply a second humidity seal over the first seal. Thus, claim 2 covers the same patentable invention as claim 1, which has been designated as corresponding to proposed Count 1[14]. (Paper 46 at 4-5).

And with respect to claim 3 which recites that the second seal comprises silicone, Watson states:

> WATSON Exhibit 1008 (item #4) teaches silicone is a known material for Moisture Protection [second] seals for LCDs. In view of WATSON Exhibit 1008, it would have been obvious to use silicone for the second seal. Thus, claim 3 covers the same patentable invention as claim 1, which corresponds to proposed Count 1 (Paper 46 at 5).

Watson essentially makes the same statement with respect to all other claims that are directed to a second [silicone] seal. For example, with respect to independent claim 4, Watson

---

[14] Throughout its motion papers, Watson refers to Count 1 and Count 2 as "Proposed Count 1" and "Proposed Count 2." The term "proposed" count generally refers to a count that a party is moving to add or substitute, and not to an existing count.

argues "It would be obvious to apply a second, silicone seal in view of WATSON Exhibits 1006, 1007, 1015 or 1016, and 1008 as applied to claims 2-3, above." (Paper 46 at 6).

Watson's statement of reasons why it should be granted relief is as follows:

> Claims 2-25 and 28-35 define (cover) the same patentable invention as claims 1, 36, 37, and/or 38 because the subject matter of Claims 2-25 and 28-35 would have been obvious to the skilled artisan from the subject matter of claim 1, 36, 37, and/or 38, which have been designated as corresponding to Proposed Count 1, and which designation the party WATSON does not dispute. Accordingly, Claims 2-25 and 28-35 should be designated as corresponding to Proposed Count 1. (37 CFR § 1.637(c)(3)(I); 37 CFR § 1.637(c)(3)(ii)).
>
> In view of the above, requirements of 37 CFR § 1.633(c)(3) and 37 CFR § 1.637(c)(3) have been satisfied. Grant of the present Motion and designation of Claims 2-25 and 28-35 of TANNAS '906 as corresponding to Proposed Count 1 is accordingly respectively requested. (Paper 46 at 25).

As the movant, Watson must show that the proposed claims define the same patentable invention as another claim whose designation as corresponding to the count the moving party does not dispute. 37 CFR § 1.637(3)(ii). Despite Watson's failure to follow the proper procedure set forth in the Standing Order[15], we address those arguments made by Watson found in the fact sections of its preliminary motions 5 and 6.

Watson fails to provide a sufficient explanation of how the different exhibits teach the second seal. Watson exhibits 1007, 1015, and 1016, standing alone, do not apparently suggest a second seal. For example, Watson 1007 shows a seal, however it is not clear that the seal is a "second seal" over a first seal as argued. Watson's explanation of sealing the LCD sandwich and polarizers for survivability in a harsh environment, does not, without more explain that the seal, as seen in Watson exhibit 1007, is a second seal.

---

[15] A parties' argument should be set forth in the body of the motion, and not incorprated from a declaration. Nor should the argument be contained in the fact section of a motion. See Standing Order, § 26(a) and Leveen v. Edwards, 57 USPQ2d 1406 (BPAI 2000).

With respect to Watson exhibit 1006, Watson's explanation of how the reference teaches a second seal is confusing and dissatisfying. Watson directs our attention to the middle column on page 2 of 1006. That portion of the document states that an end cap seal is used for end cap sealing after filling liquid crystal material into the cell. The other textual portion that Watson directs our attention to is apparently to a different seal - a moisture barrier sealant that is used for overcoating of the interconnecting area between the FPC and ITO electrodes[16]. The end cap seal shown in figure 4 apparently seals a hole used for filling the sealed plates with liquid crystal material. From the figure, it is unclear that the end cap covers just the hole or covers the hole and some of the first seal. Watson does not tell us. Thus, Watson has failed to sufficiently demonstrate that the end cap seal is a second seal as claimed.

The moisture barrier sealant is described as overcoating the interconnecting area between the FPC and ITO electrodes. The FPC electrodes appear to be those electrodes that are internal to the LCD. The ITO electrodes are apparently external electrodes for connection to other external electrical circuits. The FPC and ITO electrodes are apparently electrically connected through an anisotropic conductive film. While it is clear that the purpose of the moisture barrier sealant is to overcoat the connection between the FPC internal and ITO external electrodes, it is not clear from the description or the figure showing the moisture barrier sealant that the sealant additionally covers the first seal as suggested by Watson[17].

---

[16] Neither Watson, or Watson exhibit 1006 define "FCP" or "ITO."

[17] Watson argues that given 1006, it would have been obvious to apply a second humidity seal over the first seal (Paper 46 at 5).

- 43 -

Watson's vague explanation of the references it relies upon to teach a second seal leaves the reader confused and frustrated. Since Watson fails to sufficiently explain how the various references teach a second seal, Watson's preliminary motions 5 and 6 cannot be granted with respect to those Tannas '906 claims that recite a second seal.

Still further, even if Watson had sufficiently established that a second seal was known, such showing alone does not per se establish obviousness. Smith Industries Medical Systems, Inc. v. Vital Signs, Inc., 183 F.3d 1347, 1356, 51 USPQ2d 1415, 1420-21 (Fed. Cir. 1999) (there is not basis for concluding that an invention would have been obvious solely because it is a combination of elements that were known in the art at the time of the invention; the relevant inquiry is whether there is a reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the teachings of the references, and that would also suggest a reasonable likelihood of success); In re Kotzab, 217 F.3d 1365, 1369-70, 55 USPQ2d 1313, 1316-17 (Fed. Cir. 2000) (identification in the prior art of each individual part claimed is insufficient to defeat patentability of the whole claimed invention; rather, to establish obviousness based on a combination of elements disclosed in the prior art, there must be some motivation, suggestion or teaching of the desirability of making the specific combination that was made by the applicant).

Watson fails to discuss, in either of its motions 5 or 6, evidence in the record which would establish a reason, motivation, suggestion or teaching in the prior art as to why the subject matter of those Tannas '906 claims that recite a second seal would have been obvious in view of Tannas '906 claims 1, 36, 37, and/or 38. It is not enough to opine that it would have been obvious to provide a second seal merely because the prior art teaches a second seal. Since

- 44 -

Watson has failed to set forth a <u>prima facie</u> case with respect to claims 2-25, 27, 28, and 35, we need not and have not considered Tannas' opposition with respect to those claims.

<u>Tannas '906 claims 29-32</u>

Tannas '906 claim 29 differs from already designated claim 36, in that claim 29 recites a plurality of films on an outer surface of at least one of the front and back plates, and the step of removing an excess portion of the plurality of films, whereas, claim 36 recites a film on an outer surface of at least one of the front and back plates, and the step of removing at least a portion of the film from the front or back plate. Claims 30-32 are similar to already designated claims 36-38.

With respect to Tannas '906 claims 29-32, Watson has sufficiently demonstrated that Tannas '906 claims 29-32 define the same patentable invention as Tannas claims 36-38. Tannas, in its opposition, generally argues that Watson has failed to provide evidence of any motivation to combine the cited references for any of the Tannas '906 claims Watson seeks to designate as corresponding to count 1. While this argument has merit with respect to several of the Tannas' '906 claims as discussed above, Watson's demonstration of obviousness (motivation to combine) is sufficient for claims 29-32.

Already designated claims 36-38 are similar to those Tannas claims 29-32 with the main difference being a plurality of films as opposed to a single film. As pointed out by Watson, Tannas acknowledged at the time of the invention that commercial off the shelf displays having a plurality of polarizers and films attached to the display glass was known. The method of removing a film prior to cutting is already taught in Tannas claims 36-38. Thus, we agree that that teaching would apply to a plurality of films as Watson argues, as well as to a single film strip

as recited in already designated claims 36-38. Tannas is silent with respect to the plurality

feature recited in claims 29-32 and thus has failed to rebut the presumption that those claims

would have been obvious in view of already designated Tannas claims 36-38. Accordingly,

Tannas '906 claims 29-32 are designated as corresponding to count 1.

<u>Tannas '906 claim 33</u>

Tannas claim 33 depends on already designated claim 1 and recites "wherein the first seal

comprises microspheres or beads mixed in the adhesive for preserving the cell spacing between

the front and back plates." Watson argues that Tannas '906 claim 33 defines the same patentable

invention as already designated Tannas '906 claim 1, in view of Watson exhibits 1012-1014,

1016, and/or 1002 as follows:

> It is well known in the art to use glass beads about the perimeter of LCD plates to
> preserve minimum cell thickness. WATSON Exhibit 1016 (Page 186, lines 13-19)
> teaches that spacers should be included in the sealant. (See also Watson Exhibit 1012
> column 3, lines 48-50). It is known to include shimming spheres in adhesives and
> sealants for electronic components (See WATSON Exhibit 1013 (page 9 - Output 315),
> WATSON Exhibit 1014, and/or WATSON Exhibit 1002 (page 26, col 1, ln 53-col 2,
> ln 1)). Therefore, it would have been obvious to provide microspheres/beads mixed in
> the adhesive for preserving cell spacing, such that claim 33 covers the same patentable
> invention as Claim 1 (from which it depends) (Paper 46 at 22-23).

Watson Exhibit 1016 does teach spacers in a sealant for sealing an LCD. However, the

spacers are not beads or microspheres as claimed. Watson exhibit 1012, at column 3, lines 48-50

teaches glass bead spacers, but the spacers are apparently not mixed in an adhesive as claimed.

Instead, the glass beads are apparently used independently of a sealant to maintain spacing

between two plates. Watson also directs our attention to its exhibit 1013 and refers to "Output

315" on page 9 of that exhibit. However, the Watson 1013 pages are not numbered, and the only

"output" referred to in the exhibit does not have associated with it "315" as far as we can tell. In

any event, the "output" that we believe Watson is referring to is apparently an adhesive used to bond electrical components to heat sinks, and although on unnumbered page 9 there is a figure of glass beads, it is unclear that the beads are mixed in the adhesive as claimed. Although Watson is silent with respect to what its exhibit 1014 teaches, it apparently teaches an adhesive with sphere spacers used for bonding electrical components to heat sinks. Watson fails to explain whether the spheres disclosed in 1014 are considered "microspheres" or "beads" as claimed and understood by one of ordinary skill in the art, nor does Watson explain how the adhesives taught in 1013 or 1014 are suitable for sealing an LCD. Watson Exhibit 1002 discusses epoxies with spacers for sealing LCDs, but does not specify the types of spacers used. Thus, none of the exhibits that Watson direct our attention to apparently meet the limitation of microspheres or beads in a sealant for sealing an LCD. Watson provides no suggestion as to how the references should or could be combined to arrive at Tannas claim 33. Watson provides no motivation, to use the sealant for electronic devices to seal an LCD, or to use the "beads" or "microspheres" of one teaching in the sealant of another teaching. We will not try to make out a case for Watson. Watson bears the burden to demonstrate that it is entitled to the relief sought, and has failed to do so with respect to Tannas claim 33.

Tannas '906 claim 34

Tannas claim 34 depends on already designated claim 1 and recites "the step of outgasing the electronic display after the step of applying the first seal to remove trapped gases and voids from the area between the plates." Watson argues that given Watson claim 53, it would have been obvious to outgas the gases and voids trapped in the display, and that doing so after the step of applying a first seal would be a matter of engineering design choice.

- 47 -

However, characterizing a claim feature as a design choice is not meaningful. Virtually all features are choices of design. The question to be answered is whether the design choice at issue would have been an obvious one. At the very least, Watson should provide evidence in the form of publications or declarations, which demonstrate that degassing the display after applying a seal would have been obvious to one with ordinary skill in the art. Stating that a particular feature or method step is a design choice merely begs the question. Because Watson has failed to set forth a prima facie case of obviousness as to Tannas claim 34, Tannas' opposition in that regard need not be addressed.

Tannas '906 claims 39-41

Tannas claim 39 depends on already designated claim 26 and recites "modifying the electronic circuits on the target display portion to retain the basic functionality of the display." Claim 40 depends on claim 39 and recites "the electronic circuits comprise internal electronics, and wherein the modifying step comprises reestablishing continuity of the internal circuits." Claim 41 depends on claim 26 and recites "the electronic circuits comprise at least one of a circuit board, a TAB, and a COG disposed along an outer edge of the display, and wherein the step of cutting the display comprises cutting through at least one of the circuit board, TAB, or COG."

Tannas claim 39 is identical to already designated Watson claim 91. Thus, as Watson points out, Tannas claim 39 is anticipated by, and is to the same patentable invention as, Watson claim 91. Tannas does not discuss in any meaningful way those features of Tannas '906 claims 39-41. Tannas' sole argument with respect to claims 39-41 is that those claims should be designated as corresponding to its proposed count 3. That argument, however is not responsive

- 48 -

to the argument made by Watson that Tannas claims 39-41 define the same patentable invention as Watson claim 91 or Tannas claim 26[18]. For these reasons, Tannas claims 39-41 are added to the interference as corresponding to count 2.

For the above reasons, Watson preliminary motions 5 and 6 are granted-in-part. The interference will be redeclared in a separate, concurring paper to reflect that Tannas '906 claims 39-41 are designated as corresponding to count 2 and that Tannas '906 claims 29-32 are designated as corresponding to count 1.

Watson preliminary motion 7

Watson filed a contingent preliminary motion 7 for benefit of its earlier applications with respect to Tannas' proposed count 3. Since Tannas' preliminary motion 1, seeking to add its proposed count 3 is denied as set forth supra, there is no occasion to consider Watson preliminary motion 7. Accordingly, Watson preliminary motion 7 is dismissed as moot.

Watson preliminary motion 8

Watson moves under 37 CFR § 1.633(a) for judgment against Tannas on the ground that Tannas' patents are invalid under 35 U.S.C. § 112, ¶ 1 as failing to meet the best mode and enabling disclosure requirements. Watson seeks judgment against the Tannas patents involved in the interference, and not just to the claims that are designated as corresponding to counts 1 and 2 (Paper 71 at 2). At the time the interference was declared, although all of the Tannas claims in the '999 patent were designated as corresponding to either of count 1 or count 2, only Tannas '906 patent claims 1, 26, 36-38, 42 and 43 were involved in the interference. In connection with Watson preliminary motions 5 and 6, Tannas '906 claims 39-41 are designated as corresponding

---

[18] Tannas preliminary motion 1 to add proposed count 3 is denied. See supra at 34.

to count 2 and Tannas '906 claims 29-32 are designated as corresponding to count 1. Accordingly, there are several claims of the Tannas '906 patent that are not involved in the interference.

Watson has not cited, nor are we aware of any supporting authority that would confer jurisdiction to the board over a patent involved in an interference. The board has jurisdiction over the claims that are involved in an interference. See 35 U.S.C. § 135(a) ( "Any final decision, if adverse to the claim of an applicant, shall constitute the final refusal by the Patent and Trademark Office of the claims involved ... A final judgment adverse to a patentee from which no appeal or other review has been or can be taken or had shall constitute cancellation of the claims involved in the patent ....); see also 37 CFR § 1.633(a) ("A motion for judgment against an opponent's claim designated to correspond to a count on the ground that the claim is not patentable to the opponent."). (Emphasis added). Accordingly, to the extent that Watson's preliminary motion 8 has merit, it pertains to those Tannas '999 and '906 claims involved in the interference[19].

Best Mode

The best mode determination begins by defining the invention. Northern Telecom, Ltd. v. Samsung Elec. Co., 215 F.3d 1281, 1286-87, 55 USPQ2d 1065, 1068-69 (Fed. Cir. 2000) ("[T]he first task in any best mode analysis is to define the invention at hand. The definition of the invention, like the interpretation of the patent claims, is a legal exercise, wherein the ordinary principles of claim construction apply."). Once the invention is defined, two factual inquiries are

---

[19] Tannas did not raise in its opposition, the appropriateness of Watson's attack on its patents, as opposed to the involved Tannas claims.

made. It must be determined whether at the time the application was filed, the inventor had a

best mode of practicing the invention. If the inventor had a best mode of practicing the

invention, it must be determined whether the best mode was disclosed in sufficient detail to

allow a skilled artisan to practice it without undue experimentation. Nobelpharma AB v. Implant

Innovations Inc., 141 F.3d 1059, 1064, 46 USPQ2d 1097, 1101 (Fed. Cir. 1998).

### The Tannas invention

The involved Tannas claims are directed to a method for changing the shape of an

electronic display, by (1) cutting the display resulting in an excess and target portion; and (2) (i)

applying a first seal along an exposed edge of the target portion, or (ii) applying a first seal

between the plates and along the exposed edge of the target portion. Watson argues that Tannas

failed to disclose the best mode known to him at the time he filed his 09/274,427 ('427)[20]

application of "applying a first seal." Watson relies on alleged admissions made by Mr. Tannas,

that he concealed his best mode for (1) wicking the liquid crystal out of the space between the

plates; (2) locating the adhesive (seal) between the plates; and (3) assuring uniform spacing

between the plates, which, Watson argues are all part of the step of "applying a first seal."

### Was there a best mode?

The step of applying the first seal is described in the Tannas '906 patent, column 7, lines

23-44 which is reproduced as follows:

> The newly-exposed plate edges are then cleaned and wiped dry of any excess
> liquid crystal material using, for example, a dry cotton swab. Care should be taken to not
> use fluids, as fluids might contaminate the liquid crystal material. Liquid crystal material
> is then drained or wicked out of the cell to allow for a replacement seal line 115 to be
> placed along the then newly- exposed and newly-unsealed plate edges. The replacement

---

[20] The '427 application issued as the involved '906 Tannas patent.

seal 115 is installed by applying an adhesive along the cut edge and preferably in between the plates 20 to reseal the display 10'. The adhesive is preferably chosen to have proper mechanical properties to preserve the cell spacing. For example, precision microspheres may be mixed into the adhesive to ensure spacing. The adhesive should also have a proper viscosity to allow it to flow inwardly sufficiently to fill any void in the cell between the plates 20 and the liquid crystal material. Low-viscosity UV curing urethane of the methacrylate family have been shown to have the desired characteristics. A wetting and/or thinning agent may be used as needed. In addition, these urethanes interface with the liquid crystal material without adverse effects, as is well-known in the field of PDLCs. Curing time of approximately five minutes has been shown to be sufficient.

Watson argues that the above omits Tannas' best mode of how to wick the excess liquid crystal material, which as allegedly admitted by Mr. Tannas, includes the step of <u>squeezing the glass plates</u> (Paper 71 at 15). The alleged admission is as follows:

Q    Is that wicking technique something that is known to a person skilled in the art, as far as you know?

A    Not of average skill, but there are people that do that.

Q    Would you describe for us in your own words what that wicking technique involves?

A    It involves squeezing the cell and using an absorbent to absorb what comes out so that when you let loose the pressure, it won't get sucked back in again. So you keep doing that, and in the cell you push the liquid crystal around, and then you get the liquid crystal between the hole and the void that you've now started, and then you squeeze on the void and push out the rest and then absorb it as it comes out. So you're using the cell itself as kind of a – what do you call when you clean a baby's nose? (Watson Exhibit 1018, page 90, line 22 to page 91, line 13).

Watson has failed to sufficiently establish that Mr. Tannas knew of the alleged best mode for wicking the liquid crystal material <u>at the time Tannas filed the '427 application</u>. The question asked by counsel for Watson was for Mr. Tannas to describe, in his own words "what that wicking technique <u>involves</u>." Mr. Tannas answered that wicking "<u>involves</u> squeezing the cell," etc. Counsel for Watson formed the question in the present tense and Mr. Tannas responded in

the present tense.  Upon reading further in the transcript, Mr. Tannas responded that he had been

asked "to explain what wicking was." (Watson exhibit 1018, page 92 at 23).  The statements

made by Mr. Tannas regarding "wicking" may reasonably be interpreted to refer to what Mr.

Tannas understood wicking to mean at the time of the deposition, and not necessarily refer to a

known best mode for wicking at the time the '427 application was filed.  While it may be that

Mr. Tannas described what he believed wicking to mean at the time of the invention, it is equally

likely that Mr. Tannas was answering the question as to what wicking meant to him at the time of

the deposition.  Accordingly, Watson has not sufficiently demonstrated, that it is more likely than

not that Mr. Tannas' statements were what he believed at the time he filed his '427 application,

and thus has failed to sufficiently demonstrate by a preponderance of the evidence that Tannas

withheld the best mode for wicking.

Watson further argues that Mr. Tannas knew, at the time of the filing of '427, a best mode

for maintaining uniform spacing between the glass plates when the seal was applied between the

plates (Paper 71 at 19).  This argument is also not persuasive for similar reasons given above.

The portion of Mr. Tannas' testimony that Watson directs our attention to does not demonstrate

by a preponderance of the evidence that Mr. Tannas was referring to what he considered to be the

best mode at the time he filed the '427 application.  A reading of the transcript leaves the reader

with the impression that Mr. Tannas could have been referring to how to <u>hypothetically</u> maintain

the spacing between the plates and not necessarily what Mr. Tannas knew at the time of the

invention.  The passage to which Watson directs our attention is as follows:

Q    But the gap throughout the rest of the plate over in the other sections of the plate
     would be relatively uniform and as originally manufactured?

A    No, not necessarily.

Q    Not necessarily.  What is it that you do in order to make sure that you maintain that uniform spacing between the plate [sic] all the way across as you apply the adhesive and seal it in order to create a new plate [sic]?

A    Well, that's my trade secret.  (Watson Ex. 1018, page 62, lines 14-22).

However, the section of the transcript just prior to the above question/answer exchange is as follows:

Q    Okay.  That's very interesting the way you describe it.  Let's assume that we have a square plate and we cut off one edge.  Okay?  The other three sides of the plate, what is the relative orientation of the spacing of the plates after you cut the side?  Does it change or does it stay the same?

A    If I understand your finger-drawing on the table, it's the same.

Q    What about the spacing right at the point at which the cut was made?

A    It has freedom to move, to change now, particularly get wider.

Q    When you say "change," you're talking about the relative vertical distance between the plates, not necessarily the distance laterally, but you're talking about the vertical distance might change along the edge?

A    The gap, right.

From the above exchange, it appears that counsel for Watson was asking Mr. Tannas to give his opinion on how to maintain the spacing, given a hypothetical model.  Counsel for Watson begins the exchange with a hypothetical situation by stating:  "Let's assume that we have a square plate and we cut off one edge.  Okay?."  Mr. Tannas refers to the "finger-drawing on the table" in response to the question posed by Watson's counsel, and apparently answers the question to the hypothetical.  Mr. Tannas' responses to the hypothetical are in the present tense verse, and do not indicate to the reader that Mr. Tannas is admitting that he knew of a best mode

- 54 -

for maintaining the spacing between the plates and that he concealed that mode at the time he filed his application. Thus, Watson has failed to sufficiently demonstrate, by a preponderance of the evidence that Mr. Tannas failed to disclose his best mode of maintaining the spacing between the plates at the time the application was filed.

We next address Watson's argument that Tannas concealed the best mode of applying the adhesive seal between the plates. Mr. Tannas was initially asked to describe the process with respect to the resizing technique that is disclosed in the '906 patent (Watson 1018 at 56, lines 1-3). When asked what step is taken, in accordance with his patent after the liquid crystal material is cleaned from the cut edge, Mr. Tannas responded that you have to get the adhesive between the plates, but that way to get the adhesive between the plates is a trade secret (ff 93). Mr. Tannas was asked how his patent described getting the adhesive between the plates, Mr. Tannas responded that his patent did not teach how that's done, because he did not intend to disclose how to get the adhesive between the plates (ff 94). Mr. Tannas was then asked whether one of ordinary skill could read Tannas '906 and know how to get the adhesive between the plates. Mr. Tannas responded no, not quite and that you need to do something besides putting a bead along the cut edge to get it in between the plates (ff 95). Mr. Tannas was then asked to read from Tannas '906, column 7, and whether there was a description of squeezing the cell. Mr. Tannas responded that no there was no description of squeezing the cell, that one had to do more than just squeeze and release the cell and that he didn't purposefully go into any further detail [in his patent] because he considered that his trade secrets (ff 96). Mr. Tannas later testified that Tannas '906 does not teach one how to get the adhesive between the plates, and that that was his trade secret, to actually get it in there precisely (ff 97).

-55-

Watson argues that Mr. Tannas purposefully and intentionally withheld his best mode for locating the adhesive between the plates (Paper 71 at 18). Watson's argument has merit. Mr. Tannas acknowledged that (1) his patent did not teach how to get the adhesive between the plates because he did not intend to disclose that information, (2) that applying a bead along the cut edge was not enough, and (3) "I don't purposefully go into any further detail [in Tannas '906] because I consider that my trade secrets." The statements made indicate that Mr. Tannas, at the time he filed the '427 application, purposefully withheld the steps for locating the adhesive between the plates.

Tannas' involved claims recite either the method step of (1) applying a first seal between the plates along an exposed edge of the target display portion (Tannas '906 claim 1, 26, and 29), (2) applying a first seal along an exposed edge ... between the plates (Tannas '906 claim 36), or (3) applying a first seal along an exposed edge (Tannas '999 claim 1 and 5). Although at least Tannas '999 claims 1 and 5 do not specifically recite applying the seal between the plates, the claims encompass the preferred embodiment of applying the seal between the plates. Thus, if Tannas failed to disclose the best mode of applying the seal between the plates, then Tannas '999 claims 1 and 5 that recite applying a first seal along an exposed edge, and claims that depend from claims 1 and 5 would also be invalid for failing to disclose the best mode.[21]

Getting the seal between the plates is Tannas' preferred embodiment (Tannas 1004, col. 7, lines 30-32, "applying an adhesive along the cut edge and preferably in between the plates"). According to Mr. Tannas, getting the adhesive between the plates requires something more than

---

[21] During oral argument, counsel for Tannas agreed that if it was determined that Tannas failed to disclose the best mode for applying a seal between the plates, that those Tannas claims that merely recite applying the seal along the edge would also be invalid.

merely applying a bead of sealant along the cut edge (ff 95), and that his '906 patent does not describe how to get the adhesive between the plates (ff 94).

The '906 specification states that the replacement seal 115 is installed by applying an adhesive along the cut edge and preferably in between the plates 20 to reseal the display 10' (col. 7, lines 30-32). The '906 specification describes the desirable adhesive properties and that the adhesive should have a proper viscosity to allow inward flow to fill any void between the plates.

Tannas '906 appears to describe precisely that which Mr. Tannas testified would be insufficient for getting the adhesive between the plates - merely applying the seal along the cut edge, and letting the adhesive flow inwardly. Mr. Tannas testified that he did not purposefully disclose [the best way] to get the adhesive between the plates in his patent, since he wanted to keep it a trade secret. Based on Mr. Tannas' admissions, not only did Mr. Tannas keep the best mode of applying the seal between the plates a trade secret and out of his disclosure at the time of his invention, he left in a description of getting adhesive between the plates that he felt was not enough - applying adhesive along the edge. For these reasons, Watson has sufficiently demonstrated by a preponderance of the evidence that Mr. Tannas withheld the best mode of applying the adhesive between the plates.

At the outset, we disagree with Tannas that Watson's burden of proof is clear and convincing. Watson need only show by a preponderance of the evidence that Tannas failed to disclose the best mode of practicing the invention at the time of filing. See Bruning v. Hirose, 161 F.3d 681, 686, 48 USPQ2d 1934, 1938 (Fed. Cir. 1998) ("[D]uring an interference involving a patent issued from an application that was copending with the interfering application, the

appropriate standard of proof for validity challenges is the preponderance of the evidence standard").

Tannas argues that Watson's best mode argument is insufficient as a matter of law, since Watson failed to propose a construction of the claims. Tannas has failed to sufficiently demonstrate that a full construction of all of the limitations in the claims is necessary for Watson to meet its burden of proof. In its motion, Watson argues that Tannas failed to disclose the best mode for applying the seal to the cut edges (between the plates). Watson does not assert that Tannas failed to disclose the best mode for every limitation of the claims, only applying the seal. To that end, Watson explains that applying a first seal, in light of Tannas' specification, includes 1) removing liquid crystal material from between the plates; (2) applying an adhesive in its place in a position between the plates and (3) insuring that the plates are maintained with a uniform spacing (Paper 71 at 15). As discussed above, we agree that the step of applying the seal (between the plates) covers the preferred embodiment of getting the adhesive between the plates. Tannas fails to demonstrate that Watson's interpretation of "applying the first seal" is erroneous, and specifically Watson's interpretation with respect to getting the adhesive between the plates.

Tannas filed corrections to the Tannas transcript. One of the corrections, with added text underlined, is as follows: "I don't purposefully **want to** go into any further detail because I consider that my trade secrets" (change in bold underline) (Watson 1025)[22]. Tannas does not seek to replace or strike the original transcript. Rather, the change to the transcript was made to be consistent with Tannas' argument in its opposition that Mr. Tannas developed trade secrets, methods of "squeezing the cells," after he filed his '427 application. According to Tannas, the

---

[22] See ff 96 for the original text.

references to "trade secrets" made by Mr. Tannas during his cross examination deposition were to those subsequently developed trade secrets.

In support of Tannas opposition 8, Mr. Tannas testified that he developed his trade secret for squeezing the plates to remove excess liquid crystal material and to get the adhesive between the plates after he filed his '427 application (ff 102(d)). Further in support of Tannas opposition 8, Mr. Tannas testified that he disclosed in his '427 application, the only method for resizing liquid crystal displays that he knew of at the time he filed his application (ff 102(a)). Mr. Tannas testified that around the time he filed the '427 application he used glass cutting equipment of Villa Precision International (VPI) to practice his invention and to cut LCDs (ff 102(b)). Mr. Tannas also stated during that time he wicked the liquid crystal material with a Q-tip and used a UV curing adhesive which flowed easily between the plates to get the seal between the plates (ff 102(c)).

It was about a year after he filed the '427 application, that according to Mr. Tannas, he discovered a new method of resizing an LCD that included squeezing the plates (ff 102(d)). The new method included using special tooling and equipment, including glass pressure plates, weighing approximately 50 pounds used to squeeze the resized LCD (ff 102(e)).

Mr. Muir, of VPI testified that during the time frame from December 1998 to October1999, Mr. Tannas came to Arizona to use VPI's cutting equipment on several occasions (ff 103(d)). According to Mr. Muir, VPI did not provide Mr. Tannas with pressure plates or any tooling other than the glass cutting equipment (ff 103(e)). Mr. Muir testified that on occasion he had walked into the lab where Mr. Tannas was using the glass cutting equipment, but never observed Mr. Tannas using pressure plates (ff 103(f)). Mr. Muir testified that he had on occasion

held Mr. Tannas' briefcase upon his arrival to town, and recalls that the briefcase was very light and that he did not see Mr. Tannas bring any pressure plates or other special tooling with him (ff 103(h)). Tannas further submits into evidence redacted drawings (ff 105), redacted invoices (ff 106-107), and a redacted draft patent application (ff 108) in support of its opposition 8.

Mr. Tannas' statements made in his subsequent declaration are largely uncorroborated and are inconsistent with other evidence and statements made of record. According to Mr. Tannas, his references to "trade secrets" made during his cross examination deposition were to trade secrets that he developed after he filed his '427 application. These trade secrets were to a method for resizing LCDs in which Mr. Tannas squeezed the cut LCDs in order to remove unwanted liquid crystal material and release the pressure to get the adhesive between the plates. Mr. Tannas testified that he did not think of the squeezing of the plates until after he filed the '427 application. Mr. Tannas testified that his involved patents describe the only method that he knew of at the time he filed the '427 application. That method did not include squeezing the plates.

However, Tannas, in support of its preliminary statement (Paper 37), submitted an attachment allegedly demonstrating a 22 May 1993 conception of the invention of the counts 1 and 2. The attachment describes a method for resizing liquid crystal displays that was not included in the '427 application. The attachment [23] sets forth the idea of compressing LCD glass plates to force out voids, applying a low viscosity fluid adhesive along the cut, and getting the adhesive between the plates by suction as the compression force on the cell is reduced (ff 110). The attachment in support of Tannas' preliminary statement contradicts Mr. Tannas' statement

---

[23] The attachment is an admission against interest.

that the only method known to him at the time he filed the '427 application was the one disclosed in his patents.

The declaration of Mr. Muir and the redacted drawings, redacted invoices, and redacted draft patent application add little, if anything in support of Tannas' argument. While Mr. Muir testified that he did not see Mr. Tannas with glass plates, that does not mean that Mr. Tannas did not use some other means for squeezing the cells, e.g., his hands or a clip. The redacted drawings, invoices and draft patent application do not tell us much, since there is little if anything on the exhibit pages. We will simply not take the word of Mr. Tannas that the redacted portions are what he says they are.

Mr. Tannas' statements regarding getting the adhesive between the plates made during his cross examination have been altered, or explained to be something other than what the statements on their face suggest. However, Tannas' act of Monday morning quarter-backing will not save the day for Tannas. Statements may always be explained away to be something other than what they appear to be. But, first impressions make lasting ones. Based on the record before us, Mr. Tannas, not understanding or knowing where Watson counsel's questions were leading, answered truthfully - that he purposefully withheld the best mode for applying the seal between the plates at the time the '427 application was filed. It was only after Mr. Tannas and his counsel realized what had been said, that they attempted to explain the damaging statements with a subsequent explanation.

Evidence submitted in support of the subsequent Tannas story rests largely upon subsequent statements made by Mr. Tannas. The other evidence submitted does little, if anything to support Mr. Tannas' story. Something more is needed than Mr. Tannas' uncorroborated

- 61 -

account of events.  Cf. Cooper v. Goldfarb, 154 F.3d 1321, 47 USPQ2d 1896 (Fed. Cir. 1998)

(Inventor testimony must be corroborated by independent evidence).  Furthermore, statements

submitted in support of Tannas' preliminary statement contradict Tannas' assertions as discussed

above.  For these reasons, we do not credit Mr. Tannas' subsequent declaration made in support

of Tannas opposition 8, and thus Tannas opposition 8 necessarily fails.

    Since Tannas has failed to sufficiently rebut Watson preliminary motion 8, we need not

and have not considered Watson reply 8.  For the above reasons, Watson preliminary motion 8, is

granted-in-part.  Tannas '906 claims 1, 26, 29-32 and 36-43 and Tannas '999 claims 1-7 are

unpatentable for failing to comply with the best mode requirement of 35 U.S.C. § 112, ¶1.

    Since Watson preliminary motion 8 is granted with respect to best mode, thereby

rendering all of the involved Tannas '906 and '999 patent claims unpatentable, there is no

occasion for us to additionally decide whether Tannas' involved claims are not enabled.

Accordingly, that portion of Watson preliminary motion 8 moving for judgment on the basis that

Tannas' claims are not enabled is dismissed.

Tannas' motions to suppress

    In its first motion to suppress, Tannas moves to suppress Watson exhibits 1026-1029 and

portions of Watson replies 1 and 2.  Watson apparently relies on exhibits 1026-1029 in

connection with its replies 1 and 2.  Watson preliminary motions 1 and 2 were dismissed.

Accordingly, there was no occasion to consider Tannas' oppositions 1 and 2, Watson's replies 1

and 2, or Watson exhibits 1026-1029.  Thus, we find it unnecessary to consider the specific

objections with respect to Watson exhibits 1026-1029, or to Watson replies 1 and 2.

Tannas moves to suppress Watson exhibits 1030, 1036, 1037, 1041 and 1042, and Watson replies 5 and 6 (Tannas motion to suppress 2 and 5). Watson apparently relies on exhibits 1030, 1036, 1037, 1041, and 1042 in support of its replies 5 and 6. Watson preliminary motions 5 and 6 were granted-in-part. With respect to those Tannas claims that were added, Tannas failed to sufficiently rebut Watson's prima facie case with respect to those claims. Accordingly, we did not nor need not consider Watson's replies 5 and 6. As to those Tannas claims for which Watson failed to establish, in the first place a prima facie case for entitlement, we did not and need not look to Tannas opposition 5 and 6, and thus Watson replies 5 and 6. For these reasons, we find it unnecessary to consider the specific objections with respect to Watson replies 5 and 6 and Watson exhibits 1030, 1036, 1037, 1041 and 1042.

Tannas moves to suppress Watson exhibits 1033, 1034 and 1035 and/or portions of Watson opposition 3 (Tannas motion to suppress 3 and 4). Watson exhibits 1033, 1034 and 1035 were apparently relied on in support of Watson opposition 3 (Tannas motion to suppress 3). Since Tannas failed to sufficiently demonstrate that Watson claim 96 is unpatentable based on prior art, there was no occasion to consider Watson opposition 3 or Watson exhibits 1033, 1034 and 1035, and thus we find it unnecessary to consider the specific objections with respect to Watson opposition 3 and Watson exhibits 1033, 1034, and 1035.

Tannas moves to suppress Watson exhibits 1034-1040 and/or portions of Watson reply 8 (Tannas motion to suppress 4-7). Watson apparently relies on Watson exhibits 1034-1040 in connection with Watson reply 8. Since Tannas failed to sufficiently rebut Watson's preliminary motion 8, there was no occasion to consider Watson exhibits 1034-1040 or Watson reply 8, and

- 63 -

thus we find it unnecessary to consider the specific objections with respect to Watson reply 8 and Watson exhibits 1034-1040.

Tannas motions to suppress 1-7 are <u>dismissed</u>.

<u>Watson's motions to suppress</u>

Watson moves to suppress Tannas exhibits 1019 and 2026-2029 (Watson motion 1 to suppress). Tannas exhibits 1019 is Doyle "Meeting Minutes" relied upon by Tannas in support of its preliminary motion 3. Tannas relies on exhibits 2026-2029 in support of its opposition 8. Watson seeks to suppress the Tannas exhibits 1019 and 2026-2029 on the grounds that they are marked "CONFIDENTIAL", "Proprietary", or "Redacted." We find it unnecessary to consider the specific objections to the admissibility of Tannas exhibit 1019, since Tannas failed to set forth a *prima facie* case of anticipation in its preliminary motion 3, even assuming the exhibits to be admissible. We also find it unnecessary to consider the specific objections to the admissibility of Tannas exhibits 2026-2029, since Tannas failed to sufficiently rebut Watson's prima facie case of best mode violation in its opposition 8, even assuming the exhibits to be admissible.

Watson moves to suppress the "changes/corrections" made by Tannas to the deposition transcript of Mr. Tannas (Watson motion 2 to suppress). Tannas did not request that the changes made replace the original text, only that the changes be put into evidence. The changes made were in support of Tannas opposition 8. We find it unnecessary to consider the specific objections to the admissibility of the changes, since Tannas failed to sufficiently rebut Watson's preliminary motion 8, even assuming the changes to be admissible.

For these reasons, Watson motions 1 and 2 to suppress are <u>dismissed</u>.

RICHARD E. SCHAFER                               )
Administrative Patent Judge                      )

                                                 )
                                                 )
SALLY C. MEDLEY                                  ) BOARD OF PATENT
Administrative Patent Judge                      )  APPEALS AND
                                                 ) INTERFERENCES
                                                 )
                                                 )
LINDA R. POTEATE                                 )
Administrative Patent Judge                      )

cc (via federal express):

Attorney for Tannas (real party in interest – Tannas):
William A. English (lead counsel)

Cohen & Sakaguchi LLP
2424 S.E. Bristol Street, Suite 300
Newport Beach, CA 92660

Tel: 562-665-3953
Fax: 949-625-8955

Attorney for Watson (real party in interest – Bae Systems Avionics Limited):
Leonard C. Mitchard (lead counsel)

Nixon & Vanderhye, P.C.
8th Floor
1100 North Glebe Road
Arlington, VA 22201-4714

Tel: 703-816-4005 (lead)
Fax: 703-816-4100