Interference No. 105,096

Paper No. _____

MAIL STOP INTERFERENCE
Filed on behalf of Party Lawrence E. TANNAS, JR.
By:    William A. English, Esq.
       Neal M. Cohen, Esq.
       COHEN SAKAGUCHI & ENGLISH LLP
       2040 Main Street, 9th Floor
       Irvine, CA 92614
       Telephone:  (949) 724-1849
       Facsimile:  (949) 625-8955

## UNITED STATES PATENT AND TRADEMARK OFFICE

---

## BEFORE THE BOARD OF PATENT APPEALS AND INTERFERENCES
(Administrative Patent Judge Sally C. Medley)

---

### LAWRENCE E. TANNAS, JR.

Junior Party
(Patents 6,204,906 and 6,380,999)

v.

### DAVID S. WATSON
Senior Party
(Application 09/529,201).

---

Patent Interference No. 105,096

---

## TANNAS REQUEST FOR RECONSIDERATION
### (OF DECISION ON PRELIMINARY MOTIONS)

PLAINTIFF'S
EXHIBIT
5
PENGAD-Bayonne, N. J.

## STATEMENT OF PRECISE RELIEF REQUESTED

Pursuant to 37 C.F.R. §§ 1.640(c), 1.658, and Section 20.2 of the Standing Order, Party Tannas requests reconsideration that: 1) Tannas Preliminary Motion 2 be granted, because Watson claims 53, 78, 91, 92, 94, and 95 are not patentable to Watson due to lack of written description under 35 U.S.C. § 112, ¶1; 2) Tannas Preliminary Motion 3 be granted, because the Doyle references anticipate Watson claim 96; and 3) Watson Preliminary Motion 8 be denied, because Watson has failed to demonstrate that Tannas did not disclose the best mode in the Tannas patents.

## EVIDENCE RELIED UPON

| Exhibit | Brief Description |
|---|---|
| Tannas Exhibit 1004 | U.S. Patent No. 6,204,906 |
| Tannas Exhibit 1005 | Declaration of James Fergason |
| Tannas Exhibit 1009 | Declaration of Lawrence E. Tannas, Jr. |
| Tannas Exhibit 1018 | Doyle SID Article |
| Tannas Exhibit 1019 | Doyle Meeting Minutes |
| Tannas Exhibit 1021 | Declaration of Dr. Terry J. Scheffer |
| Tannas Exhibit 2025 | Declaration of Lawrence E. Tannas, Jr. |
| Watson Exhibit 1019 | Deposition of Lawrence E. Tannas, Jr. |
| Watson Exhibit 1020 | Deposition of Dr. Terry J. Scheffer |
| Watson Exhibit 1021 | Deposition of James Fergason |
| Watson Exhibit 1022 | Deposition of Dr. William Doane |
| Watson Exhibit 1034 | Deposition of Lawrence E. Tannas, Jr. |
| Watson Exhibit 1037 | Deposition of Dr. Terry Scheffer |

## STATEMENT OF MATERIAL FACTS

1.    Outside the context of the Tannas patents, Tannas' experts testified that the language "applying a first seal between the plates" means that the seal is applied and located in between the plates. For example, when presented with a hypothetical that involved applying an

adhesive "between the plates," Dr. Scheffer testified "If you applied pressure, clean off the excess and put liquid crystal along the edge, release the pressure, then in my opinion liquid crystal will move in between the plates, but that will change the gap, and the liquid crystal may move in more on one part than another and so on." Watson Ex. 1020, pp. 83:22-84:15.

    2.     When Mr. Fergason was asked about a hypothetical involving squeezing a display to apply a seal along cut edges of a display, the following exchange occurred:

> Q  In that hypothetical as drawn there I mean are we [at] least in agreement once the adhesive is placed in position, it is without question going to be resident between the plates?
>
> A  Uh-huh. . . .
>
> Q  If we apply the bead of adhesive and then we reduce the compressive force just slightly, I think we're in agreement, aren't we, that with that reduction in compressive force that the adhesive material will move inwardly and between the plates. . . ? I'm not asking for how much. I'm asking do you agree with me that it will move inwardly between the plates. . . ?
>
> THE WITNESS: We can always come up with a hypothetical that will do this. We can come up with a hypothetical that will not do this. I mean this is not -- hypotheticals won't get a display made. . . . I'm just puzzled. I have to say that I'm puzzled. You know, we're talking about -- again *we're talking about in one case finding some adhesive between the plates and the other case about sealing the two plates together at that surface.* It's quite clear that whatever you do here is not going to be the same as done here which is sealing those two plates together."

Watson Ex. 1021, pp. 96:16-98:18 (emphasis added)

3.      The following exchange occurred later during Mr. Fergason's deposition when the hypothetical was changed to include a meniscus of liquid crystal material along the cut edge:

"Q  Now let's apply the bead of adhesive . . . to that cut edge.  Am I correct that the bead of adhesive as it traversed into and made contact with the inner parts of the plate, top and bottom, that adhesive would necessarily by definition be between the two plates?  The reason I say that is it flows down into and makes contact with the meniscus. . . .  Would you agree with that?

A  Well, I keep coming back to the fact that it's describing -- that you are describing -- you are trying to stretch this to say that you are getting some sort of a seal between the plates, and I can't see that you get a seal between the plates.

Q  If you do it that way?

A  If you do it that way.  *If this thing is loaded with liquid crystal,* you're going to be able to get enough adhesive in there to get the plates bonded.  *I just don't see it.*  I see a clear-cut explanation of a method here in which two parts are sealed together in the presence of liquid crystal and in a way which seals the two plates together within the perimeter of the display.

Q  But not necessarily with the adhesive being between the plates in the hypothetical that I gave you?

A  . . . *The bond line in your case is on the edges of the glass as opposed to the bond line being between the two glasses* on the other case."

Watson Ex. 1021, p. 92:9-93:25 (emphasis added).  Also see, Ex. 4 from Watson Ex. 1021 (showing a drawing of the hypothetical being discussed).

4.      Tannas' expert, Mr. Fergason, testified that a seal applied along an exposed edge of the cut edges of a display would constitute a "butt seal" and not a seal "between the plates."

3

For example, with reference to the hypothetical involving a meniscus along a cut edge of a display, Mr. Fergason testified " we're struggling here with what actually happens when we make this seal. I would regard this as possible in some small area where you might get incursion of the adhesive, but in general I would think that *your seal would be essentially a butt seal as opposed to between the plates*. . . . There are two plates and I have them separated, a butt seal versus seal here, and it's a difference in kind, and you are butt sealing. With a welder, or whatever you're using, you seal two plates together with a gap between them at the edges. It's different than putting something between those plates and sealing it." Watson Ex. 1021, pp. 90:17-91:8 (emphasis added). See also, Id., p. 74:12-20 ("Q What would you characterize as item 120? A I'd call it a fillet. Q A fillet as opposed to a seal between the plates? A As opposed to a seal between the plates. In fact you could make -- you could omit 115, I think, and have pretty well what you have in the case of Watson.").

      5.      Tannas' experts testified unanimously upon cross-examination that "gap" means the distance between the plates even outside the context of the Tannas patents. Watson Ex. 1020 (Dr. Scheffer testifying), p. 30:10-14 ("Q So the gap between the plates would be the entire area from the perimeter of one plate down to the surface of the other? A It's the distance between the two plates regardless of what is in between"); Watson Ex. 1021 (Mr. Fergason testifying), p. 76:17-19 ("Q So the gap is actually the distance between the plates? A Yes."), p. 77:2-14 ("A The definition I would use is the distance between the two plates"), p. 114:7-13 ( With reference to the Watson specification "Gap is the distance between the two plates"); Watson Ex. 1022 (Dr. Doane testifying), p. 38:11-15 ("Q Would it be appropriate in our discussion here if we referred to the distance between the two plates that we're talking about as the gap between the plates. . . ? A Yes, I would accept that."); p. 39:9-13 ("Q And *would you agree with that definition not only from what you see in the [Tannas] patent but this as a definition which would be*

4

*normally used by people in the art*? A Yes."); p. 56:25-57:8 ("Q Did you find anything in the Watson application that suggested that our definition that we talked about earlier of the term "gap" would be different than your understanding that it meant the distance between the plates as opposed to on the outside? A Well, I'd have to say I don't recall any firm definition that he made of gap anywhere, but I think there is a difference here between the word 'sealed' and 'material placed in the gap.'"); p. 57:9-14 ("Q . . . you didn't see anything in the Watson application that would indicate that the definition of gap would be inconsistent with a distance defined by the space between the plates? A I don't recall anything.")

6.    Tannas' expert, Mr. Fergason, testified that the Watson specification fails to disclose how to apply a seal that is located in between the plates. For example, when Mr. Fergason was asked, "All right. Would you agree with me at least that with respect to the various embodiments [in the Watson specification] that you see that the seal material, whatever its form or whatever its configuration, would be positioned in the gap between the two glass plates as we talked about earlier today?" Mr. Fergason responded, "It is surely not disclosed." Watson Ex. 1021, p. 112:14-20. Further, when asked whether page 13 of the Watson specification suggested sealing the gap with an adhesive between the plates, Mr. Fergason repeated "again this does not disclose anything but taking a bead of adhesive." Id., p. 113:13-24.

7.    Similarly, Tannas' expert, Dr. Scheffer, testified "what I understood from what I read [in the Watson specification] is that when you make that cut. . . , and then the seal is applied along the edge of the cell and cured. So to me there's no indication that the seal is going between the plates." Watson Ex. 1020, pp. 81:16-82:3. Further, when asked "And in your view again if you apply the adhesive along that edge, in your expert opinion it is not possible the adhesive would traverse in between the plates?" Dr. Scheffer responded *"There is nowhere it can go. There's already liquid crystal there."* Id., p. 83:10-15 (emphasis added).

8.    Tannas' expert, Dr. Doane, also testified that "Well, when I read the Watson application, I did not see anywhere in there where it described putting the adhesive between the plates. It talked about running a bead down the outside of the plates, and I didn't see anywhere – I couldn't find anywhere where it talked about putting the adhesive between the plates." Watson Ex. 1022, p. 55:18-23. Dr. Doane agreed that the Watson specification discloses that "the seal is on the outside of the gap. It's not within the gap." Id., p. 56:10-16.

9.    The Tannas patents disclose "Liquid crystal material is then drained or wicked out of the cell to allow for a replacement seal line 115 to be placed along the then newly-exposed and newly-unsealed plate edges. The replacement seal 115 is installed by applying an adhesive along the cut edge and preferably in between the plates 20 to reseal the display 10'." Tannas Ex. 1004, col. 7:27-32. Dr. Scheffer testified that this wicking required physical removal of some of the liquid crystal before the final seal is applied. Watson Ex. 1020, p. 46:13-18; also see, p. 45:6-8 ("he's removing liquid crystal material from the cell to make a place for the sealant to come in between the two plates."). Unlike the Tannas patents, the Watson specification does not suggest wicking out some liquid crystal material. Watson Ex. 1021, pp. 113:23-114:5.

10.    The Doyle SID Article expressly states that "NAWC cut a cell and measured the glass spacing. Interior cell spacing was measured as well as exterior spacing at the seal. The cell was resealed, refilled and cycled in solar testing and heat." Tannas Ex. 1018, p. 26, col. 1, lines 46-49. Similarly, the Doyle Meeting Minutes states "one corner [of a cell] had been cut and resealed to be used as the test vehicle." Tannas Ex. 1019, p. 7:1-3. Relying on these statements, Dr. Scheffer testified that a person of ordinary skill would appreciate that a seal was applied along an exposed edge to create a barrier to prevent the image-generating medium (liquid crystal) from escaping, and that such a seal would be necessary in order to subject the LCD to subsequent testing. Tannas Ex. 1021 ¶ 19.

11.    Dr. Scheffer testified that he was familiar with the types of displays discussed in the Doyle SID Article since he invented them in 1983, and received at least two US patents for his invention.  Watson Ex. 1037, p. 136:19-137:12.

12.    During his cross-examination, Dr. Scheffer was asked whether the Doyle references "talk about rechecking the operability of the displays after the sealing," and responded "they did do further testing after resealing."  Watson Ex. 1037, page 170:18-24.  When he was asked whether the Doyle references disclose that "there was testing that was performed after the resealing was done to determine whether they [the displays] were operable," Dr. Scheffer responded "Well, I think part of the testing would include operation," and explained that "when you test the display, you operate it.  That's understood."  Watson Ex. 1037, p. 168:1-10.

13.    The Doyle SID Article states "The displays are used as frequency and channel indicators on a UHF radio. . . and in most of the returns, a color shift was noted to some extent.  Testing of the displays through all individual specification requirements also failed to identify a cause."  Tannas Ex. 1018, p. 24, col. 2:22-29.  The Doyle SID Article also states that "Solar exposure was highly suspect, due to the measurable red shift in the chromaticity of the displays' background."  Id., p. 25, col. 1:4-6.

14.    The Doyle SID Article also states "NAWC cut a cell and measured the glass spacing. . . .  The cell was resealed, refilled and cycled in solar testing and heat.  *No difference was noted before and after cycling measurements*."  Id., p. 26, col. 1:46-50 (emphasis added).

15.    During the same deposition in which Mr. Tannas made the statements relied upon in Findings of Fact 93-97, Mr. Tannas was asked "So as we sit here today, do you believe as the inventor of the 906 -- of the invention described in the 906 patent that you described in your patent application when it was filed the best mode for making and using your invention?" and responded "Yes, I do."  Watson Ex. 1019, pp. 40:21-41:9.

7

16.    Mr. Tannas was then asked "As we sit here today, Mr. Tannas, do you believe that when you filed your patent application relating to the 906 patent that it contained a description of the invention that would be sufficient to enable one of ordinary skill in the art to make and use the invention as described and claimed?" and answered "Yes." Watson Ex. 1019, p. 41:10-16.

17.    During this same deposition, Mr. Tannas was cross-examined extensively (from 9:47 am to 10:55 am, and again from 1:18 pm to 1:34 pm) regarding where the Tannas patents disclosed how to apply a seal "between the plates." Watson Ex. 1019, pp. 42:10-47:4; 99:6-105:9. For example, Mr. Tannas was specifically asked "where in the patent you have the description of the manner in which you would apply the first seal between the plates." Id., at p. 42:11-15. Mr. Tannas answered "one place of note . . . is column 7, line 23 through 49." Id. at p. 43:5-8. See also, p. 46:9-14 ("column 7 . . . [line 8 through 49."); p. 100:2-3 ("It's discussed in column 7, line 23 to 49."); p. 102:10-12 ("Let's go through this area that I cited. That's where there's a major effort to describe the steps.").

18.    Tannas' experts testified that the Tannas patents sufficiently describe how to get the adhesive between the plates. Watson Ex. 1021 (Mr. Fergason testifying), p. 101:14-20; Watson Ex. 1020 (Dr. Scheffer testifying), p. 44:13-22 ("Yes, there is a place where he states what he does here. Let me just find out where that is. Okay. That would be column 7 starting with line 23."), p. 47:1-16, p. 50:21-51:11 ("My understanding is that the cell is placed in the fixture. Then the cell is opened, that edge is opened, and then the liquid crystal at that edge is wicked out to a certain amount. . . . And then the low viscosity UV curing sealant would be put on the edge that will allow it to wick into that empty space and then cured."); see also, Tannas Fact 9 above.

8

19.    Tannas testified that he developed a new process for resizing LCDs about a year after filing the '427 application that included special tooling, including a set of pressure plates for squeezing an LCD.  Tannas Ex. 2025, ¶ 6.

20.    The following exchange occurred when Mr. Tannas was cross-examined about whether he tried applying a seal between the plates by squeezing the plates at the time of filing the '427 application:

Q  So you used one hand to hold and squeeze the plates and the other hand then wicked off the edge first; is that right?  A  Right.

Q  And then you took adhesive and applied it to the cut edge while still holding it and squeezing it?  A  Right.

Q  And then you observed it to see whether or not the adhesive would go in between the two plates?  A  Right.

Q  And you said that didn't work that well.  Is that what you said?

A  Then I released it to encourage the adhesive to go in. . . .  And when I would release it in the process of squeezing it, I got air bubbles in, and the adhesive would not go in uniformly.  So then I tried some other ways basically squeezing less and releasing less until I got to the point where *I really didn't squeeze any more than just enough to stabilize it* at what I considered its position when assembled, wiped it clean, put the adhesive down and waited a brief time until the adhesive went in by it own mechanism, namely, because of its viscosity and penetrating properties."

Watson Ex. 1034, pp. 81:13-82:12 (emphasis added).

21.    Mr. Tannas acknowledged that, at the time of filing the '427 application, the process described in the Tannas patents worked successfully, unlike the experiments that involved squeezing the plates.  Watson Ex. 1034, pp. 82:22-83:4 ("And that worked the best and

had the least ramifications, and it appeared to be the golden moment. . . . It was the golden moment to me because the adhesive went in orderly, and I didn't have the same problem with the bubbles getting in.").

22.    When asked further about these experiments in his laboratory, the following exchange occurred:

Q And did you -- in the course of your laboratory experience did you apply the adhesive seal and release the pressure on the vise to see what would happen?

A In one of these combinations I did that, yes.

Q What was the result?

A It was kind of out of control. I couldn't keep the meniscus uniform, and I couldn't draw in the adhesive without drawing in air bubbles, and I tried degassing the air bubbles, and that didn't work.

Q So as far as you were concerned -- I mean at that point in time the best way that you knew of was to place the plates between a fixture of some kind like a vise or these clamps that you mentioned and to apply the adhesive along the cut edge and to allow that adhesive to go into the gap between the plates by capillary action. . . . Is that a fair summary of what you discovered. . . ?

THE WITNESS: . . . that sounds like a fair summary, yes.

Watson Ex. 1034, pp. 89:14-90:11.

23.    During Mr. Tannas' first deposition, before the statements identified in FF 95 and 96, Mr. Tannas stated that "you have to respect my right that my process *is* a trade secret. . . . And I do not want BAE to know what they *are*." Watson Ex. 1018, p. 66:3-13.

## WHY RELIEF SHOULD BE GRANTED

**A.    The Watson Application Fails to Provide a Written Description for "Applying a First Seal Between the Plates" and Therefore Tannas Preliminary Motion 2 Should Be Granted**

On page 28, lines 5-12, the decision states that Tannas has failed to sufficiently demonstrate that the Watson specification fails to provide support for "applying a first seal between the plates." Tannas requests reconsideration and reversal of the decision for three reasons. First, the decision overlooks the definitions proposed by either of the parties to the present interference, and adopts a claim construction that eviscerates the phrase "between the plates" from the claims. Second, the decision relies on use of the term "gap" in the Watson specification to support its claim construction (a term not found in the Watson claims), yet overlooks the only evidence of record regarding the meaning of "gap," i.e., that provided by Tannas' experts. Finally, the decision overlooks Tannas' expert testimony that a bead of sealant applied along the cut edge of a display, as described in the Watson specification, could not penetrate and be located between the plates.

### 1.    "Applying a First Seal Between the Plates" Cannot Be Broad Enough to Mean a Seal Lying Along the Same Plane as the Cut Edges of the Plates

On page 30, lines 20-22, the decision adopts a construction for "applying a first seal between the plates" that was not presented by either party, i.e., that this phrase is "broad enough to mean that the seal lie along the same plane as the cut edges of the plates." The decision overlooks both parties' meanings of "applying a first seal between the plates," and, adopts a claim construction that is not supported by the record. Because the decision's claim construction was not proposed by either party, the parties' pleadings did not previously address this issue.

The decision correctly acknowledges that Tannas' experts testified that "applying a first seal between the plates," as used in the Tannas patents, means that a seal is applied that is located between the front and back glass plates of an LCD, as explained in Tannas Preliminary Motion 2

11

(p. 5:3-6:2, citing Tannas Ex. 1005 ¶¶ 13-15, Tannas Ex. 1009 ¶¶ 12-14).  The decision, however, overlooks that, when Tannas' experts were cross-examined, they consistently testified that the phrase "between the plates" means that the seal is located in the space between the plates, even outside the context of the Tannas patents.  Tannas Facts 1-3.  Instead of considering Tannas' expert testimony, the decision cites no basis in the record for the definition it adopts, and, in fact, adopts a construction that eviscerates the phrase "between the plates" from the claims.

Specifically, Watson claim 96 does not include "between the plates," but instead recites "applying a first seal *along an exposed edge* of the target display portion, the first seal creating a barrier to prevent the image-generating medium from escaping out of the area between the plates."  Based upon the plain meaning of this claim language, "applying a seal along an exposed edge" must be different than "applying a first seal between the plates along an exposed edge."  . Properly construed, the language "applying a seal along an exposed edge" must mean that "the seal lies along the same plane as the cut edges of the plates."  This interpretation is entirely consistent with the Watson specification that a seal applied "along an exposed edge" is not "between the plates," as explained by Tannas' experts.  Tannas Facts 2-4, 6-8.  Such a seal can seal the exposed edge to create a barrier, but not extend between the plates.

Additionally, based upon claim differentiation, the language "applying a first seal *between the plates* along an exposed edge," as found in Watson claim 53, must mean something different than the language of Watson claim 96, which merely recites "applying a first seal along an exposed edge."  Even Watson recognizes this difference, by arguing at page 15, lines 1-2 of Watson Opposition 2, that the phrase "applying a first seal between the plates" does not "specify the amount of the sealant that must be 'between' the plates nor limits the seal to being disposed solely between the plates."  (emphasis in original).  Thus, Watson does not dispute that the plain

meaning of "applying a first seal between the plates," necessarily means that at least some of the seal must be applied and located between the plates. Watson only disputes how much of the sealant must be located between the plates.

Therefore, based upon the evidence of record, the phrase "applying a first seal between the plates" must mean more than "that the seal lies along the same plane as the cut edges of the plates." In fact, based upon the plain meaning of the phrase, as well as the only testimony on this issue (namely that of Tannas' experts), as well as Watson's own arguments, the phrase "applying a first seal between the plates" must mean that the seal itself must be applied such that it is located between the plates.

As explained in Tannas Preliminary Motion 2 (p. 5:3-6:8) and Tannas Reply 2 (p. 6:15-7:23), the Watson specification fails to support applying a first seal between the plates, as recited in Watson claims 53, 78, 91, 92, 94, and 95. Therefore, the only possible conclusion is that these claims are not patentable to Watson due to lack of written description under 35 U.S.C. § 112, ¶1. Accordingly, the decision should be reversed, and Tannas Preliminary Motion 2 should be granted.

### 2. The Decision Bases Its Claim Construction on Use of the Term "Gap" in the Watson Specification Despite the Fact That the Watson Claims Never Recite the Word "Gap."

At page 31, lines 12-21, the decision appears to conclude that the language from the Watson specification that "the gap between the plates 12 and 13 is then sealed . . . by applying a bead of ultra-violet curing sealant" is synonymous with the claim language "applying a first seal between the plates." The problem with this assumption is that the phrase "between the plates," as used in the Watson claims, necessarily modifies the "first seal." There is no "gap" recited in any of the Watson claims. Therefore, based upon the plain language of the claims, the phrase

13

"between the plates" refers to a location of the recited "first seal," and cannot possibly be referring to any "gap," which is not recited in claims.

Further, the decision overlooks Tannas Reply 2 (p. 6:17-7:17) and the identified supporting expert testimony, which explains that a person of ordinary skill in the art would understand "gap" to mean a ***distance between the plates***, i.e., how far away the plates are from one another, and not a location for a seal. Tannas' experts were cross-examined extensively on this issue, and consistently testified that a person of ordinary skill would understand "gap" to be the distance between the plates. Tannas Fact 5. Thus, based upon the plain meaning, the "gap" described in the Watson specification is simply the distance that the plates are apart from one another along the cut edge.

Tannas' expert testimony on the term "gap" is consistent with Watson's own definition and related arguments. In Watson Opposition 2, Watson argues that the only seal shown in the Watson application is "between the plates and positioned in the gap" (p. 16:2-3), and that the adhesive would flow inward "to fill any void between the plates" (page 16:13-15).

Even Watson did not argue that the claim language does not require a seal located in between the plates. Instead, Watson recognized that the claim language required the seal to be applied and located between the plates, but argued that the bead disclosed in the Watson specification would, in fact, penetrate the space between the plates, as described in the Tannas patents. Watson Opposition 2, pp. 16:19-17:2.

Nonetheless, even if the definition of the term "gap" identified at page 31, lines 19-21 of the decision ("an opening in a structure or surface") is the correct one, this definition does not support that sealing such a gap requires applying a seal between the plates, as claimed. As explained by Tannas' expert, Dr. Doane, the Watson specification discloses that "the seal is on the outside of the gap. It's not within the gap." Tannas Fact 8. In other words the bead of

14

sealant disclosed in the Watson specification is not applied "between the plates" but is on the

outside of the gap. Similarly, Mr. Fergason testified during cross-examination that the bead of

sealant disclosed in the Watson specification is a "butt seal" or "fillet" and is not "between the

plates." Tannas Fact 4; see also, Tannas Facts 6, 7.

Accordingly, the phrase from the Watson specification reciting that "the gap between the

plates is sealed" cannot support the decision's claim construction for "applying a first seal

between the plates."

### 3. The Decision Overlooks the Testimony of Tannas' Experts That a Bead of Adhesive Applied Along the Cut Edges Could Not Extend Between the Plates Because There is Already Liquid Crystal Between the Plates

At page 31, lines 21-24, the decision states that, even assuming Tannas' proposed

construction, "It would logically follow that the gap and the adhesive to seal the gap are within

the perimeter of the outer edges of the glass plates. Tannas has failed to suggest otherwise." The

decision overlooks the uncontroverted testimony of Tannas' experts to the contrary, as explained

in Tannas Reply 2 (p. 8:1-15).

Tannas' expert, Mr. Fergason, testified unequivocally during cross-examination that the

Watson specification does not disclose applying a seal between the plates when he stated that

there was "no attempt to get bonding between the internal parts of the plate[s]" in the Watson

specification. Tannas Fact 6. When asked whether the seal material disclosed in the Watson

specification was positioned in the gap between the plates, he responded "It is surely not

disclosed." Id. Further, when asked whether page 13 of the Watson specification suggested

sealing the gap with an adhesive between the plates, Mr. Fergason repeated "again this does not

disclose anything but taking a bead of adhesive." Id.

Similarly, Dr. Scheffer testified that the Watson specification merely disclosed that "the

end of [the] plate is sealed", i.e., that sealant is applied along the edge. Tannas Fact 6. Further,

Dr. Scheffer reinforced that, if adhesive is applied along the cut edge, *as disclosed in the Watson specification, it is not possible* for the adhesive to traverse between the plates, because "There is nowhere it can go. There's already liquid crystal there." Id. Finally, Dr. Doane also testified that the Watson specification merely discloses a seal that is "outside of the gap. It's not within the gap." Tannas Fact 8.

Further, the Tannas patents expressly disclose that "Liquid crystal material is then drained or wicked out of the cell to allow for a replacement seal line 115 to be placed along the then newly-exposed and newly-unsealed plate edges. The replacement seal 115 is installed by applying an adhesive along the cut edge and preferably in between the plates 20 to reseal the display 10´." Tannas Fact 9. As Dr. Scheffer explained, this wicking requires "physical removal of some of the liquid crystal" before the seal is applied. Id. Removing liquid crystal material is predicate to applying the seal between the plates "to make a place for the sealant to come in between the two plates." Id. The Watson specification does not disclose any such removal, which is why Dr. Scheffer testified that "it is not possible for the adhesive to traverse in between the plates" following the Watson specification because "There is already liquid crystal there."

Thus, within the context of the Watson specification, all of Tannas' experts testified that the Watson specification failed to disclose a method that included applying a seal that was located within the gap or between the plates. Watson has provided no evidence to the contrary, and the decision identifies none that would contradict the testimony of Tannas' experts.

Given the proper construction for "applying a first seal between the plates," as originally presented in Tannas Preliminary Motion 2, the decision relies on no evidence to support that the Watson specification disclosed a seal applied such that it is located between the plates. The decision completely overlooks Tannas' evidence to the contrary. For these reasons, the Board should reconsider and reverse its decision on Tannas Preliminary Motion 2, and find that Watson

16

claims 53, 78, 91, 92, 94, and 95 are not supported by the Watson specification, as required by

35 U.S.C. § 112, ¶1.

**B.    The Doyle References Disclose Every Step of Watson Claim 96, and Therefore Tannas Preliminary Motion 3 Should Be Granted**

Although the decision does not appear to dispute that the Doyle references disclose the

"cutting" step of Watson claim 96, at page 37, lines 15-20, the decision concludes that the Doyle

references do not teach applying a first seal along the exposed edge, as claimed.  In addition,

between page 38, line 3 and page 39, line 7, the decision concludes that Watson claim 96

inherently requires the display to be operative upon completing the recited steps, and that the

Doyle references fail to disclose any operability testing to demonstrate that the disclosed displays

remained operable.  The decision should be reversed for three reasons:  1) the only evidence of

record supports that the Doyle references disclose "applying a first seal," as claimed; 2) the

express language of Watson claim 96 does not require the display remain operative; and 3) even

if such operability is required, the evidence supports that the displays discussed in the Doyle

references were operated during the disclosed testing.

**1.    The Decision Misapprehends Dr. Scheffer's Testimony That the Doyle References Disclose Applying a First Seal Along an Exposed Edge of the Target Display Portion.**

At page 37, lines 15-20, the decision rejects Dr. Scheffer's testimony that the Doyle

references teach applying a first seal along an exposed edge, as claimed.  The decision overlooks

Dr. Scheffer's direct testimony discussed in Tannas Preliminary Motion 3 (pp. 13:3-14:2).  Dr.

Scheffer testified that, based upon the passages of the Doyle references, "a person of ordinary

skill would appreciate that a seal was applied along the exposed edge to create a barrier to

prevent the image-generating medium (liquid crystal) from escaping.  Such a seal would be

necessary in order to subject the LCD to subsequent testing." Tannas Fact 10.

17

First, as explained in Tannas Preliminary Motion 3 (p. 13:3-17), the Doyle references expressly state that the involved displays were "resealed." Tannas Fact 10. Dr. Scheffer's direct testimony explains why applying such a seal would not only be appreciated by a person of ordinary skill, but would be necessary, i.e., in order to subject the LCD to subsequent testing. There is no evidence to suggest, nor did Watson argue, that the process described in the Doyle references may have involved "a resealing of the two pieces that were severed," as proposed at page 37, lines 18-20 of the decision. It is unclear why Dr. Scheffer would be obligated to discuss all alternative methods that might have been possible, rather than the method that he testified a person of ordinary skill would take from the Doyle references, in order to constitute something more than "unsupported assertions." The decision states that the Federal Rules do not require the fact finder to credit unsupported assertions of an expert, citing Rohm & Haas, 127 F.3d 1089, 1092. In Rohm, the only evidence offered to support a claim of infringement was an expert's opinion, referred to by the court as "general" and "summary." Id. The opinion was "unsupported." Id.

Further, contrary to Rohm, Dr. Scheffer testified that he was familiar with the types of displays discussed in the Doyle SID Article, because he actually invented them. Tannas Fact 11. Thus, Dr. Scheffer would be particularly qualified to, and did, testify as to what a person of ordinary skill would understand based upon reading the Doyle references. This further supports that Dr. Scheffer's testimony should not be dismissed. Since his testimony was uncontroverted on the issue of whether the Doyle references disclose "applying a first seal," his testimony sufficiently supports Tannas Preliminary Motion 3. By rejecting the testimony of Dr. Scheffer under these circumstances, the Board imposes a virtually impossible burden on Tannas.

### 2. The Decision Erroneously Concludes That Watson Claim 96 Inherently Requires the Recited Display to Be Operative Upon Completing the Claimed Method

At page 38, lines 3-20, the decision concludes that it is inherent to the method of Watson claim 96 that the display remain operative once its physical shape is changed, and that the Doyle references do not disclose operability testing. The decision misapprehends the express language of Watson claim 96, as explained in Tannas Reply 3 (pp. 5:9-7:7), and therefore should be reversed for two reasons. First, the plain language of Watson Claim 96 does not require that the recited display remain operative *after* completing the cutting and resealing steps. Second, even if such operability is required, as explained in Tannas Reply 3 (p. 7:3-7), Dr. Scheffer testified that the displays disclosed in the Doyle references were tested after resealing, and that such testing would be "understood" to include operability testing.

At page 38, lines 4-9, the decision concludes that the language "an electronic display" in the preamble of Watson claim 96 requires that the display remain operative once its physical shape has been changed. The decision overlooks the express language of Watson claim 96, which merely requires that the method *begin* with an electronic display. The preamble does not limit the expressly recited steps, and therefore cannot be considered limiting of the scope of Watson claim 96.

Further, the Federal Circuit has held that a prior art reference is still valid for what it discloses, even if it is inoperative. Beckman Instruments Inc. v. LKB Produkter AB, 892 F.2d 1547, 1551, 13 USPQ2d 1301 (Fed. Cir. 1989) ("Even if a reference discloses an inoperative device, it is prior art for all that it teaches."). Thus, as long as the Doyle references disclose "cutting the display along desired dimensions resulting in a target display portion and an excess display portion" and "applying a first seal along an exposed edge of the target display portion," Watson claim 96 would be anticipated, even if the disclosed displays were inoperative.

The doctrine of claim differentiation also dictates that Watson claim 96 does not require that the recited electronic display remain operable. While other Watson claims recite "retaining the basic functionality of the display" (including claim 98, which depends from Watson claim 96), this language is not present in Watson claim 96. Therefore, basic functionality or operability is not required in Watson claim 96.

Accordingly, the decision should be reversed because, based upon the express language of Watson claim 96 and the doctrine of claim differentiation, there is no requirement that the electronic display recited in the preamble remain operable. Thus, as long as the Doyle references disclose the recited steps of cutting and applying a first seal, Watson claim 96 is unpatentable to Watson.

### 3. Even if Watson Claim 96 Required an Operative Display After Completing the Recited Steps, the Doyle References Disclose the Necessary Testing to Demonstrate Operability

At page 38, lines 17-20, the decision concludes that the testing discussed in the Doyle references is limited to physical testing and not operability testing. The decision overlooks Dr. Scheffer's testimony on this issue, as explained in Tannas Reply 3 (pp. 6:19-7:7), which supports that, if operability of the displays discussed in the Doyle references was required, the Doyle references disclosed that the displays were operated during the testing.

During his cross-examination, Dr. Scheffer was asked whether the Doyle references "talk about rechecking the operability of the displays after the sealing," and responded "they did do further testing after resealing." Tannas Fact 12. When he was asked whether the Doyle references disclose that "there was testing that was performed after the resealing was done to determine whether they [the displays] were operable," Dr. Scheffer responded "Well, I think part of the testing would include operation," and explained that "when you test the display, you operate it. That's understood." Id. Watson provided no evidence to controvert Dr. Scheffer's

testimony. Therefore, the only evidence of record supports that a person of ordinary skill would understand the Doyle reference to disclose that the displays were tested for operation.

Further, review of the Doyle references themselves would support that the displays were tested to ensure that they were operational. The Doyle SID Article states "The displays are used as frequency and channel indicators on a UHF radio. . . and in most of the returns, a color shift was noted to some extent. *Testing of the displays through all individual specification requirements* also failed to identify a cause." Tannas Fact 13. Surely, testing displays through *all* specification requirements would include operating the displays. This conclusion is further supported by the Doyle SID Article, where it states that "Solar exposure was highly suspect, due to the measurable red shift in the chromaticity of the displays' background." Id. To detect red shift in the chromaticity of the displays' background would necessarily require operating the display; otherwise the display would simply be dark.

Finally, with respect to the paragraph that anticipates Watson claim 96, the Doyle SID article states "NAWC cut a cell and measured the glass spacing. . . . The cell was resealed, refilled and cycled in solar testing and heat. No difference was noted before and after cycling measurements." Between page 38, line 20 and page 39, line 3, the decision concludes that the first sentence describes "solar testing and heat," and that this refers to physical testing and not operability testing. The decision, however, overlooks the very next sentence, which states that *"No difference was noted before and after cycling measurements."* This sentence supports that, after the physical testing, i.e., solar and heat cycling, the displays were tested and "no difference was noted." As supported by Dr. Scheffer's testimony, the differences that were monitored after the physical testing would involve operating the display to ensure that no differences were noted that would have been caused by the physical testing.

Accordingly, even if operability were required to anticipate Watson claim 96, the Doyle

references, as well as the uncontroverted testimony of Dr. Scheffer, demonstrate that the displays

discussed in the Doyle references were tested for operability. Therefore, this further supports

that Watson claim 96 is anticipated by the Doyle references.

**C.    The Decision Overlooks Tannas' Evidence That Mr. Tannas Disclosed the Best Mode for "Applying a First Seal Between the Plates."**

The decision should be reconsidered, and Watson Preliminary Motion 8 should be denied

for two reasons: 1) the decision misapprehends Mr. Tannas' testimony from his first deposition

when the decision concludes that he admitted that he did not disclose the best mode, and 2) the

decision overlooks Tannas' evidence demonstrating when he developed the method that is the

subject of the trade secrets which he sought to keep secret during his cross-examination.

**1.    Mr. Tannas Testified During His Original Cross-Examination That He Disclosed the Best Mode for Applying the Seal Between the Plates.**

**a.    Mr. Tannas Testified That The '906 Disclosed How to Apply a Seal Between the Plates at Column 7, Lines 23-49.**

At page 56, lines 18-19, the decision concludes that getting the seal between the plates is

Tannas' preferred embodiment. Tannas does not dispute this conclusion. Between pages 56,

line 20 and page 57, line 2, the decision then concludes that Mr. Tannas admitted that the '906

patent "does not describe how to get the adhesive between the plates." The decision overlooks

Tannas' evidence discussed in Tannas Opposition 8, as well as Mr. Tannas' testimony during his

first deposition (when Mr. Tannas made the statements that have been alleged as relating to his

best mode). Mr. Tannas and his experts have testified that the '906 patent expressly discloses

how to get the adhesive between the plates at column 7, lines 23-49, as explained in Tannas

Opposition 8 (p. 14:9-21). Tannas Facts 17, 18.

During his first deposition, Mr. Tannas testified, after being asked directly, that he

believed that he described the best mode for making and using the invention in the '906 patent

when it was filed. Tannas Fact 15. He also testified that he believed that the '906 patent would enable one of ordinary skill in the art to make and use the invention as described and claimed. Watson Fact 16.

In fact, Mr. Tannas was cross-examined for almost one and half hours regarding where the Tannas patents disclosed how to apply a seal "between the plates." Tannas Fact 17. For example, when Mr. Tannas was asked "where in the patent you have the description of the manner in which you would apply the first seal between the plates, Mr. Tannas repeatedly identified column 7 as disclosing this process. Tannas Fact 17. This testimony is entirely consistent with the testimony of Tannas' experts. Watson Fact 18.

Thus, the real issue is whether the method of applying a seal between the plates described at column 7 of the '906 patent was Tannas' best mode or whether the best mode was a method that involved "squeezing the plates." Because the decision does not clearly make this distinction, Tannas requests reconsideration and clarification of this issue. Further, as explained in Tannas Opposition 8 (pp. 15:20-16:20) and below, Tannas did not, in fact, consider a method for applying the seal that involved "squeezing the plates" to be the best mode at the time he filed the '427 application. Rather, Mr. Tannas testified that at the "golden moment" he concluded that the best way was to wick out liquid crystal material, and then apply a low-viscosity adhesive along the cut edge such that it flows between the plates - the very way described in the Tannas patents. Tannas Facts 19-21.

### b. The Decision Misapprehends the Statements Made By Mr. Tannas When It Concludes That They Relate to Best Mode.

At page 57, lines 7-14, the decision concludes that Mr. Tannas testified that "he *did* not purposefully disclose [the best way] to get the adhesive between the plates, since he wanted to keep it a trade secret." This conclusion misapprehends the very language upon which it relies, inserting the words "best way" where they did not exist, and changing the tense of Mr. Tannas'

statements from "do" to "did," to bootstrap the statements to support the decision. Further, the decision overlooks the other substantial evidence presented by Tannas that a method that involved "squeezing the plates" was not the best mode at the time the original Tannas application was filed.

For example, during the portion of Mr. Tannas' cross-examination identified in FF 94 of the decision, Mr. Tannas was not asked about best mode, but was asked whether "the patent teaches one skilled in the art here how to get the adhesive 115 in the position shown in the figure, namely in between the plates." Thus, at most, Mr. Tannas was being asked about enablement, and not best mode. Given his and his experts' other specific testimony that the Tannas patents are enabled, his response merely demonstrates that he was confused about the circumstances of the question when he stated "I don't think I explain or give a teaching of how that's done in the patent." Even if his statement is taken at face value, however, it does not support that Mr. Tannas admitted that he failed to disclose the best mode, but, at most, raises a question of whether the Tannas patents are enabled.

Similarly, Mr. Tannas' statements identified in FF 95 also, on their face, appear to relate to enablement and not best mode. Mr. Tannas was asked whether "someone who had the skill in the art" would be able to apply the adhesive according to the teachings in his patent in order to get it in between the plates. Based upon the testimony of Mr. Tannas elsewhere, as well as his experts' testimony, however, there can be no doubt that the Tannas patents, in fact, enable applying a seal between the plates. Thus, these passages do not demonstrate that he withheld information relating to best mode.

At page 55, lines 8-10, the decision misapprehends Tannas' testimony identified in FF 93, stating that the question was "what step is taken, *in accordance with his patent*." The decision overlooks the actual statements, as explained in Tannas Opposition 8 (p. 17:11-17). Mr.

Tannas was not asked what step is taken in accordance with his patent. Mr. Tannas was asked questions *in the present tense* and answered them *in the present tense.* Based upon Mr. Tannas' answer, it is clear that he did not make statements about his patent, but about his activities at the time of the deposition. As explained in Tannas Opposition 8 (p. 17:11-17), Mr. Tannas did not behave as if these questions were asking him what he *did* at the time of filing the first Tannas application (or even what the Tannas patents disclose). Clearly, he understood the questions as asking what he *does* (i.e., as of the time of the deposition), as evidenced by his response: *"The way I do it is my way, and I'd just as soon keep that a trade secret."*

This is entirely consistent with Mr. Tannas' statements earlier when he stated "you have to respect my right that my process *is* a trade secret. . . . And I do not want BAE to know what they *are*." Tannas Fact 23. Thus, as explained in Tannas Opposition 8 (pp. 16:24-17:10), Mr. Tannas was very concerned that his much larger competitor was trying to use the deposition as an opportunity to pry into his trade secrets.

With respect to FF 96, as explained in Tannas Opposition 8 (p. 18:3-23), these statements merely demonstrate that Mr. Tannas agreed that the Tannas patents do not disclose "squeezing the plates." When asked whether column 7 of the '906 patent disclosed the hypothetical process involving "squeezing the plates," Mr. Tannas testified that it did not disclose squeezing the plates. He explained that "this tells you how to get liquid crystal material out and where to put the adhesive." FF 96. Mr. Tannas then returned to the deposing attorney's hypothetical about "squeezing the plates" and testified that people would know how to squeeze based upon "first principles." FF 96. These final words clearly show that Mr. Tannas was discussing the *earlier hypothetical*, and not his best mode at the time of filing the '427 application.

Therefore, these statements do not demonstrate that Mr. Tannas withheld the best mode known at the time of filing the '427 application. At most, they demonstrate that, at the time of

his cross-examination, Tannas had trade secrets that he wanted to keep from his competitors. Therefore, Watson has failed to meet its burden even by a preponderance of the evidence, and Watson Preliminary Motion 8 should be denied.

### c. Mr. Tannas Testified During His Second Deposition That He Tried Squeezing the Plates at the Time of Filing the '427 Application But Could Not Get It To Work.

At page 55, lines 16-20, the decision concludes that Mr. Tannas was asked whether there was a description of squeezing the plates at column 7 of the '906 patent, and that his response was an admission that he withheld the best mode. Tannas response admitted that squeezing the plates was not disclosed. But, it was not an admission that he withheld the best mode. The decision states at page 59, line 13-16, that "according to Mr. Tannas he discovered a new method of resizing an LCD that included squeezing the plates about a year after he filed the '427 application." The decision misapprehends Mr. Tannas' testimony identified in Tannas Opposition 8 (pp. 15:20-16:16).

First, Mr. Tannas never testified that he "discovered" a new method, but rather that he "developed" a new process that included special tooling including a set of pressure plates for squeezing an LCD. Tannas Fact 19. The decision interprets Mr. Tannas' testimony as if it were an all-or-nothing event, rather than as a series of ongoing activities in which he tried many things, including squeezing the plates, but was unable to get any process to work at the time the '427 application was filed other than that process described in the '906 patent.

As Mr. Tannas testified during his cross-examination, he was aware of a process that involved "squeezing the plates" at the time he filed the '427 application (and was, in fact, aware of this option when he conceived of the invention in 1993, as the decision acknowledges at page 60, lines 15-20). He testified, however, that he was unable to get such a procedure to work at that time. Mr. Tannas was cross-examined extensively on this issue, and acknowledged that he

26

tried squeezing the plates during some of his experiments. The problem was "when I would release it in the process of squeezing it, I got air bubbles in, and the adhesive would not go in uniformly. So then I tried some other ways basically squeezing less and releasing less until I got to the point where *I really didn't squeeze any more* than just enough to stabilize it at what I considered its position when assembled, wiped it clean, put the adhesive down and waited a brief time until the adhesive went in by it own mechanism, namely, because of its viscosity and penetrating properties." Tannas Facts 20-22. He defined this revelation as his "golden moment." Tannas Fact 21.

Further, when asked specifically about using a vise or clamps to squeeze the plates, Mr. Tannas testified that "It was kind of out of control. I couldn't keep the meniscus uniform, and I couldn't draw in the adhesive without drawing in air bubbles." Tannas Fact 22. He was then asked whether "*at that point in time the best way that you knew* of was to place the plates between a fixture of some kind like a vise or these clamps that you mentioned and to apply the adhesive along the cut edge and to allow that adhesive to go into the gap between the plates by capillary action," i.e., the very process described in column 7 of the '906 patent. Id. Mr. Tannas confirmed that this was true. Id.

Thus, although Mr. Tannas testified that he knew about the possibility of squeezing the plates at the time he filed the '427 application, he did not believe it was his best mode, because he could not get it to work given the limited tools at his disposal at that time. Consequently, he disclosed the process that he knew worked, i.e., the very process described at column 7 of the '906 patent. Therefore, Tannas did not fail to disclose the best mode in the Tannas patents.

## 2. The Decision Overlooks Tannas' Evidence Regarding His Subsequent Development of Special Tooling That Allowed Him to Apply a Seal Between the Plates by Squeezing the Plates

At page 61, lines 1-9, the decision concludes that Mr. Tannas' statements and evidence discussed in Tannas Opposition 8 are "largely uncorroborated and are inconsistent with other evidence and statements of record." The decision overlooks the testimony of Mr. Muir, who corroborated that Mr. Tannas did not have pressure plates when Tannas practiced his resizing method at the time of filing the '427 application, as explained in Tannas Opposition 8 (pp. 13:20-14:2). Mr. Muir's testimony is entirely consistent with and fully corroborates Mr. Tannas' testimony that he was unable to successfully practice a resizing process that involved squeezing the plates until much later when he developed his special tooling that he maintains as a trade secret.

The decision also misapprehends Mr. Muir's testimony, and instead speculates that, while Mr. Muir testified that he never saw Mr. Tannas with any pressure plates, "that did not mean that Mr. Tannas did not use some other means for squeezing the cells, e.g., his hands or a clip." There is no evidence to suggest that this might have occurred, let alone, actually occurred. In fact, the only evidence of record mentioning using hands, clips, or a vise is Mr. Tannas' testimony, which explains how these methods were unsuccessful. Tannas Facts 20-22. Mr. Tannas testified that the methods using hands or a vise to squeeze the plates introduced air bubbles or resulted in the adhesive not going in uniformly. Id.

The fundamental problem on this issue is that, when the decision states at page 61, line 14 that "first impression make lasting ones," the decision transfers the burden to Tannas to prove that he did not squeeze the plates, and that he did not believe squeezing the plates was the best mode at the time of filing the '427 application. The burden is Watson's to prove Tannas violated the best mode. It's not Tannas' burden to prove that he did not violate the best mode. There is

no evidence that supports that Tannas, in fact, successfully applied a seal between the plates by squeezing the plates at the time of filing the '427 application, because, as Mr. Tannas has testified, he was unable to successfully use such a method.

At page 61, lines 8-9, the decision states that it cannot "simply take the word of Mr. Tannas that the redacted portions [of Tannas Exhibits 2026-2029] are what he says they are." The decision overlooks the portions of Tannas Exhibits 2026-2029 that remain and were not redacted, which corroborate Mr. Tannas' testimony, as explained in Tannas Opposition 8 (p. 16:4-16). Watson does not object to the authenticity of Tannas Exhibits 2026-2029, only to the fact that Tannas redacted the trade secret portions of the documents.

In addition, before filing Tannas Exhibits 2026-2029, Tannas requested a protective order, which the Board denied in an Order on October 24, 2003 (Paper No. 76), as explained in Tannas Opposition to Watson Motion to Suppress 1 (pp. 5:18-6:2). Thus, the Board put Tannas in the position of either presenting un-redacted versions of Tannas Exhibits 2026-2029, and consequently destroying his trade secrets, or presenting the redacted versions and (unknown to Tannas at the time) having them rejected as insufficient. Therefore, there is no basis in the record for ignoring the exhibits, as presented.

For example, although Tannas Exhibit 2026 does not show the details of the pressure plates from the drawings, the captions clearly indicate the subject of the drawings, the author, and the dates of their creation. These dates are entirely consistent with and fully corroborate the invoices submitted as Tannas Exhibits 2027 and 2028, which show that third persons were involved in the construction and use of the pressure plates. The redacted exhibits do not disclose the substance of Mr. Tannas' trade secrets, but they do disclose the nature of the trade secrets and when they were developed.

Finally, between page 60, line 15 and page 61, line 2, the decision relies on Tannas' preliminary statement as evidence contradicting Mr. Tannas' statement that the only method known to him at the time he filed the '427 application was the one disclosed. The decision overlooks Mr. Tannas testimony, which states that the Tannas patents disclose the only method "known *and practiced* by him," as explained in Tannas Opposition 8 (p. 13:12-20). As explained above, Mr. Tannas did not deny that he knew that squeezing the plates was possible. He only denied that he was able to successfully practice it at the time the '427 application was filed. The best mode requirement does not require Mr. Tannas to disclose a method that he could not get to work. Because the best mode requirement does not require disclosure of a method that the inventor believed would not work, the decision should be reconsidered and Watson Preliminary Motion 8 should be denied.

## CONCLUSION

Tannas respectfully submits that Watson claims 53, 78, 91, 92, 94, and 95 are not supported by the Watson specification, that the Doyle references anticipate Watson claim 96, and that Watson has failed to demonstrate that Tannas failed to disclose the best mode for "applying a first seal between the plates" in the Tannas patents. Therefore, Tannas respectfully requests that the decision be reconsidered, and, specifically, that Tannas Preliminary Motions 2 and 3 should be granted, and Watson Preliminary Motion 8 should be denied.

Respectfully submitted,
COHEN SAKAGUCHI & ENGLISH LLP

By: _____
William A. English, Lead Counsel
Registration No. 42,515

2040 Main Street, 9th Floor
Irvine, CA 92614
Telephone: (562) 665-3953
Facsimile: (949) 625-8955

30

<u>Certificate of Service</u>

A copy of TANNAS REQUEST FOR RECONSIDERATION was served on this 26th day of July 2004, by placing copies of same in a package addressed to:

Leonard C. Mitchard
Stanley C. Spooner
NIXON & VANDERHYE, P.C.
1100 North Glebe Road, 8th Floor
Arlington, Virginia 22201-4714
Phone: (703) 816-4000
Facsimile: (703) 816-4100

And forwarding said package via FedEx, prepaid, on July 26, 2004 (FedEx Tracking No. 8463 7822 6807).

William A. English
Registration No. 42,515
Lead Counsel, Party Tannas

Attorneys for TANNAS:
William A. English, Reg. No. 42,515
Neal M. Cohen, Reg. No. 41,683
COHEN SAKAGUCHI & ENGLISH LLP
2040 Main Street, 9th Floor
Irvine, CA 92614


Attorneys for WATSON:
Leonard C. Mitchard, Reg. No. 29,009
Stanley C. Spooner, Reg. No. 27,393
NIXON & VANDERHYE, P.C.
1100 North Glebe Road, 8th Floor
Arlington, VA 22201-4714

31