Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

LAWRENCE E. TANNAS, JR.        )
Junior Party,                  )
Patents 6,204,906 and 6,390,999 )
                               )
vs.                            )
                               )
DAVID S. WATSON                )
Senior Party,                  )
Application 09/59,201          )
_____)
Patent Interference No. 105,906 )
_____)

LAWRENCE E. TANNAS, JR.

Newport Beach, California

Wednesday, September 17 2003

Reported by:
SHERYL HILTON MEYER
CSR No. 2852

JOB No. 615706A

2

1          UNITED STATES PATENT AND TRADEMARK OFFICE
           BEFORE THE BOARD OF PATENT APPEALS


PLAINTIFF'S EXHIBIT 8

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

2                                AND INTERFERENCES

3

4          LAWRENCE E. TANNAS, JR.      )
                   Junior Party,        )
5          Patents 6,204,906 and 6,390,999 )
                                        )
6                   vs.                 )
                                        )
7          DAVID S. WATSON             )
                 Senior Party,          )
8          Application 09/59,201        )
                                        )
9   Patent Interference No. 105,906 )
                                        )
10

11

12

13

14

15              Deposition of LAWRENCE E. TANNAS, JR.,

16       Volume 2, taken on behalf of Party Watson at

17       2424 S.E. Bristol, Suite 300, Newport Beach,

18       California, beginning at 8:37 a.m. and ending

19       at 3:44 p.m. on Wednesday, September 17, 2003,

20       before SHERYL HILTON MEYER, Certified Shorthand

21       Reporter No. 2852.

22

23

24

25

                                                        3

1   APPEARANCES:

2          HONORABLE ADMINISTRATIVE PATENT JUDGE SALLY C.
           MEDLEY
3          (Telephonic appearance.)

4   For Party Tannas:

                        Page 2

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

```
 5        COHEN & SAKAGUCHI, LLP
          BY:  NEAL M. COHEN
 6        BY:  WILLIAM ENGLISH
          BY:  JAMES K. SAKAGUCHI
 7        Attorneys at Law
          2424 S.E. Bristol Street, Suite 300
 8        Newport Beach, California 92660
          (949) 724-1849
 9
     For Party Watson:
10
          NIXON & VANDERHYE, P.C.
11        BY:  JAMES T. HOSMER
          BY:  STANLEY C. SPOONER
12        Attorneys at Law
          1100 North Glebe Road, Eighth Floor
13        Arlington, Virginia 22201
          (703) 816-4028
14

15

16

17

18

19

20

21

22

23

24

25
```

                                                    4

```
 1                          INDEX

 2   WITNESS                            EXAMINATION

 3   LAWRENCE E. TANNAS, JR.
     Volume 2
 4

 5             BY MR. HOSMER                     5

 6
```

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

7

8

9

EXHIBITS

10

| TANNAS | | PAGE |
|---|---|---|
| 8 | Declaration of Lawrence E. Tannas, Jr.; 5 pages | 51 |
| 9 | Patent 09/529201; 30 pages | 54 |
| 10 | UK Patent GB 2330 423B; 30 pages | 54 |
| 11 | Priority Document; 30 pages | 54 |
| 12 | History of the 906 patent prosecution; 107 pages | 120 |
| 13 | Hinata patent 5,610,742; 17 pages | 130 |
| 14 | Matsuyama patent JP61210326; 3 pages | 130 |
| 15 | "Advanced Cockpit Displays"; 31 pages | 146 |
| 16 | Visitor Management Register; 1 page | 165 |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1  INDEX (Continued):

2

INSTRUCTION NOT TO ANSWER

3

| Page | Line | Page | Line |
|---|---|---|---|
| 9 | 17 | 160 | 21 |
| 11 | 19 | 161 | 7 |
| 13 | 8 | 161 | 14 |
| 13 | 22 | 161 | 23 |
| 17 | 5 | 162 | 6 |
| 17 | 2 | 162 | 16 |
| 53 | 4 | 162 | 23 |

4

5

6

7

8

9

Page 4

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1    Newport Beach, California - Wednesday, September 17, 2003

2                        8:37 a.m. - 3:44 p.m.

3

4                        LAWRENCE E. TANNAS, JR.,

5    having been first duly sworn, was examined and testified

6    as follows:

7

8                        EXAMINATION

8:37A  9    BY MR. HOSMER:

10          Q    Good morning, Mr. Tannas.

11          A    Good morning, Jim.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

12    Q    Let me first ask you if you had an opportunity

13  to talk about your deposition during the break with your

14  counsel?

15    A    No.

16    Q    Did you discuss any of the matter that we

17  raised yesterday with your counsel?

18    A    No, I didn't.

19    Q    Did you have a chance to talk with anyone else,

20  for example, Dr. Doane?

21    A    No, I didn't.

22    Q    How about Dr. Fergason?

23    A    No, I didn't.

24    Q    Did you have any conversations with them

25  whatsoever between yesterday's close of the deposition

7

1  and this morning?

2    A    None whatsoever.

3    Q    How about Mr. Scheffer?

4    A    Yes.  I picked him up at the airport and took

5  him to his hotel last night.

6    Q    Did you have a chance to talk with him about

7  your deposition?

8    A    I didn't -- well, your question was different.

9  Had a chance.  I had a chance, but I did not.

10    Q    You did not discuss it.  So you followed the

11  guidelines that we talked about at the beginning of your

12  deposition yesterday with respect to a deposition?

8:38A  13    A    Except for my wife.

14    Q    Except for your wife?

Page 6

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

15     A     She pestered the heck out of me.

16     Q     That's all right.  I'm sorry she did, but I

17   think you can talk with her.

18            (Discussion off the record.)

19   BY MR. HOSMER:

20     Q     Mr. Tannas, I'd like to return for a few

21   minutes to a little bit about your background and

22   experience generally.  Yesterday you mentioned that you

23   had a number of issued U.S. patents; is that right?

8:45A  24     A     Yes.

25     Q     How many in total do you have?

8

1     A     Seven.

2     Q     And you have -- I think you mentioned that you

3   had one pending application.

4     A     Correct.

5     Q     So there is a total of eight, including the

6   application, a total of eight items including the

7   application; is that right?

8     A     To my memory, yes.

9     Q     I think the declaration or the papers I've seen

10   mentioned you had eight patents, but it really should be

11   seven patents and one application; is that right?

12     A     I believe that's right.  I haven't taken a

13   conscious effort to look back on how many patents I have.

14     Q     To the best of your recollection --

15     A     To the best of my recollection.

16     Q     -- it's just seven?

Page 7

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

17    A    Yes.

18    Q    I believe I saw the earliest date on those

19  patents was -- go back as far as 1973/'74.

20    A    Yes.

21    Q    And does that sound consistent with your

22  recollection?

23    A    Yes, it does.

24    Q    It sounds to me like you've had over the years

25  fairly extensive experience and background in dealing

9

1  with patents and applications.  Would that be a fair

2  assessment of part of your experience?

8:46A    3    A    Not any more than an engineer that has a couple

4  of patents because most of those patents were processed

5  by the company I worked for, and I don't own them.  So my

6  only real significant experience has come on this one.

7    Q    I guess what I'm getting at is I just want to

8  get a feeling for your involvement in the preparation of

9  applications and what we call the prosecution of the

10  applications in the patent office.  Could you give me

11  just a general description of how involved you were in

12  that process.

13        MR. COHEN:  Objection.  I'll instruct him not

14  to answer to the extent it requires information beyond

15  the scope of admissible discovery based on the APJ's

16  order.  Can you make it a more specific question?

17        (Instruction not to answer.)

18        MR. HOSMER:  No.

19    Q    You can answer.  Actually the guidelines we're

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

20    operating by, just as a reminder, Mr. Tannas, do not

21    require that either I respond to these objections unless

22    there is an instruction not to answer.  Unless there is

23    a privileged matter and there is an instruction, you're

24    obligated to answer the question as asked; and so I don't

25    need to reformulate the question.  I did some yesterday,

10

1    but today I'd like for you to answer the question that I

2    asked unless you are instructed not to do so.

8:47A   3         MR. COHEN:  I did instruct him not to do so.

4              MR. HOSMER:  You instructed him not to answer

5    that question --

6              MR. COHEN:  Yes.

7              MR. HOSMER:  -- about his past experience with

8    respect to patents?  On what basis?

9              MR. COHEN:  Would you read the question back?

10              (Record read.)

11              MR. COHEN:  I'll instruct him not to answer on

12    the basis it seeks information related to inventorship

13    and/or priority.

14              MR. HOSMER:  His declaration makes reference --

15    Q    Your declaration, Mr. Tannas, makes reference

16    to the fact that you are the patentee, that you've been

17    involved in getting these patents over the years; am I

18    right?

19    A    I'm the named person, yes.

20    Q    And my question to you is did you interface at

21    all with your patent counsel during the course of the

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

22    prosecution of the patents that we're talking about here

23    today?

8:48A    24         A    In the preparation of the patent?

25         Q    Yes.

11

1         A    Yes.

2         Q    And we're going to mark and identify your

3    patent applications during the course of your testimony

4    here today.  Now am I right you had some involvement in

5    the preparation of the applications that relate to the

6    inventions which are described and claimed in the patents

7    that are at issue today?

8         A    In 906 and 999 I had involvement.  The other

9    patents I had very little involvement in.

10         Q    All right.  Let's talk about the patents that

11    are involved in the interference.  Could you describe

12    just generally what your involvement was in the

13    preparation of those applications before they were filed.

14              MR. COHEN:  I'm going to make the same

15    objection and instruct the witness not to answer.  If

16    you'd like to discuss it off the record, maybe we can do

17    that.  If we're going to have an argument, we will need

18    to call the APJ.

19              (Instruction not to answer.)

20              MR. HOSMER:  You're instructing him not to

21    answer that question?

22              MR. COHEN:  Yes.

23              MR. HOSMER:  And what's the basis for the

24    instruction?

Page 10

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

25          MR. COHEN:  The basis is that it's seeking

                                                    12

1    information that's related to inventorship and/or

2    priority, and that's beyond the scope of admissible

3    discovery according to the APJ's order.

8:49A    4          MR. HOSMER:  The preparation and the statements

5    in his patent application you're contending are outside

6    the scope of the examination?

7          MR. COHEN:  No, I'm not.  The question that you

8    asked I'm objecting to and instructing him not to answer

9    on that basis.

10          MR. HOSMER:  Mark these questions.  We're going

11    to call the ADJ.

12    Q    I'll ask you another question, Mr. Tannas.  Did

13    you assist in the preparation of the draft applications

14    which relate to the inventions covered by the patents

15    involved in the interference?

16    A    Yes.

17    Q    Did you provide any textual material that

18    related to the drafting of the applications as they were

19    filed in the patent office?

20    A    Yes.

21    Q    And did you review drafts of the applications

22    before it was actually executed by you and filed in the

23    patent office?

24    A    Yes.

25    Q    During the course of your involvement in that

Page 11

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

13

1    process, did you have an understanding of the need to

2    provide information in your patent and specification for

3    the best mode of making and using and practicing your

4    invention?

8:51A    5         MR. COHEN:  Objection.  I'm going to object to

6    that and instruct the witness not to answer based on the

7    same APJ's order.

8              (Instruction not to answer.)

9    BY MR. HOSMER:

10        Q    Do you understand what I mean when I use the

11   term "best mode" of your invention, Mr. Tannas?

12        A    I think you mean what I know in that context is

13   the preferred embodiment.  Is that the same as the best

14   mode, preferred embodiment?

15        Q    Do you understand that if we use the term that

16   you use "preferred embodiment," that you have an

17   obligation to describe the preferred embodiment in your

18   patent application?

19             MR. COHEN:  I'm going to object and instruct

20   the witness not to answer on the basis of the APJ's

21   order.

22             (Instruction not to answer.)

23             MR. HOSMER:  That asks for a yes-or-no answer.

24             MR. COHEN:  I'm still objecting and instructing

25   him not to answer.

14

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

8:52A

1      MR. HOSMER:  On what basis?

2      MR. COHEN:  On the basis of the APJ's order

3  that limits this deposition to the first phase of the

4  interference and restriction questions so that they can't

5  be asked regarding inventorship or priority.

6      MR. HOSMER:  How could this possibly relate to

7  inventorship, this question?

8      MR. COHEN:  Well, number one, the order states

9  that the questions are to be limited to the first phase

10  of the interference.

11      MR. HOSMER:  You said that, and my question to

12  you, sir, is how does this relate to inventorship asking

13  him about the preparation of his patent application?

14      MR. COHEN:  I'm instructing the witness not to

15  answer based on the APJ's order.  If you would like to

16  contact the APJ to discuss it, we can go off the record

17  and talk about it first.

18      MR. HOSMER:  Mr. Spooner, would you try to get

19  in touch with the ABJ to see if we can't resolve this.

20      MR. COHEN:  Let's hold the deposition until we

21  do that.

22      MR. HOSMER:  We're not going to hold the

23  deposition.  We're going to move forward with additional

24  questions.

25      MR. COHEN:  The order says that if we make an

15

1  objection and instruction that we are to contact the APJ

2  and postpone the deposition.  We can look at the order if

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

3      you want to do that.

4            MR. SPOONER:  I have the order in front of me,

5      sir.  What it says is that we contact the APJ.  We can

6      continue with other noncontested questions, but we

7      firstly have to determine whether the APJ is in her

8      office and how she can be contacted.

9            I'd rather not delay the rest of the deposition

10     while I use your phone to try to contact the APJ.  If we

11     reach the APJ, we will then move the phone over here so

12     that the court reporter can take down the substance, and

13     we'll put in a conference call.

8:53A  14            MR. COHEN:  Let me see the order real quick

15     that we're referring to.  Would you mind going off the

16     record or do you want to stay on the record?

17            MR. HOSMER:  Yes, we will stay on the record.

18            MR. SPOONER:  Right here.  That is the order

19     that you are concerned with.  This is on page 33 of the

20     special order.  This is the procedure.

21            MR. COHEN:  Under these circumstances the

22     deposition shall be suspended.

23            MR. SPOONER:  Counsel, if you want to suspend

24     it, that delays it even further.  That makes the problem

25     we already spoke about even more critical, but it's your

16

1      choice.  I'm just saying from the administrative aspect

2      of contacting the judge's office to see whether she is

3      available, we can do it concurrently and then suspend the

4      deposition and have a conference with the judge on the

5      record and then return to the deposition.  If you don't

Page 14

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

        6   want to do that and want to take the additional time,

        7   that's fine with me.

8:54A   8           MR. COHEN:  I'm going to follow the order that

        9   says to suspend the deposition under these circumstances.

       10           MR. SPOONER:  Okay.

       11           (Discussion off the record.)

9:00A  12           MR. COHEN:  We're on the record.  Counsel have

       13   agreed to allow the deposing counsel to ask one more

       14   question.

       15           MR. HOSMER:  Two questions.

       16           MR. COHEN:  Two questions that may avoid the

       17   need for the APJ's involvement.

       18   BY MR. HOSMER:

       19       Q   Mr. Tannas, here are my two questions:  As we

       20   sit here today with you having testified yesterday about

       21   your 906 patent, do you believe in your view as the

       22   inventor and as the person skilled in the art that the

       23   patent contains a written description of your invention

       24   that is sufficient to enable someone skilled in the art

       25   to make and use your invention and that it had that

                                                                   17

        1   description at the time you filed your application?

        2           MR. COHEN:  I'm going to object and instruct

        3   the witness not to answer on the basis of the APJ's

        4   order.

        5           (Instruction not to answer.)

        6   BY MR. HOSMER:

        7       Q   My second question is as we sit here today, do

                                Page 15

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

8      you believe the application that you filed which resulted

9      in the --

9:01A   10          MR. COHEN:  I'm sorry.

11     BY MR. HOSMER:

12          Q     As we sit here today, would you agree with me

13     or do you believe that the specification of your patent

14     which is involved in this interference contains the best

15     mode or the preferred embodiment as you say of your

16     invention at the time you filed the application?

17          MR. COHEN:  Objection, and I'll instruct the

18     witness not to answer the question based on the APJ's

19     order.

20          (Instruction not to answer.)

21          MR. HOSMER:  Okay.

22          MR. COHEN:  Can we go off the record for a

23     minute?

24          MR. HOSMER:  Sure.

25          (Recess.)

18

9:05A   1          (Telephone conference with Judge Medley)

2          MR. COHEN:  Hello.  This is Neal Cohen and Bill

3     English on behalf of party Tannas.

4          MR. SPOONER:  And Stanley Spooner and Jim

5     Hosmer on behalf of the party Watson.

6          HONORABLE MEDLEY:  Okay.

7          MR. SPOONER:  If your Honor could speak up a

8     little bit, we have reached a series of questions in the

9     deposition that opposite counsel party Tannas, counsel

10    for the party Tannas has instructed the witness Larry

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

11    Tannas not to answer on the basis of your order, and to

12    quote the part of your order that's pertinent it says

13    "Further ordered that cross-examination during the

14    preliminary motions phase shall not include questions of

15    inventorship or derivation."

16         what we would like to do is have the court

17    reporter read back to your Honor the first question that

18    was asked and also read the objection and then where

19    counsel are available to answer any questions you might

20    have on that, and we would like to get a ruling.

9:06A  21         HONORABLE MEDLEY:  Okay.

22         MR. SPOONER:  There are a total of four

23    questions, and so we'll just start with the first one

24    first if that's appropriate.

25         HONORABLE MEDLEY:  Okay.


                                                        19


1          MR. COHEN:  This is Neal Cohen on behalf of

2     party Tannas.  I also would like to read from the order

3     the statement that says "As explained by the APJ,

4     cross-examination shall be limited to the issues raised

5     during the preliminary motions phase of the interference

6     and are not to include questions regarding derivation or

7     inventorship."

9:07A  8          And the court reporter will read the first

9     question now, I believe.

10         (Record read as follows:

11              "Could you describe just generally what

12              your involvement was in the preparation of

                         Page 17

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

13    those applications before they were filed."

14    "MR. COHEN:  I'm going to make the same

15    objection and instruct the witness not to

16    answer.  If you'd like to discuss it off

17    the record, maybe we can do that.  If we're

18    going to have an argument, we will need to

19    call the APJ."

20    HONORABLE MEDLEY:  What are those applications?

21    What does that refer to?

22    MR. COHEN:  The two applications that are in

23    the interference, the two patents of Tannas, the 906 and

24    999.

25    HONORABLE MEDLEY:  And, Mr. Spooner, in what

20

1    context was the question?

2    MR. SPOONER:  Your Honor, the question was in

3    the context of ascertaining the extent and the input

4    that Mr. Tannas had to the application.  Mr. Tannas had

5    previously testified that with respect to the other

6    patents listed in his CV he had not had a lot of input

7    to those patents because they were owned by a

8    corporation.

9    He has testified that he had more input to

10    these two patents which are owned by Mr. Tannas.  In his

11    declaration he states and I quote paragraph 10 "Based

12    upon my review of the claim language, the specifications

13    and file histories of the Tannas patents," his own

14    patents, parenthetical insertion, "a person of ordinary

15    skill in the art would understand the 'applying a first

Page 18

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

16    seal between the plates' to mean that a seal is applied

17    in the space between the glass plates and not simply

18    along the fractured edges of the plates."

19            Now our question is a threshold question to

20    determine what Mr. Tannas knows about what one of

21    ordinary skill in the art would understand and what he

22    put into his own patent application regarding that

23    feature.  We're not asking whether he was the inventor

24    of it.  We're not asking for his opinion as a patent

25    attorney.

21

1             He has presented himself as an expert in the

2    field of sealing patents -- of sealing liquid crystal

3    displays, and one of the subject matters is this seal

4    being located between the plates.  We need to know

5    whether he understands what is normally included in a

6    patent application since he has testified that his review

7    of the claim language, the specification and the file

8    histories of his own patents that they meet what a person

9    of ordinary skill in the art needs to practice those

10    inventions.

9:09A    11            MR. COHEN:  This is Neal Cohen on behalf of

12    party Tannas.  The question that was asked, at least the

13    first in a series of four, requested general information

14    as to his involvement in the preparation and prosecution

15    of the patent applications.

16            The follow-up questions are questions involving

17    his best mode.  None of these requirements have anything

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

18   at all to do with determining the counts which is the

19   first phase of the interference.  The judge's order based

20   on our previous phone conference states that the

21   questioning shall not include -- shall be limited to --

22   let me read it directly -- "shall be limited to the

23   issues raised during the preliminary motions phase of the

24   interference."

25          MR. HOSMER:  Your Honor, this is Jim Hosmer.


                                                          22


1          HONORABLE MEDLEY:  Well, I'm not sure how the

2    question of his involvement in the preparation of the

3    application pertains to him testifying.  As I remember

4    your paragraph 10 declaration, he was just stating what

5    his opinion was of his specification of what the patent

6    actually disclosed or what one of ordinary skill in the

7    art would understand the patent to disclose or describe.

8    So I'm not sure what -- how the question, Mr. Spooner, of

9    his involvement in the preparation of those applications

10   actually goes to what his understanding of the patents

11   actually say.

12          MR. SPOONER:  Your Honor, how it applies is he

13   is opining as an expert that his patent application

14   teaches these items, these issues to one of ordinary

15   skill in the art, and his declaration and indeed one of

16   his preliminary motions suggests that he believes as a

17   person -- as an expert in the field that the Watson

18   applications do not support this applying a seal between

19   the plates.

20          We need to understand what his background is

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

21    with respect to his expert opinion as to the Tannas

22    patent meeting the enabling disclosure requirement and

23    the Watson patent not meeting the enabling disclosure

24    requirement.  He's the one who made the motion, your

25    Honor, saying that we should not be entitled to benefit.

23

1    We need to explore that and find out what his basis for

2    that opinion is.

9:12A    3        MR. COHEN:  This is Neal Cohen on behalf of

4    party Tannas.

5        HONORABLE MEDLEY:  Is that any different than

6    him reading a different patent that he's not even related

7    to in any way to say, you know, this is standard.  This

8    is what one of ordinary skill in the art would know.

9        You can direct questions to that like how do

10    you know that this is what one of ordinary skill in the

11    art would know, but I don't understand how the

12    involvement in the preparation of those applications

13    would lead to a conclusion that he was or was not when he

14    made his statement one, understanding what he read from

15    the disclosure as being what one of ordinary skill in the

16    art would understand if that makes sense.

17        MR. HOSMER:  It does, your Honor.  This is Jim

18    Hosmer, and I'm the one who asked the question.  One of

19    the reasons, and quite frankly I confess to you this is

20    probably one of the most basic questions asked in many

21    depositions obviously, and I understand the scope of the

22    order, but it really goes to Mr. Tannas's involvement to

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

23    the extent that it would be inconsistent with any of the

24    positions he's taken in the preliminary motions as to

25    what he believes is taught by, for example, the Watson

24

1    specification to a person skilled in the art.

2         Did he, for example, during the preparation of

3    his own application suggest a definition of a term or use

4    a term or was he involved in the drafting of parts of the

5    specification that might be inconsistent with views that

6    he's taken in his declaration and in the preliminary

7    motion.  It really goes as much to his expertise, as

8    Mr. Spooner said, and to his credibility and to his

9    veracity and accuracy of some of the statements that he's

10   made in the declaration.

11        Quite frankly I confess to your Honor that I'm

12   absolutely at a loss how that relates in any way to

13   inventorship.  It certainly does not or how it relates to

14   derivation.  It certainly does not.  So we see that as

15   something that is preliminary in nature.  It goes to the

16   very heart and sole of an inventor and as the premier

17   lexicogopher to use that term in the patent profession of

18   the words in his own application.  That's the reason for

19   the question.

9:14A   20        MR. COHEN:  This is Neal Cohen on behalf of

21   party Tannas.  I would just like to add that this is the

22   second day of the deposition of Mr. Tannas, and so the

23   preliminary questions regarding his qualifications were

24   extensively covered yesterday, and it's our belief that

25   they're using this deposition of Mr. Tannas for the exact

Page 22

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

25

1    purpose that we attempted to resolve with the previous
2    conference call with the APJ; that is, they're trying
3    to get more information that's related to inventorship,
4    priority, best mode and other issues that are not related
5    to defining the counts or the preliminary motions, and
6    that's why we made the objection and instructed the
7    witness not to answer.
8              HONORABLE MEDLEY:  Does Tannas -- I'm sorry.
9    Did Watson copy claims in this interference?
10             MR. SPOONER:  And the answer from Stanley
11   Spooner is yes, Watson did indeed copy the claims,
12   independent claims of the two Tannas patents.
13             HONORABLE MEDLEY:  Because I have not read
14   Tannas's motion, and so I'm kind of shooting from the
15   dark here; but if there is a dispute over whether or not
16   Watson has written description support for a claim term
17   that may have come -- cropped up from Tannas's involved
18   patents, then I think it -- probably then it would be
19   okay to ask such a question as to what kind of
20   involvement or did you think of other terms or were the
21   claim terms that you say that Tannas says Watson does not
22   have in its application.
9:16A  23             MR. SPOONER:  Your Honor, that's precisely
24   Tannas's preliminary motion two.  They are -- it's a
25   motion to deny or, excuse me.  It's their motion one.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

26

1   It's actually three motions in one.  They moved to add a
2   third count.  They moved for benefit with respect to
3   third counts, and they moved to deny Watson benefit of
4   that third count because allegedly there is no support in
5   the Watson priority document for that third count.  That
6   third count relates to the language "Applying a first
7   seal between the plates," and that's exactly what I
8   referred to in this paragraph 10 earlier.
9          Now the one other point that I'd like to make
10  is the court's order -- what the party Tannas's counsel
11  has been reading is the commentary in the order and not
12  the order itself.  On page 10 of your order of
13  September 3, 2003 you say "Accordingly, it is," and there
14  is a reference ordered, further ordered, further ordered,
15  further ordered, and the further ordered is what I quoted
16  your Honor as the order of September 3.
17         And it states "Further ordered that
18  cross-examination during preliminary motion phase shall
19  not include questions of inventorship or derivation."
20  Now we're not asking any questions regarding the
21  inventorship.  We're not asking any questions regarding
22  derivation.  We just want to know what Mr. Tannas's level
23  of understanding was when he prepared the application and
24  he prepared the words and the claims that he now says are
25  not supported in his expert opinion by the party Watson's

27

1   patent application.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

9:18A    2          MR. COHEN:  This is Neal Cohen on behalf of
3    party Tannas.  Again just now the last thing Mr. Spooner
4    said was that they're trying to ask questions about his
5    involvement as the inventor in the applications.  It's
6    completely irrelevant, and it's beyond the scope of the
7    order because it's trying to get information from
8    Mr. Tannas that's unrelated to the defining of the
9    counts.
10          We agreed that the -- one of the preliminary
11    motions filed is to redefine the count; and if they will
12    ask questions specifically about that language and
13    Mr. Tannas's expert opinion in that regard, we would not
14    object to those questions.  The problem is they're asking
15    general questions related to inventorship and
16    Mr. Tannas's involvement and the best mode requirement,
17    and those are expressly beyond the scope of the order and
18    have nothing to do with the interference counts or the
19    preliminary motion phase.
20          MR. SPOONER:  Your Honor, just again, Clint
21    Spooner.  Inventorship occurred long before Mr. Tannas
22    prepared his patent application.  In his preliminary
23    amendment he suggests that conception was in 1993.  He
24    filed his patent application in March of 1999.  We are
25    not asking questions about inventorship or derivation.


                                                        28


1    We're simply asking questions regarding what he
2    understood the terms in his claim language, specification
3    and file histories, things which he has referred to in

**Page 25**

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

4    his declaration.

9:19A    5            HONORABLE MEDLEY:  That's a little bit

6    different than having a general question what was your

7    involvement in the preparation of the application, don't

8    you think?  Maybe you could rephrase the question.

9            MR. SPOONER:  We have rephrased it several

10    times, your Honor, and none of our phrased questions go

11    to inventorship, and none of them go to derivation.  They

12    don't go to inventorship.  They go to his understanding

13    of what those words mean.

14            After we get his understanding of what those

15    words mean, we're then going to ask him why the Watson

16    patent doesn't mean the same thing in view of the same

17    disclosure, and we've got to establish this threshold

18    understanding on the part of this expert witness first so

19    that we can pursue --

20            HONORABLE MEDLEY:  I think the way you just

21    phrased it, I'm totally in agreement with you, and I

22    don't understand, Mr. Cohen, why you would object to

23    something like that.  I mean you've opened the door.  You

24    said that he's not showing something -- he's not, excuse

25    me, that Watson is not describing a term that they are

29

1    now claiming and that Mr. Tannas as an expert understands

2    those terms, and so certainly they should be able to ask

3    questions regarding the terms that you say Watson does

4    not enable or describe.

9:21A    5            MR. COHEN:  We agree with that, your Honor, and

6    we would not object to questions of that nature.  If the

Page 26

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

7    court reporter can read back the four questions that we

8    objected to, if it's necessary, all we objected to was

9    questions relating to best mode, Mr. Tannas's involvement

10   in the preparation of the application and his beliefs and

11   thoughts as the inventor of the application.

12        HONORABLE MEDLEY:  What was the last one?

13        MR. COHEN:  His beliefs and thoughts as the

14   inventor of the two Tannas patents.

15        HONORABLE MEDLEY:  Well, that goes to what he

16   thought the terms meant.  Why is that something you would

17   object to?

18        MR. COHEN:  I object to it because they asked

19   him as the inventor of the patent application.

20        HONORABLE MEDLEY:  He's certainly -- that's

21   what he said.  He said I'm the inventor, but we're not

22   going to whether or not he actually is.  We're all

23   assuming at this point yes, he is, and so they can cross

24   and ask him as the inventor of this what was your

25   understanding at the time that you were involved in the


30


1    application or drafting of the application or when you

2    invented what were you thinking when you came up with

3    these terms and what did they mean to you.

9:22A  4        MR. COHEN:  Okay.  To me that is -- that

5    question is getting to issues that have nothing to do

6    with the finding of the counts, but they're just using

7    the deposition to try to get information from Mr. Tannas

8    that's relevant to the second phase of the interference.


Page 27

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

9         If they want to ask him questions related to

10  his opinion as to what these terms mean to someone of

11  ordinary skill in the art, that's fine; but they're

12  asking him questions as to what he knew or what he did

13  not know at the time he drafted the application.  It's

14  completely irrelevant, and normally I might not object;

15  but based on our previous discussion and the order, I'm

16  objecting to it because it's beyond the scope of the

17  order. Did I make that distinction clear?

18         HONORABLE MEDLEY:  I believe so.  Your problem

19  is that you don't want them to ask questions about what

20  he thought in the past or what he was thinking when he

21  came up with certain terms?

22         MR. COHEN:  That's correct.

23         MR. HOSMER:  Your Honor, this is Jim Hosmer

24  again.  I'm not going to ask him about past history with

25  respect to these terms.  I want to ask him from the date

31

1  in which he filed the application what he believed he

2  meant and what involvement he had in defining the terms

3  in the specification.

4         It has nothing, your Honor, to do with

5  inventorship per se.  It has to do quite frankly with

6  Section 112 more than anything else.  It has to do with

7  his understanding of the requirement, among other things,

8  to provide a description of his invention in his words,

9  his definitions that are not only consistent with the

10  counts but consistent with his own patent specifications.

9:24A  11         HONORABLE MEDLEY:  I see the distinction here.

Page 28

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

12    Why can't you just direct the question as to what he

13    thinks these terms actually mean or what one with

14    ordinary skill would think the term means.

15            MR. COHEN:  Neal Cohen for party Tannas.  Those

16    questions we would not object to.

17            MR. SPOONER:  Your Honor, the problem is

18    Mr. Tannas is both being presented as an expert witness

19    but he is unique.  He has the knowledge of what the

20    inventor of these two patents meant when he filed the

21    application.

22            Let me read you his declaration which is in

23    support of his two motions, one of which seeks to deny us

24    benefit.  Paragraph 12 of the Tannas declaration states

25    "Based upon my review of the Watson applications, a


                                                              32


1    person of ordinary skill in the art would not understand

2    any of Watson's applications to describe or show

3    'applying a first seal between the plates.'"

4            Now what we're contending is that Mr. Tannas

5    has a certain specialized knowledge as the inventor, the

6    ultimate person responsible for the language in the

7    patents, in the claims, in the specification of the

8    Tannas patents, and we need to know what he intended them

9    to mean so that we can then compare and contrast the

10   supporting discussion in the Tannas patents with the same

11   supporting discussion in the Watson applications.

12           So it's not just getting an impartial expert's

13   opinion on what one of ordinary skill in the art would

                          Page 29

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

14  understand.  We need to know the inventor's understanding

15  of what he meant.  That's what we were -- they opened

16  him up when they made him an expert witness, and we're

17  entitled to cross him on these statements and his

18  understanding of what his language in his patent means,

19  and that's all we're seeking to do.

9:26A  20            MR. COHEN:  Again this is Neal Cohen for party

21  Tannas.  That's exactly what we are trying to prevent

22  which is the exact reason we had the conference call

23  before and got the APJ's order.  This is a unique

24  situation where Mr. Tannas is also the inventor, and this

25  deposition is supposed to be limited to the preliminary

33

1  motion phase.  They're still trying to use it to depose

2  Mr. Tannas as if it was the second phase, and they're

3  trying to get information related to his involvement.

4            HONORABLE MEDLEY:  How do the questions go to

5  the issue of derivation and inventorship?

6            MR. SPOONER:  Exactly.

7            MR. COHEN:  The other three questions that we

8  didn't read ask whether he understood what best mode

9  was and whether he believed the best mode was disclosed

10  in the application.

11            HONORABLE MEDLEY:  I'm having a hard time

12  trying to understand what best mode has to do in the

13  Tannas application or, I'm sorry, the Watson -- the

14  Tannas patent, what that has to do with enablement and

15  description support in the Watson application.

9:27A  16            MR. HOSMER:  This is Jim Hosmer.  I'm sorry to

Page 30

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

17    keep interrupting or keep injecting because you're

18    listening to all these different voices; but since I

19    asked the questions, the reason for determining whether

20    or not Mr. Tannas has an understanding of the obligation

21    to provide the best mode in his invention and the

22    obligation to describe a preferred embodiment is because

23    he's criticizing the Watson application in his motions

24    as not having such a disclosure, and he touts the

25    description in his own application, his own patent

34

1    specification as satisfying those requirements.  We need

2    to establish a foundation that he understands as an

3    inventor that he has an obligation to tell the patent

4    office and the world that this is the best way to make

5    his invention, and this is the way in which someone

6    skilled in the art could make and use it.

7              HONORABLE MEDLEY:  Mr. Cohen, it sounds like

8    you all opened the door then to that.

9              MR. HOSMER:  In their preliminary motions, your

10   Honor, I sincerely believe that's absolutely what they

11   did by criticizing our application in the interference as

12   not satisfying those minimum really threshold Section 112

13   enablement requirements.  They may not have characterized

14   it as the enablement problem, but the expert opinion and

15   testimony of Mr. Tannas in his declaration and their

16   motion papers are riddled with references to the lack of

17   satisfaction of that, and it seems as a foundation basis

18   that I'm entitled to ask Mr. Tannas with respect to his

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

19  own and our application where the line is drawn.

9:28A  20      MR. COHEN:  Your Honor, did you have a comment

21  for me?  This is Neal Cohen.

22      HONORABLE MEDLEY:  It sounds like you opened

23  the door when you talked about preferred embodiment.  Why

24  can't they cross on that?

25      MR. COHEN:  We did not discuss that in any of

35

1  the motions or any of the declarations.  We didn't

2  discuss best mode at all.  The only issue that we brought

3  up was the lack of enablement, excuse me, not even lack

4  of enablement, but the lack of written description in the

5  Watson applications.

6      MR. HOSMER:  If that's not enablement, your

7  Honor, I mean when we talk about the written description

8  requirement in paragraph 1 of Section 112, it has, as I'm

9  sure you know, the two basic fundamental requirements.

10  You need to disclose the best mode in that written

11  description.  You need to show there is a way at the time

12  the application is filed that someone skilled in the art,

13  a phrase used repeatedly by Mr. Cohen and Mr. Tannas not

14  only in their papers but in the deposition, have the

15  ability to make and use the invention.  This they claim

16  is theirs and not ours.

17      HONORABLE MEDLEY:  A written description of

18  enablement and best mode are separate requirements.

19      MR. SPOONER:  Exactly, your Honor.  This is

20  Clint Spooner.  The final point that I want to make

21  though is --

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

9:29A  22          HONORABLE MEDLEY:  I have written descriptions
       23  support.  I mean they're two separate fundamental
       24  different things, and from what Mr. Cohen is telling me
       25  they only argued written description.

                                                                36

        1          MR. SPOONER:  Your Honor, the written
        2  description that they're arguing is that it is deficient,
        3  and we only seek to question and find out what the
        4  deficiencies are and what Mr. Tannas's understanding of
        5  those terms is.  We have to understand what the claim
        6  terms are, and Mr. Cohen keeps talking about this being
        7  the preliminary phase of determining the scope of the
        8  count, and that's precisely what we're trying to
        9  determine.  We need to understand what Mr. Tannas is
       10  reading into the various limitations that in his motions
       11  to deny us benefit he's arguing we don't have in our
       12  specification, and that's exactly what we're trying to
       13  find out.
9:30A  14          HONORABLE MEDLEY:  Well, it sounds like
       15  Mr. Cohen doesn't object to those questions.  He just
       16  objects to the questions being asked at the time of the
       17  invention what he thought.
       18          MR. SPOONER:  No.  It's not at the time of the
       19  invention what he thought.  I think it's at the time that
       20  he prepared his patent application which is the critical
       21  time.
       22          MR. HOSMER:  The question really is, and the
       23  court reporter could read it, your Honor, is at the time

                              Page 33

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03
24   in which you filed your application did you understand,

25   Mr. Tannas, that you had an obligation to describe the


37


1    best mode for making your invention.  Did you have an

2    understanding to provide enough of a description to

3    enable someone to make and use your invention.

4           Those are the questions, and he was instructed

5    not to answer those.  Quite frankly again I confess I do

6    not believe they relate in any way to inventorship or

7    derivation.  They relate to the fundamental basis of

8    their motion with respect to what the disclosures in

9    these two cases actually mean to someone skilled in the

10   art.

11          MR. COHEN:  This is Neal Cohen hopefully for

12   the last time.  Your Honor is correct that we would not

13   object to questions that were asked of Mr. Tannas related

14   to his declaration and the lack of written description in

15   the Watson applications for the phrases that we argued.

16          We do object to the questions that Mr. Hosmer

17   just stated.  Those questions are proper for a later

18   deposition of Mr. Tannas as the inventor.  They are

19   completely irrelevant.  They are just trying to get

20   information to help them in other phases of this action

21   or other actions, but they have nothing to do with

22   defining the counts.  We didn't open any doors or ever

23   talk about best mode.

24          MR. SPOONER:  Your Honor, Clint Spooner finally

25   I hope.  They opened the door when they made Mr. Tannas

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

38

1    who is the inventor an expert witness.  They gave him a
2    declaration which he has signed and submitted in support
3    of their preliminary.  In that deposition he makes a
4    number of statements.  He makes those statements from a
5    special viewpoint both as an expert witness and as the
6    inventor.
7              We are entitled to examine him with respect to
8    what he understood when he filed that patent -- when he
9    signed that declaration and filed that patent application
10   and made those statements.  That's all we're trying to do
11   because then we're going to have to compare what he
12   understood and what one of ordinary skill in the art
13   would understand, if there is a difference, those
14   statements to mean with respect to our own patent which
15   they have alleged doesn't support the claim language.
16             So we're looking at claim language, and then
17   we're looking at what he understood that claim language
18   to mean as the inventor and then what one of ordinary
19   skill in the art would understand that language to mean.
20   There is a slight difference, but we want to understand
21   if he believes the difference to be substantive or not,
22   and so we have to ask him.
9:33A   23             HONORABLE MEDLEY:  Okay.  Here's what we're
24   going to do.  I believe the questions are not directed
25   to inventorship.  They're not asking specifically

39

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

1   Mr. Tannas, are you the inventor or what was your

2   knowledge of or those sorts of things or what did you do

3   as the inventor or that type of thing.

4          Furthermore, I am going to overrule the

5   objection, and party Tannas, you can object to the

6   questions and the answers provided in the standing order,

7   and I will reconsider them in the form of a motion to

8   suppress when all the evidence is turned in, but right

9   now those questions the witness will answer them.

10         MR. SPOONER:  Thank you, your Honor.

11         MR. COHEN:  Your Honor, this is Neal Cohen.

12   Also you are overruling the objection on the questions

13   related to best mode?

14         HONORABLE MEDLEY:  Yes.

15         MR. COHEN:  Okay.

16         HONORABLE MEDLEY:  They are just asking what

17   was your understanding at the time that you prepared the

18   application of what best mode means to you.

9:34A   19         MR. COHEN:  Okay.  Do you have any comments?

20         MR. HOSMER:  Thank you, your Honor.

21         MR. SPOONER:  Thank you, your Honor.  Sorry to

22   bother you.

23         MR. COHEN:  Thank you, your Honor.

24         HONORABLE MEDLEY:  Good luck.  Bye-bye.

25         MR. COHEN:  Just a second, please.  Are you

40

1   ready?  Do you want to read back the questions and have

2   him answer them?

Page 36

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

3          THE REPORTER:  It's going to take a while

4     because of all the --

5          MR. COHEN:  Do you want to go from scratch?

6          MR. SPOONER:  Do you want to take a short

7     break?

8          THE REPORTER:  It will take a couple of

9     minutes.

10          (Discussion off the record.)

9:45A    11    BY MR. HOSMER:

12     Q    Let me see, Mr. Tannas.  We have agreed off the

13     record that I'm going to try to ask you one or two

14     questions that are consistent with the judge's ruling but

15     perhaps not phrased exactly as the ones before.  I think

16     that we will wait to get those from the court reporter,

17     and we can over the lunch break formulate those in a way

18     that you can on the record answer those specific

19     questions, but let me ask you this as the question that

20     relates to the same subject matter.

21          So as we sit here today, do you believe as the

22     inventor of the 906 -- of the invention described in the

23     906 patent that you described in your patent application

24     when it was filed the best mode for making and using your

25     invention?


                                                            41


1          MR. COHEN:  I will object based on the same

2     grounds that it is beyond the scope of the permissible

3     discovery based on the APJ's order.  I normally would

4     instruct the witness not to answer, but based on the

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

5  APJ's ruling on the teleconference, I will not make that

6  instruction at this point.

9:46A  7  BY MR. HOSMER:

8      Q    Mr. Tannas, what is your answer?

9      A    Yes, I do.

10     Q    As we sit here today, Mr. Tannas, do you

11  believe that when you filed your patent application

12  relating to the 906 patent that it contained a

13  description of the invention that would be sufficient to

14  enable one of ordinary skill in the art to make and use

15  the invention as described and claimed?

16     A    Yes.

17         MR. COHEN:  I have the same objection, and I

18  normally would instruct the witness not to answer; but

19  based on the APJ's ruling, I will not make the

20  instruction.

21         THE WITNESS:  Yes, I do.

22  BY MR. HOSMER:

23     Q    Thank you.  Mr. Tannas, would you take your 906

24  patent, and I believe it was marked as Exhibit Number 2,

25  I believe.

42

1         MR. SPOONER:  Exhibit 3.

9:47A  2         MR. HOSMER:  Exhibit 3, I'm sorry.

3         THE WITNESS:  Yes.

4  BY MR. HOSMER:

5      Q    Yesterday, Mr. Tannas, we talked a good bit

6  about the description and method in your patent for

7  placing the seal between the plates.  Do you recall that

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

8  discussion?

9      A    Yes.

10     Q    I'd like you to, as an academic exercise from

11  you as the inventor, to take the patent and if you could

12  just look through the patent and identify by the column

13  and line designations where in the patent you have the

14  description of the manner in which you would apply the

15  first seal between the plates.

16         MR. COHEN:  Objection.  This was asked and

17  answered several times yesterday.

18         MR. HOSMER:  I don't think so.  I hear your

19  objection, but I want to be sure the witness understands.

20     Q    I am really asking you to give me chapter and

21  verse in the form of column and line numbers as best as

22  you can everywhere in the patent that you believe it

23  describes the manner in which you would apply the first

24  seal between the plates.

9:48A   25         MR. COHEN:  Same objection.


                                                        43


1          MR. HOSMER:  Thank you.

2          THE WITNESS:  Do I answer?

3          MR. COHEN:  Yes, you can answer the question.

4          THE WITNESS:  Well, it would take a while to

5   find every place, but one place of note --

6          MR. COHEN:  Don't write on this.

7          THE WITNESS:  -- is column 7, line 23 through

8   49.

9:49A   9   BY MR. HOSMER:

                          Page 39

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

10    Q    I'd like you to actually take the time if you

11  don't mind, just a few minutes, Mr. Tannas, and I want to

12  be sure that I record all the places in the patent that

13  you believe contain a description of your invention that

14  would support that particular language, and I'll quote it

15  to you "applying a first seal between the plates."  We

16  have that particular section you mentioned.  Are there

17  any other sections that you can find?

18         MR. COHEN:  Objection.  Asked and answered and

19  also ambiguous.

20  BY MR. HOSMER:

21    Q    I just need the column and line numbers if you

22  can.

23    A    Well, I would have to be sure I caught them

24  all, and so I'd have to reread the whole thing.  Is that

25  what you want me to do?

44

1     Q    I'd like you to take a few minutes, yes, and

2  actually read it.  If it takes longer than a few minutes,

3  and we can take a break if you want to do that, but I

4  would like to know --

5     A    I think I have to in order to answer your

6  question.

7     Q    I would actually appreciate your taking the

8  time to do that.  It is important.

9     A    Okay.

10    Q    And once again to be clear, I'm looking for

11  descriptions in your patent that talk about the way in

12  which you would apply the seal between the plates.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

9:50A    13    A    Okay.

        14         MR. COHEN:  Same objection.  Ambiguous.

        15         THE WITNESS:  I'll read the patent.  It's

        16    several pages long.

        17    BY MR. HOSMER:

        18    Q    Actually if you don't mind, I want to give you

        19    the time to do it to make sure your answer is complete.

        20    I don't want it to be incomplete on the record, and so we

        21    can take a few minutes' break if you prefer.

        22         MR. COHEN:  I suggest we take a break then.

        23    Off the record then.

        24         (Recess.)

10:42A    25    BY MR. HOSMER:

                                                        45

        1    Q    Mr. Tannas, when we adjourned, I requested that

        2    you provide me what I referred to as chapter and verse of

        3    the column and line numbers on the record for one phrase

        4    and then off the record I mentioned another, but first

        5    let me see did you find the column and line numbers that

        6    you feel support the method for applying a first seal

        7    between the plates as described and claimed in your

        8    patent?

        9         MR. COHEN:  Objection.  Ambiguous and

        10    objection.  Beyond the scope of the APJ's order.  I would

        11    normally instruct the witness not to answer, but I will

        12    withhold the instruction.

        13         THE WITNESS:  I found several places where it

        14    supported the need to do it --

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

15    BY MR. HOSMER:

16        Q    Would you --

17        A    -- direction to do it.

18        Q    Would you give me the actual column and line

19    numbers of whatever you found, how many you found so that

20    we can note them in the record, please.

21        A    Okay.

22            MR. COHEN:  Same objections.

23            THE WITNESS:  Okay.  Now in the abstract

24    line -- it's not lined in the margin like the other

25    parts, but I'm counting line 6 in the abstract, line 6, 7

46

1    and 8, 10 and 11.  Column 1, 44 to 51, column 2, column

2    3.

10:45A    3    BY MR. HOSMER:

4        Q    The line numbers in column 2?

5        A    They were electronic, and I thought we were

6    just doing the seal now; is that correct?

7        Q    That's right.  Thank you.

8        A    Column 3, line 14, 15.  Line 25, 26.  Column 4,

9    1 through 9.  Column 5.  Column 7.

10:48A    10    Q    You mentioned column 5.  Were there line

11    numbers?

12        A    None.

13        Q    Thank you.

14        A    8 through 49.  Column 8.  Column 9, 16.

10:49A    15    Q    There is nothing in 8?  I'm sorry.  You

16    mentioned 8, and there is nothing in 8?

17        A    Nothing in 8.

Page 42

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

18      Q     And then column 9, lines 16 through --

19      A     27, yes, 16 through 27.  Column 9, 44 through

20    40.  Correction, 44 through 58.  Column 11, 47 and 48.

21    Column 12, 5 through 9 -- through 12.  5 through 12.

22    Column 6 -- column 12, sorry, 27 through 35.  Continuing

23    on 12, line 52 through 53.  Correction, 52 through 68.

24            Column 13, 1 through 4.  Column 15, still on

25    13, 15, 16.  32 through 33.  Column 14, 22 through 25.

47

1     Continuing column 14, line 64 through 67.  Column 15,

2     line 14 and 15.  Line 34 through 38.  Column 16, 5

3     through 8.  Column 16, 17, 18.  Column 16, 33 to 34, and

4     that's all.

10:55A   5      Q     Great.  Off the record, Mr. Tannas, I also

6     suggested that you perform the same exercise with the

7     results you just read into the record with respect to

8     another phrase, and that phrase was "reestablishing

9     electrical circuitry," and let me ask you first did you

10    undertake to identify those portions of the specification

11    which you feel support that particular phrase?

12      A     Yes, I did.

13            MR. COHEN:  Objection.  Vague and ambiguous.

14            MR. HOSMER:  What I'd like to do -- let's go

15    off the record a second.

16            (Discussion off the record.)

10:56A  17   BY MR. HOSMER:

18      Q     Mr. Tannas, would you go ahead and read the

19    column and line numbers that you feel support the

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

20   description of the invention as it relates to

21   establishing of electrical circuitry.

22        MR. COHEN:  Objection.  Ambiguous.  It's also

23   beyond the scope of admissible discovery according to the

24   APJ's order.  I would normally instruct the witness not

25   to answer, but I'll withhold the instruction.


                                                        48


1        THE WITNESS:  Okay.  Abstract line 15 to 23.

2   Column 2, line 59 through 65.  Column 3, line 16 to 19.

3   Column 3, 33, 38, 33 through 38.  Column 3, line 47

4   through 49.  Column 4, line 11.  Let me add to the

5   adhesive part column 4, line 11 through 15.  Column 4,

6   lines 65 through 67.  Column 5, 37 through 67.  Column 6,

7   42 through 46.  That's in column 6.  Column 8, line 8

11:01A  8   through 22.  Column 8, line 36 through 40.  Column 8

9   continuing, 56 through 62, and continuing on column 8, 66

10   and 67.  Column 9, line 1 through 15.  Going to column

11   10, lines 60 through 62, and line 63 through 66.  Column

12   11, line 1 through 16.  Column 16, line 46 through 61

13   correction, 46 through 57 on column 16.

11:05A  14   BY MR. HOSMER:

15        Q    Thank you.  Mr. Tannas, when I was taking notes

16   with respect to the phrase "applying the first seal

17   between the plates," I jotted down the recitation to

18   column 9, lines 43 through 48.  Excuse me, 44 through 48.

19   Would you turn to that particular section for a moment?

20        A    Column what?

21        Q    Column 9, lines 44 through 58.

22        A    Yes.

Page 44

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

23      Q      Let me read the first couple of sentences, and

24  then I have a question about it.  The first, and am I

25  right that this is one of the sections that you cited

49

1  that was in support of the phrase "applying the first

2  seal between the plates"?

3      A      Yes.

4      Q      All right.  The section reads "The first seal

5  115 is an adhesive and serves the purpose of barricading

6  the image-generating medium from leaking out, as well as

7  mechanically holding the plates 20 together at the proper

8  spacing.  By way of example, the cell gap (space between

9  the plates 20) for AMLCD is typically 6 micrometers with

10  tolerances of 0.1 micrometers."

11          My question is with reference to the phrase

12  "cell gap."  Do you see that, Mr. Tannas?

11:06A   13      A      Yes.

14      Q      And do you see the brief space between the

15  plates 20?

16      A      Yes.

17      Q      Am I correct that is your definition in column

18  9 in the specification of the term "cell gap"?

19          MR. COHEN:  Objection.  Calls for speculation,

20  ambiguous, and it's beyond the scope of permissible

21  discovery according to the APJ's order.  I would normally

22  instruct the witness not to answer, but pursuant to the

23  phone conference I will not instruct the witness not to

24  answer.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

25          THE WITNESS:  Okay.  Before I answer, I'm

50

1    looking for the position of plate 20.  I see 20 -- okay.

2    I see 20 in figure 4A, B and C, and there is a 20F and

3    20B, and I think that is an aid for the front plate and

4    the back plate.  By way of example, the cell gap spaces

5    between the plates 20 is typically 6 micrometers with the

6    tolerance.  That is a definition of cell gap.  It may not

7    be complete.  There might be other things that do enhance

8    that definition, but generally that's considered the cell

9    gap in the industry and my meaning in the cell gap here.

11:08A  10  BY MR. HOSMER:

11        Q    Yes, and by that definition you do not mean to

12   suggest I take it that the cell gap would necessarily be

13   the distance on the outside of the plates.  It would be

14   the distance between the plates as you say in the

15   specification here?

16        A    Right.

17             MR. COHEN:  Objection.  Ambiguous.  The same

18   objections regarding the APJ's order.

19             THE WITNESS:  Yes.

20   BY MR. HOSMER:

21        Q    And using the term "cell gap" in connection

22   with that particular description, I take it that you do

23   not intend to use the term "gap" in any special or

24   unusual way that would be outside the understanding of

25   someone else skilled in this art?

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

51

1    A    Right.

2         MR. COHEN:  Objection.  Calls for speculation,

3    and the same objections regarding the APJ's order.

4         (Tannas Exhibit 8 was marked for

5         identification by the court reporter.)

6         MR. HOSMER:  Let's go ahead and mark the next

7    exhibit.

8    Q    Mr. Tannas, you'll be pleased to know that

9    we're not going to look at the patent for a while.

11:09A  10   A    I'm ready for it.

11   Q    The next exhibit number 8 is entitled

12   "Declaration of Lawrence E. Tannas, Jr. in Support of

13   Tannas Preliminary Motions One and Two."

14        Neal, do you have a copy of that?  I have one

15   here for you if you don't.

16        MR. COHEN:  Thanks.

17        THE WITNESS:  I'm looking at my copy of that,

18   yes.

19   BY MR. HOSMER:

20   Q    Now do you recognize Exhibit Number 8,

21   Mr. Tannas?

22   A    Yes.

23   Q    Did you prepare this declaration yourself?

24   A    Yes.

25   Q    And by prepare I mean did you actually write

52

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

1    the language that you see here and submit it to your

2    counsel or was it the other way around?

3        A    I probably primarily prepared it and then

4    submitted it to counsel.

11:10A    5        Q    Did you review any drafts of the declaration

6    before you signed this version we see in Exhibit 8?

7        A    Yes, I did.

8        Q    Do you recall if you made any changes to any of

9    the drafts?

10        A    I recall making changes.

11        Q    Did you keep copies of the drafts?

12        A    No.

13        Q    Well, did you provide copies of the drafts

14    declaration to any of the other witnesses that are

15    involved in the case such as Mr. Fergason and Mr. Doane

16    and Mr. Scheffer?

17        A    What was the question?

18        Q    Did you provide copies of your drafting

19    declaration to Mr. Scheffer or Mr. Doane or Mr. Fergason?

20        A    No.

21        Q    Did you discuss your declaration with any of

22    those gentlemen?

23        A    No.

24        Q    Did you discuss your declaration with anyone

25    other than counsel?

53

1        A    No.

2        Q    Did counsel make any changes to your draft

3    declaration?

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

4         MR. COHEN:  Objection.  Privileged information.

5    I'll instruct the witness not to answer.

6         (Instruction not to answer.)

11:11A   7   BY MR. HOSMER:

8    Q    You can answer the question yes or no.  I'm not

9    going to ask you what the changes are, but that's not

10   privileged.

11        MR. COHEN:  I instructed the witness not to

12   answer the question at all.

13   BY MR. HOSMER:

14   Q    In paragraph 5 of your declaration, Mr. Tannas,

15   it indicates that you reviewed copies of three particular

16   documents.

17   A    Yes.

18   Q    I believe that those are the exhibits which

19   have been attached to various motions filed on your

20   behalf.  Is that consistent with your understanding?

21   A    Yes, but it's a little confusing because the

22   numbers don't track in my own mind.  I have the

23   comprehension of two documents, one of October '97 and

24   the one of July '98.  The one in July '98 I believe

25   there's three different numbers for that one, three

54

1    different minor variations.

11:13A   2   Q    Yes.  Okay.  I'll tell you what.  Let me go

3    ahead and put in front of you the three documents which I

4    think are referenced here, and then I'll just ask you

5    whether or not those are the documents that you recall

Page 49

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

6    reviewing.  If not, we'll straighten that out quickly.

7              (Tannas Exhibits 9, 10 and 11

8              were marked for identification

9              by the court reporter.)

10   BY MR. HOSMER:

11        Q    The first one we marked as Exhibit Number 9

12   which I believe is just for the record identified Patent

13   Application 09/529201.  Let me put that one in front of

14   you first and the second one which is Exhibit --

15              MR. SPOONER:  That's his copy.

16              MR. HOSMER:  Exhibit Number 10 will be a copy

17   of the published British patent 2330 423.  That will be

18   Exhibit Number 10.

19              (Discussion off the record.)

20              MR. HOSMER:  And Exhibit Number 11 will be a

21   copy of what we characterized as priority document

22   9721804.4.  That is Exhibit Number 11.

11:14A  23              THE WITNESS:  I have three in front of me.

24   BY MR. HOSMER:

25        Q    My question, Mr. Tannas, is are those the three

55

1    documents that you recall reviewing that are mentioned

2    and cited in paragraph 5 of your declaration?  I just

3    want to be sure that we're talking about the same

4    documents when we talk about paragraph 5.

5         A    Okay.  804.4 is one of them.  201 is the other

6    one.  I reviewed those two.

7         Q    So you did not review the published British

8    patent that we'll call the 423?

Page 50

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

9       A    I did review that.

10           MR. COHEN:  Objection.  Ambiguous.

11:15A  11  BY MR. HOSMER:

12      Q    I'm just trying to clarify which two of the

13  three you reviewed or did you review all three?

14      A    I reviewed all three.

15      Q    All three.

16           MR. COHEN:  Same objection.  That was a

17  misleading question.

18           MR. HOSMER:  I'm sorry.  I was trying to find

19  out if he reviewed them all.

20           MR. COHEN:  If you will allow me to make a

21  statement on the record then.

22           MR. HOSMER:  Sure.  Go ahead.

23           MR. COHEN:  This is a 423B, not 423A.

24  BY MR. HOSMER:

25      Q    With that characterization, Mr. Tannas, there

56

1  is a typographic error in paragraph 5 of your declaration

2  then.

3           MR. COHEN:  Are you asking me?

4           MR. HOSMER:  Is that the wrong document?

5           MR. COHEN:  Would you like to go off the record

6  and discuss it?

7           MR. HOSMER:  Yes.

8           (Discussion off the record.)

11:16A  9  BY MR. HOSMER:

10      Q    Mr. Tannas, your counsel has kindly noted that

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

11  the number of the document in front of you for the

12  published British patent with the last three digits 423B

13  as opposed to A, which is mentioned in your declaration,

14  and my question to you is do you recognize the document

15  in front of you which is 423B as the one that you

16  actually reviewed?

17      A    Actually I reviewed A, I believe.  And when I

18  started to review B, it looked like it was exactly the

19  same thing, and so from a practical actual standpoint I

20  don't think I reread it again.

21      Q    Okay.  Mr. Tannas, I actually selected these

22  documents to show you during your deposition based on the

23  exhibits which were attached to your motion papers, and

24  I notice on the front of the first page of the British

25  patent, it does refer to the law offices of your counsel

57

1   with the phone number there.  So is it possible that

2   there is just a typographic error in paragraph 5 and that

3   you actually reviewed this document or do you feel

4   confident that it was a different document?

11:17A    5      A    It's possible.

6      Q    In any event we can try to clarify that later.

7      A    If I may.

8      Q    Go ahead.

9      A    Well, can we go off the record so I can ask the

10  difference between A and B?  I believe it's just the

11  removal of the claims about the mechanism to break the

12  glass.  Is that the only difference between the two?  I'm

13  asking you to help me --

Page 52

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

14      Q    Yes.

15      A    -- quickly get through this.

16      Q    Actually I can't help you there.  All I'm

17  really interested in knowing is which document you had

18  reviewed.  What I can do, Mr. Tannas, for you and the

19  benefit of counsel is maybe to direct my questions with

20  respect to say the U.S. application, and we can use that

21  as a focal point and straighten out this issue about the

22  exact version you looked at later.

23      A    Okay.  Can you help me here?  Page 7 there is a

24  part marked out.  Is that the only difference between the

25  two?

58

11:18A   1      Q    Again, Mr. Tannas, I confess that I elected

2  these exhibits based on what was submitted by your

3  counsel, and I took it for granted that since this was

4  referenced in your declaration -- this was an attachment

5  to the papers -- that this was in fact the same document

6  that you reviewed, so I will leave that to your counsel

7  to straighten out.

8          MR. COHEN:  There is no question pending right

9  now, correct?

10          MR. HOSMER:  No.

11          MR. COHEN:  Okay.

12          MR. HOSMER:  No.

13      Q    In any event these three documents in front of

14  you, Mr. Tannas, I take it we can agree these all relate

15  to the Watson invention which is involved in the

Watson Ex 1019 – Tannas Deposition Volume 2 9-17-03

16   interference and have been cited and relied upon by the

17   party Watson.  Do you recognize that?

18        A    Yes, I do.

19        Q    All right.  Your declaration goes on in the

20   next three paragraphs and talks about the opinions that

21   you've been asked to provide, and then in paragraph 9, if

22   you follow with me, is that your definition in paragraph

23   9, Mr. Tannas, of the level of skill of the person --

24   excuse me -- the definition of a person of ordinary skill

25   in the art based on your understanding?

59

11:20A   1        A    Yes.

         2        Q    You mention there that the level of skill

         3   should be at least three years of experience in research

         4   or manufacturing of LCDs.  Do you see that?

         5        A    Yes.

         6        Q    Could you explain for me a bit further what

         7   you mean in your definition of level of skill of the

         8   manufacturing of LCDs?  I'd like you to explain a bit

         9   further, if you would, Mr. Tannas, what you mean when you

        10   use the term "manufacturing of LCDs" in your definition

        11   of the level of skill?

11:21A  12        A    Literally a person who had experience in the

        13   manufacturing process of LCDs.

        14        Q    And by manufacturing we're talking about

        15   manufacturing new LCDs --

        16        A    New LCDs.

        17        Q    -- some of which we discussed yesterday in your

        18   deposition?

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

19      A    Right.

20      Q    You mentioned also that this person should have

21  experience in research or manufacturing.  Is it both or

22  is it an either/or or is it both?

23      A    It's my intent the research part be relative to

24  manufacturing in which case it would be studies relating

25  to improvements in manufacturing, quality control of

                                                                    60

1   manufacturing.

2       Q    That would be an aspect of the level of skill

3   that you would find important in addition to a skill

4   relating strictly to manufacturing?

11:22A  5       A    Right.

6       Q    Okay.  In paragraph 12, Mr. Tannas, let me read

7   it, and then I'll ask "Based upon my review of the Watson

8   applications, a person of ordinary skill in the art would

9   not understand any of the Watson applications to describe

10  or show 'applying a first seal between the plates.'"  Do

11  you see that?

12      A    Yes, I do.

13      Q    My question is that statement, I take it from

14  just the clear language itself, means that there is

15  nothing in any one of the three Watson applications that

16  describe or show applying the first seal of plates in

17  your view?

11:23A  18      A    Speaking as an expert, I could not find a

19  single aspect in all of the documents --

20      Q    No description --

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

21      A      -- that related to anything about the first

22   seal for resealing between the plates.

23      Q      And when you use the phrase "describe or show,"

24   you mean not only a written textual description but also

25   a visual depiction by way of figures?

61

1      A      Right.

2      Q      Nothing in the text, nothing in the figures in

3   any one of the applications that supports the phrase

4   "applying a first seal between the plates"?

5      A      Right.

6      Q      Am I going too far in using the word "nothing"?

7      A      I couldn't find anything.

8      Q      All right.

9      A      And there were some things that suggested the

10   converse of that.

11:24A  11      Q      And when you mentioned and used the word

12   "converse," let's look at paragraph 13.  Does that have

13   anything to do with your use of the word "converse"?  It

14   begins with the word "instead."

11:25A  15      A      That and also the objective to tile displays

16   together to make a bigger display.

17      Q      That reference is not necessarily cited in

18   paragraph 13, but that's a different reference?

19      A      That is correct, but I thought I was being more

20   responsive to your question.

21      Q      You were, and I appreciate it, but I want to

22   make sure that it was something different than what we

23   saw actually here in paragraph 13.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

24      A    I don't think it's different.  It's in addition

25    to.

                                                              62

1      Q    In addition to.  Thank you.  I didn't mean

2    different but in addition to.  Thank you for that

3    clarification.  Now as you look at those two phrases that

4    you have listed in paragraph 13, Mr. Tannas, what is it

5    based on your experience that prevents those two phrases

6    from suggesting to someone skilled in the art that the

7    adhesive seal would be applied along the cut edge between

8    the plates?  Do you understand my question?

11:27A  9      A    No, I don't.

10      Q    Well, what is wrong with the teaching in those

11    sentences?  What is missing that would keep someone

12    skilled in the art from understanding that it means the

13    adhesive would be applied along the cut edge between the

14    plates?

15            MR. COHEN:  Objection.  Ambiguous.  And I also

16    want to clarify also where we're referring to, what

17    paragraph?

18            MR. HOSMER:  Paragraph 13.

19            MR. COHEN:  Of the declaration?

20            MR. HOSMER:  Yes, thank you.

21      Q    Do you understand my question?  What is

22    missing?

23      A    Yes, I do.  I understand your question very

24    clearly, and the first phrase "The fractured edges of the

25    glass plates 12 and 13 are sealed by applying a bead,"

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

63

1    and the word "bead," I'm sensitive to that word "of

2    ultraviolet curing liquid crystal," and I'm sensitive to

3    the speed of response of curing using ultraviolet as an

4    adhesive.

5         So the things that are missing are that it's a

6    bead, and there is -- so the thing that's missing is a

7    bead is a bead; and if it's to be between the plates,

8    it progresses beyond the state of a bead.  So the thing

9    that's missing is to get it between the plates, you have

10   to do more than just leave it as a bead.

11:28A 11   Q    And when you say you need to do more, based on

12   your experience, what would someone of skill in the art

13   need to do that would be enough to get the adhesive

14   between the plates?

15        A    Well, first of all, you have to be motivated to

16   do it.  It wouldn't happen.  So if you were motivated to

17   do it, then one skilled in the art would take the extra

18   steps to do it.

19        Q    What extra steps are you thinking of?

20        A    Get the proper material so it will flow in.

21        Q    Do you mean the proper viscosity and chemical

22   constituents?

23        A    Yes.

24        Q    What else?

25        A    Apply a means of getting it in such as drawing

64

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

1  it in or pushing it in, allowing time for it to get

2  there, and then having a cure mechanism that would work

3  inside the plate.  And typically UV does not respond with

4  ultraviolet -- the plates do not conduct ultraviolet

5  light as well as with a bead.  It's absorbed by the

6  glass, and it's absorbed by the electric circuits on the

7  glass and the indium tin oxide, ITO, on the glass.

11:29A  8      Q     So someone skilled in the art would need to

9  know a little bit about UV curing and the possible

10  differences between curing outside the context of a glass

11  plate and say in between glass plates?

12      A     Right.

13      Q     At the time of the Watson patent application,

14  and we're talking about that in paragraph 13, was it

15  known in the art at this point in time to be able to

16  place pressure on the two plates, the substrates in the

17  manner that we talked about yesterday?

18          MR. COHEN:  Objection.  Ambiguous.  Calls for

19  speculation.

20          THE WITNESS:  Yes.  It was known in the art.

21  BY MR. HOSMER:

22      Q     And was it known in the art to be able to apply

23  an adhesive at least at one point on the plates under

24  pressure and to release the pressure on the plates and

25  draw the adhesive into and between the two plates?

65

11:30A  1          MR. COHEN:  Objection.  Calls for speculation.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

2   Ambiguous.

3        THE WITNESS:  That was known in the art and

4   also a fundamental principle of the hydraulics of the

5   cell.

6   BY MR. HOSMER:

7        Q    Do you believe, Mr. Tannas, that a person

8   skilled in the art at the time of the Watson application

9   in 1997, the first application, would understand that the

10  adhesive could flow into the cell along the cut surface

11  of a resized LCD by suction as compression on the cell is

12  released?

13       A    Yes.

14            MR. COHEN:  Objection.  Ambiguous.  Calls for

15  speculation.

16  BY MR. HOSMER:

17       Q    The answer is yes?

18       A    Yes.

19       Q    Would you look at Exhibit 9, the U.S. case.

11:33A  20        MR. COHEN:  Do you want to look at my copy?

21            MR. HOSMER:  Okay.

22            MR. COHEN:  Exhibit 9 is the 201.

23            MR. HOSMER:  Thank you.

24            MR. COHEN:  There is no question, right?

25            MR. HOSMER:  Not yet.  Give me a moment.

66

1            MR. COHEN:  Okay.

2            MR. HOSMER:  Sorry.

3        Q    Before we talk about that let me ask you a

4   question about paragraph --

Page 60

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

　5　　A　　Jim, let me back up just a moment.

　6　　Q　　To clarify an answer?  Go ahead.

　7　　A　　You wanted me to state what was wrong or what

　8　was incomplete or wouldn't suggest between the plates on

　9　paragraph 13.

11:34A　10　　Q　　Yes, I did.

　11　　A　　And I addressed the first statement, but did

　12　you want me to address the second statement also?

　13　　Q　　I'm sorry.  I didn't follow up on that.  Yes.

　14　Why don't you go ahead and do that.  The question, I

　15　guess, is what is wrong with respect to that statement.

　16　What is missing in that second statement that would not

　17　support a person skilled in the art to understand the

　18　cell would be between the plates?

　19　　　　MR. COHEN:  Vague and ambiguous.

　20　　　　THE WITNESS:  Okay.  Well, the first part is

　21　the same as the part above from the 804 document or

　22　applying a frits seal or using a laser to weld the plates

　23　12 and 13 together, and that occurs in document 423 and

　24　201.  To one skilled in the art they would recognize that

　25　as not feasible at all and written by somebody who

67

　1　doesn't understand how a cell is constructed.

11:35A　2　BY MR. HOSMER:

　3　　Q　　Okay.  And to briefly revisit our discussion

　4　yesterday, the glass frit technology is the one that

　5　applies the glass particles and then is heated and sealed

　6　on the outside; is that right?

Page 61

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

7    A    The whole mass is heated, and the glass melts,

8  yes, or it flows. It's already in liquid form, and so it

9  can't melt. It flows technically.

10    Q    So that part of that disclosure you find

11  deficient because it would not necessarily be between the

12  plates using the glass frit technology?

13    A    No. I find it technically unachievable --

14    Q    I see.

15    A    -- in any way. And when we discussed frit

16  yesterday, I said that in the '70s I used a glass frit,

17  and the glass frit was used to put on the display before

18  the liquid crystal was inside. It was used on displays

19  that did not have color filters and electronics and

20  complex circuitry inside. So after the display is made

21  and you try to put on the glass frit, you would destroy

22  the whole display. All of the internal components would

23  be melted.

11:36A  24    Q    So in your view in the context of resizing the

25  LCDs, the only real operative method for resealing would

68

1  be to use an adhesive that would be applied preferably

2  between the two plates as opposed to any other method?

3         MR. COHEN: Objection. Ambiguous. Calls for

4  speculation.

5         THE WITNESS: Well, you're adding a lot more.

6  Whatever method you use you could not heat it up to the

7  point where the display would be destroyed.

8  BY MR. HOSMER:

9    Q    I understand.

Page 62

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

10      A    Both the laser and the frit process would

11  destroy the part of the display that you're trying to

12  seal.

13      Q    I understand.  It's a problem of the heat

14  accumulation and possible destruction as opposed to the

15  position of the seal itself.

16      A    Right.

17      Q    I understand.  And now turning just briefly to

18  paragraph 14, you indicate, and again I'm reading for the

19  record "Thus, a bead of sealant applied along 'the

20  fractured edges of the glass plates.'"

21          Let me just stop right there.  By that phrase

22  "the fractured edges of the glass plates," you mean the

23  two cut plates in the resizing operation; is that

24  correct?

11:38A    25      A    That's correct.

                                                        69

1       Q    Excuse me.  Actually not cut through, but they

2   are scored as we talked about yesterday; is that right?

3       A    Where are we starting?

4           MR. COHEN:  Objection.  Ambiguous.

5           THE WITNESS:  Let me read paragraph 14 to see

6   the context.

7   BY MR. HOSMER:

8       Q    Then I'll reask the question.  My co-counsel

9   just reminded me that I didn't get it right which is not

10  unusual.

11      A    Okay.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

12    Q    My first question relates to the phrase used in

13    that sentence that I read "the fractured edges of the

14    glass plates." Am I right that is the cut edge after the

15    initial resizing operation?

11:39A   16         MR. COHEN:  Objection.  Ambiguous.

17    BY MR. HOSMER:

18    Q    You're looking at the cut edges, the fractured

19    edges?

20    A    Yes.

21    Q    Okay.  It says that "A bead of sealant applied

22    along the fractured edges of the glass plates would bond

23    only for the fractured edges of the glass plates and

24    would not penetrate the plane of the cut glass edges to

25    penetrate between the plates."  Do you see that?

70

1    A    Yes, I do.

2    Q    And is that your view as we sit here today with

3    respect to the disclosure in Watson of the use of an

4    epoxy sealant along the cut edge?

5         MR. COHEN:  Objection.  Calls for speculation.

6         THE WITNESS:  As described there is no reason

7    to believe that the sealant would go anyplace other than

8    where it was put.

9    BY MR. HOSMER:

10    Q    Would a person skilled in the art in reading

11    the Watson application understand that an adhesive seal

12    could penetrate the cut glass edges as you say if the

13    glass plates were under pressure and then you release the

14    pressure as we spoke of earlier?

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

11:40A  15         MR. COHEN:  Objection.  Ambiguous.  Calls for

16    speculation.  Incomplete hypothetical.

17         THE WITNESS:  Well, one skilled in the art

18    would visualize this as a container, and nothing is going

19    to go inside the container unless there's a space.  So to

20    get the adhesive inside between the plates you either

21    have to remove liquid crystal first or expand the plates

22    and change the gap.

23         MR. HOSMER:  Would you read his answer?

11:41A  24         (Record read.)

25    BY MR. HOSMER:

71

1         Q    Let me refer you back to what you identified

2    yesterday as your first law and assume the plates are

3    under pressure and we apply the adhesive seal.  Using

4    your first law, when the pressure on the plates is

5    released even slightly, isn't it true that it would cause

6    the plates to actually -- it would cause the adhesive

7    seal to be sucked into the plates?

8         MR. COHEN:  Objection.  Ambiguous.  Calls for

9    speculation and mischaracterizes the witness's testimony.

10    BY MR. HOSMER:

11         Q    Go ahead.

12         A    Only if when you squeeze the plate some of the

13    liquid crystal got out because if you put the bead down

14    first and then squeeze the plate, the liquid crystal

15    would go pushing against the bead and then release the

16    pressure.  The bead would push the liquid crystal back

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

17    in the display, and it would be back to its original

18    position.  So squeezing by itself and releasing by itself

19    is a vehicle to make it move.  It's not a vehicle to

20    cause the adhesive to stay between the plates.

11:42A    21        Q    I understand.  If we apply your first law in

22    the following order where we place the plates under

23    pressure and let's say we squeeze out a small amount of

24    liquid crystal material --

25        A    Yes.


                                                              72


1        Q    -- wipe off the material from the cut edge with

2    the plates still under pressure and apply the epoxy

3    adhesive sealant material --

4        A    Yes.

5        Q    -- and release the pressure slightly.  Under

6    the first law that you mentioned, I take it that the

7    adhesive would traverse inwardly between the plates.

8        MR. COHEN:  Objection.  Ambiguous.  Calls for

9    speculation.  Incomplete hypothetical.  Mischaracterizes

10    the witness's testimony.

11        THE WITNESS:  Okay.  That would be the way that

12    one skilled in the trade would get the adhesive to go

13    between the plates, and that would be self-evident and

14    obvious to anyone skilled in this industry.

11:44A    15    BY MR. HOSMER:

16        Q    Okay.  And in that context the method that I

17    described of pressure, application of adhesive, release

18    of pressure, that same basic three-step methodology was

19    used in the manufacture of original LCD plates as we

Page 66

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

20    discussed yesterday, correct?

21         MR. COHEN:  Objection.  Ambiguous.

22         THE WITNESS:  No.

23    BY MR. HOSMER:

24    Q    Different?

25    A    There's several differences because I think

73

1    in the back of your mind the context of this discussion

2    we're talking about getting adhesive between the plates

3    along the cut edge for the purpose of resizing a display

4    versus getting adhesive into the bottle cap or the fill

5    port, and in the case of the fill port the spacing is

6    fixed by the original seal that almost traversed the

7    entire perimeter of the display.  In this case there is

8    no control on this edge that you're trying to fill --

11:45A  9    Q    Was it --

10    A    -- so --

11    Q    Go ahead.  I'm sorry.

12    A    Finish it?

13    Q    Sure.

14    A    What you described is the obvious way to get

15    adhesive between the plates, and it's used in the

16    industry to fill the port; but there is no place in the

17    industry that I'm aware of that ever used this to fill an

18    entire edge by getting the adhesive between the plates.

19    Q    All right.  When you contemplate your invention

20    in which the adhesive is applied along one edge, I take

21    it that you believe that you contemplated being able to

Page 67

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

22    have the plates in a pressurized situation squeezed

23    together slightly and release them so the adhesive could

24    come in.  Is that what you considered to be part of what

25    your invention is --

74

1    A    Yes.

2    Q    -- as reflected in the patent?

3         MR. COHEN:  Objection.  Calls for speculation.

4    Ambiguous.  It's beyond the scope of the permissible

5    discovery as ordered by the APJ.  I would normally

6    instruct the witness not to answer, but I'll withhold the

7    objection.

11:46A    8         MR. HOSMER:  I think the answer was yes.

9    Q    Do you believe the Watson applications do not

10    contain a disclosure that would allow someone skilled in

11    the art in reading the applications to understand that

12    the adhesive seal should be between the two plates?

13         MR. COHEN:  Objection.  Ambiguous.

14         THE WITNESS:  That is correct.

15    BY MR. HOSMER:

16    Q    Okay.  Would you now take -- turning back to

17    Exhibit 9, which I apologize for waiting so long to show

18    you or talk about, but Exhibit 9 is the U.S. file or the

19    Watson application, I believe, Mr. Tannas.

20         MR. COHEN:  This is the actual exhibit.

21    BY MR. HOSMER:

22    Q    Do you have it in front of you, sir?

23    A    Yes, I do.

24    Q    Could I see your copy of it?

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

11:47A    25          MR. COHEN:  Here's the exhibit.


                                                                75


1              MR. HOSMER:  Well, I have it clipped here.

2              Mr. Tannas, let me --

3              MR. COHEN:  Sorry about that.

4    BY MR. HOSMER:

5        Q    Mr. Tannas, the exhibit was taken from the

6    exhibits submitted, I believe, by counsel as we talked

7    about before, and you will notice that this does not have

8    any figures attached to it.  Do you see that?

9        A    This is not the actual -- I see there's lots of

10   writing in here.

11       Q    Yes.

12       A    And I never saw this before.

13       Q    Okay.

14       A    This is not the actual copy that I looked at.

15       Q    Well, it does on the front have your counsel's

16   office there, and I would represent to you that I

17   faithfully copied what was in the exhibit the papers

18   copied by your counsel.  Are you telling me that that is

19   a different version than what you reviewed?

11:48A   20       A    It appears to be the version that I reviewed

21   with some annotation on it.

22       Q    Do you have a copy of -- it doesn't have any

23   drawings as well; am I right?

24       A    I didn't see them.

25       Q    Do you by any chance have with you a copy of


                         Page 69

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

76

1    the U.S. application that you did review that you
2    referred to earlier?
3        A    I have a copy that I kind of -- that is
4    actually one from your Exhibit 1005 which is like the
5    three that I reviewed somewhat together, and I have a
6    copy of that with the figures.
7        Q    And that one you recognize as the one you
8    reviewed?
9        A    I recognize it.
10       Q    Let's use that.
11       A    It's number 577.
12       Q    All right.  I think I have a copy of that, and
13   I'd like to have that in front of me as I ask you the
14   next few questions.
15           Let's go off the record.
11:50A  16           (Discussion off the record.)
11:51A  17   BY MR. HOSMER:
18       Q    We have now decided after a short discussion
19   off the record that a document that we'll look at is what
20   we have marked here as Exhibit Number 10; is that right?
21       A    It's your Exhibit 5.
22       Q    Exhibit 11.  Exhibit 11, yes.
23       A    This is the one I haven't seen.  Wait.  Exhibit
24   11 does have figures.  It is from Neal's office.
25       Q    Yes.  Here is the question, Mr. Tannas.  Is

77

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

1    Exhibit 11 the one that you recall seeing and reviewing?

2         A    Yes, Exhibit 11 is, and this is the one from

3    Neal's office.  It has the figures.

4         Q    That's fine.

11:52A    5              (Discussion off the record.)

6    BY MR. HOSMER:

7         Q    Mr. Tannas, you have Exhibit Number 11 in front

8    of you, and I want to be sure we're talking about the

9    exact same document.  There is a reference in paragraph 5

10   of your declaration that you reviewed application

11   number -- British application number 9721804.4.  That's

12   in paragraph 5.  Now am I right that Exhibit 11 is the

13   application that you're talking about in paragraph 5?

11:53A    14        A    Yes.

15        Q    And you've reviewed both the textual material

16   and the figures?

17        A    Yes.

18        Q    Mr. Tannas, would you turn to the figures

19   toward the back of the application Exhibit 11 beginning

20   with figures 1, 2 and 3 on that page.

21        A    Yes.

22        Q    Do you have that?

23        A    Yes, I do.

24        Q    We should take a look at figure 1 specifically.

25   Now based on your understanding in reading the Watson

78

1    application, can you identify for us the various

2    component parts that you saw in figure 1 say beginning

Page 71

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

3    with item 12.

11:54A    4         MR. COHEN:  Objection.  Ambiguous.

5         THE WITNESS:  Item 12 appears to be the front

6    plate.  Do you want me to go through all of them?

7    BY MR. HOSMER:

8         Q    I'll call out the numbers.  Item 13, is that

9    the back plate?

10        A    Yes.  I don't want to contradict what it says,

11   but just looking at the figure at this point by itself,

12   it looks like it's the back plate.

13        Q    Item 11.

14        A    Is in the area of the liquid crystal.

15        Q    That's the liquid crystal material?

16        A    Uh-huh.

17        Q    Item 15, what is that?

18        A    Item 15 is the front, probably the front

19   polarizer and compensating film.

20        Q    Is polarizing substrate a proper term to use

21   for that?

11:55A   22        A    It's kind of a slang term for it, yeah.

23        Q    All right.

24        A    And it would be an abbreviated phrase, but it

25   does include other things, but --

79

1         Q    All right.  And item 17, what is that?

2         A    Okay.  Item 17 and 14 -- item 17 I don't know.

3    I would have to read the text to be sure, but it looks

4    like it's referring to something on the inner surface of

5    the front plate.

Page 72

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

6      Q    Is it the conducting layer?

7      A    There is a conductive layer on that surface,

8    and it could be that, and there are filters.  It could be

9    the filters.  It could be spacers.

11:56A  10      Q    I would just represent that is the conducting

11    layer and --

12      A    Okay.

13      Q    Do you see item 14?

14      A    Yes, I do.

15      Q    Do you recognize that as being a seal that is

16    positioned between plates 12 and 13?

17      A    Yes, I do.

18      Q    And my question to you is what is it about the

19    disclosure in figure 1 which you feel does not support

20    Watson's position that an adhesive seal that's placed

21    along the cut edge would not -- in a resized application

22    would not be positioned between the plates?

23      A    Well, your question is out of context.  This is

24    not a resized display.  This is the display before Watson

25    applies his intellectual properties, and so how would

80

1    that relate to your question at all?

11:57A  2      Q    So you're saying that because figure 1 relates

3    to an uncut display that the seal shown in item 14 does

4    not support Watson's position that the adhesive seal

5    would be positioned between the plates in a resized

6    application?

7      A    The question is not functional.  I mean we're

Page 73

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

8    looking at a device before he applies his intellectual

9    property so how could this imply anything about what his

10   new novel thing is going to do?

11       Q    As you look to the Watson application,

12   including all of the figures and the text, did you find

13   any type of seal relative to the two plates of any

14   different kind other than the one that you see identified

15   as item 14 in figure 1?

16           MR. COHEN:  Objection.  Ambiguous.

17           THE WITNESS:  Yes, I did which suggests that it

18   is a bead.  In his figure 3 he talks about providing a

19   seal on the displays there that are used to tile together

20   to make a bigger display.

11:59A   21           MR. COHEN:  If I can clarify the record, Larry,

22   can you specify what specific figure you were referring

23   to?

24           THE WITNESS:  Figure 6, and the objective is to

25   have the seal have a gap minimum -- minimal.

81

1    BY MR. HOSMER:

2        Q    Now we talked about the spacing requirement

3    yesterday.  How does that relate to your answer that

4    there are other methods.  I don't quite understand the

5    connection.

6        A    Okay.  He's trying to get the two displays as

7    close as possible.  If he had a bead on the edge --

12:00P   8        Q    Go ahead.

9        A    If he had a bead on the edge, it would put a

10   space there.  So he does not put a bead.  He does not

Page 74

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

11    seal the edge of that display.

12        Q    But isn't the figure you're referring to there,

13    doesn't that have to do with the tiling configuration

14    that's talked about in the Watson application and not

15    necessarily the resizing where you have the cut edge and

16    you're applying adhesive along the cut edge?

17        A    Yes.  He doesn't use his seal because it would

18    cause a space or a gap there, and he says that.

19        Q    Where does he say that?

20        A    In the text.

21        Q    Would you --

22        A    It will take me a while to find it now.  I'm

23    recalling from memory that assembly in figure 6 is done

24    without a seal.  One place it's referred to is on page 10

25    starting at line 20, "Laminating those four plates to

82

1    another plate rather than put a seal bead along the

2    edge."

3            So on line 24 I'll read it.  "Abutting their

4    respective fractured edges 27 and 28, the four liquid

5    crystal displays 10.  Then abutting their respective

6    fractured edges 27 and 28 the four liquid crystal

7    displays 10 then being laminated to form a single display

8    with increased operating area."

12:03P  9        Q    All right.

10        A    So he abuts them and laminates.  He cuts them

11    and abuts them without putting an adhesive.

12        Q    All right.  But we're talking about there where

Page 75

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

13    you are increasing the size in the resizing operation as

14    opposed to cutting down the size of the original LCD,

15    aren't we?

16        MR. COHEN:  Objection.  Calls for speculation,

17    and it's ambiguous.

18        THE WITNESS:  That's just a play on words.  To

19    achieve this you're cutting off the old seal which is

20    between the plates and causes an area and substituting

21    that with no seal at all but holding the displays

22    together with a front laminate and a back laminate.

23    BY MR. HOSMER:

24    Q    And that's the tiling operation that you're

25    talking about?

83

1    A    That's Mr. Watson's tiling operation.

2    Q    Right, but Mr. Watson also discloses cutting a

3    LCD and resizing it without necessarily tiling it with

4    any other LCDs and resealing that cut edge in the resized

5    product, doesn't he --

12:05P    6        MR. COHEN:  Objection.  Calls for speculation.

7    BY MR. HOSMER:

8    Q    -- and that's shown in figures 2 and 3.

9        MR. COHEN:  Objection.  Calls for speculation,

10    ambiguous and calls for a legal conclusion.

11        THE WITNESS:  Well, I don't see where you're

12    going.

13    BY MR. HOSMER:

14    Q    I'm saying don't figures 2 and 3 of the

15    document in front of you, Exhibit 11, isn't that in

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

16      reference to resizing an LCD where you cut one edge and

17      you seal that edge, and you have a resized LCD different

18      from tiling?

19              MR. COHEN:  Same objections.

20              THE WITNESS:  Yeah, that's -- it appears to be

21      resizing to achieve a new size of one display that's

22      smaller, and to do that he has to cut the original seal

23      and replace that seal with a bead along the edge.  Now

24      to make a display that appears larger, he cuts four

25      displays.  In that case since he wants it to be larger,

84

1      he only cuts off a small amount, and the amount cut off

2      is the original seal so that when he abuts the edges

3      together, he will have as much area as possible.

12:06P   4      BY MR. HOSMER:

5          Q    You're not suggesting, are you, Mr. Tannas,

6      that the Watson applications do not enclose an embodiment

7      in which you take a single LCD, that your intention is to

8      resize it, you cut one edge and that you reseal that edge

9      with epoxy to create a new display?

10              MR. COHEN:  Objection.  Ambiguous.  Calls for

11      speculation.

12      BY MR. HOSMER:

13          Q    Are you suggesting --

14              MR. COHEN:  Hold on.  Let me state my

15      objections.  Ambiguous.  Calls for speculation.  Calls

16      for a legal conclusion.

17              THE WITNESS:  I'm suggesting that Watson has

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

18    two inventions here.  One is to seal by cutting and

19    putting a bead along the edge, and the other is to cut,

20    abut and seal by laminating a plate on the top and the

21    bottom of the display.

22    BY MR. HOSMER:

23        Q    All right.  I want to be sure I understand your

24    position about figure 1 that's shown in Exhibit 11.  Are

25    you telling me that you do not believe that in the

85

1    resizing operation that I just described that other

2    embodiment that you mentioned that during the resizing

3    that the seal -- that the resizing does not result in a

4    seal like that shown in figure 14 -- in item 14, excuse

5    me?

12:07P  6        A    There is no reason to believe that.

7        Q    Now have you ever seen an LCD in its original

8    manufactured form that had two different types of seals

9    on two different edges, one like item 14 and one

10    different from that?

11        A    Oh, boy.  I've seen all kinds of seals in my

12    life, and so I don't know what you have in mind, where

13    you're trying to take me.  I've seen lots of different

14    things in displays, but --

15        Q    Isn't it almost universally true that the seal

16    that exists on all four of the sides, let's say, of a

17    rectangular and square-shaped LCD would have the same

18    seal at the periphery, the same type of seal?

19            MR. COHEN:  Objection.  Ambiguous.

20            THE WITNESS:  Okay.  I'm not quite sure of the

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

21 purpose of the thrust of your question, but let me

22 comment that you usually always want the seal to be

23 between the plates, and you always get the seal between

24 the plates by adding it to one of the plates before the

25 plates are even brought in contact with each other.

86

1 BY MR. HOSMER:

2      Q     And that would be true of a resizing operation

3 as well?

12:08P 4      A     No, absolutely not.  In a resizing operation

5 the plates are already together, and so it's an entirely

6 different situation.

7      Q     And as we spoke yesterday, it's very important

8 in that resizing and resealing operation that the spacing

9 between the plates remain very, very closely

10 controlled --

11      A     Correct.

12      Q     -- correct?

13      A     Yes.

14      Q     And in order to ensure that spacing is

15 carefully controlled, wouldn't a person skilled in the

16 art in looking at the Watson application understand that

17 the seal that's applied on the cut edge would be one

18 which was like item 14, namely, between the plates after

19 resealing?

20      A     No.

21      Q     Let's make sure that we're talking about --

22 when I use the word "resizing," I'm talking about

**Page 79**

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

23    reducing the size of a display.

12:09P    24    A    Right.

25    Q    And in that situation when the size is reduced,

87

1    I just want to be sure that your position is the

2    disclosure here for seal 14 would not suggest to someone

3    skilled in the art that in resealing the cut edge and

4    applying the epoxy adhesive the resulting seal would not

5    necessarily be between the plates as shown in figure 1.

6          MR. COHEN:  Objection.  Ambiguous and asked and

7    answered.

8          THE WITNESS:  Well, if you are skilled in the

9    art, you would know it's not necessary because there are

10    other ways to ensure the spacing after the cell is

11    assembled.

12    BY MR. HOSMER:

13    Q    What are those other ways?

14    A    One is the spacers inside the cell and the

15    other is the perimeter seal.

16    Q    Are you saying someone skilled in the art would

17    have the option of placing the seal of item 14 either

18    between the plates or having the seal on the outside?

12:11P    19          MR. COHEN:  Objection.  Calls for speculation.

20          THE WITNESS:  For resizing or for --

21    BY MR. HOSMER:

22    Q    Resizing.

23    A    -- or manufacturing?

24    Q    Resizing.

25    A    Yes.  Because the space -- if you open the

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

88

1    cell, the spacing is not necessarily disturbed unless you

2    squeeze on it and do things to it or unless you lose --

3    no.  The spacing can be preserved.  Cutting the cell you

4    can reserve the spacing because of the spheres that are

5    distributed throughout that cell.

6        Q    You can also preserve the spacings by placing

7    the two plates under a fixed pressure uniformly across

8    the cut edge, couldn't you?

9        A    No.

10       Q    That's not possible to do?

11       A    It is, but that's not sufficient.

12       Q    In your view a person skilled in the art would

13   not be capable of applying uniform pressure to the two

14   plates so the same pressure exists across the plates

15   including across the cut edge?

12:12P  16       A    The display is cut, and the person that's

17   skilled could apply uniform pressure.  There's tooling to

18   do that and when the person did that, then the spheres

19   could compress.  They are typically plastic embedded

20   in polyimide, so they could compress depending on -- in

21   proportion to the pressure level, and as they compress,

22   the liquid crystal fluid would be forced out in

23   proportion to how much they press.

24       Q    And my question is would that same person of

25   skill in the art using that pressure type of arrangement,

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

89

1    fixed pressure uniformly across the plate including the

2    cut edge know that you could apply an adhesive and result

3    with a seal similar to that shown in item 14 of figure 1

4    by in this case releasing the pressure slightly on the

5    plates as we spoke of earlier?

6        A    Why would they do that?  If they read the

7    Watson patent, they would say "Ha, I'll put a bead, cut

8    it carefully, not disturb it, and I'll put a bead along

9    the edge."  And one skilled in the art would expect the

10    display to still function.

12:13P  11        Q    Actually that wasn't my question.  My question

12    was would this person with skill in the art not just try

13    to make it function, but would this person with skill in

14    the art understand that you could create a seal which was

15    as shown in item 14 in figure 1 by having the plates

16    under pressure by applying the adhesive, releasing the

17    pressure slightly and sucking in the adhesive into the

18    gap?

19        MR. COHEN:  Objection.  Ambiguous.  Calls for

20    speculation.

21        THE WITNESS:  For a person skilled in the art,

22    I'm not sure why they would be motivated to do that.

23    BY MR. HOSMER:

24        Q    Take a look --

25        A    If they were motivated to do it, they could do

90

1    it.

Page 82

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

2    Q    Okay.  Take a look in Exhibit Number 11 on page

3   13 if you would for just a minute, Mr. Tannas.

4         MR. COHEN:  Are you referring to -- Jim, are

5   you referring to page 13?

12:14P  6         MR. HOSMER:  Page 13 of Exhibit 11.  Am I on

7   the right page here?

8         MR. COHEN:  Page 13 page or fax page?

9         MR. SPOONER:  Page 13 of the document.

10         MR. HOSMER:  The real page 13.

11    Q    Are you there with me?

12    A    Yes, I am.

13    Q    Would you take a look at the last sentence on

14   page 13, Mr. Tannas.  I'll read it into the record.

15   "when both glass plates 12 and 13 have been fractured

16   along their respective grooves 32 the excess region 23 is

17   removed, and the gap between the fractures sealed as

18   described above."  Do you see that?

19    A    Yes.

20    Q    And my question to you is when it uses the

21   phrase "the excess region 23 is removed and the gap

22   between the fractures sealed as described above" --

23    A    I'm looking for --

12:15P  24    Q    -- do you understand the term "gap" --

25    A    Yes.

91

1    Q    -- to be that annular space that exists between

2   plates 12 and 13 as shown in figure 1?

3    A    Yes.

Page 83

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

4          MR. COHEN:  Objection.  Ambiguous.

5     BY MR. HOSMER:

6          Q     Well, doesn't this suggest or tell someone

7     skilled in the art at the time of the Watson application

8     that the adhesive in the recut edge would be positioned

9     in this gap between the two plates?

10         A     No.

11         Q     Why not, sir?

12         A     It's like, you know, like a crack in a door.

13    To seal a crack, well, you could seal a crack many ways.

14    You can put tape over it or you could fill it full of

15    silicone epoxy.  So what is the motivation?

16         Q     Are you saying, sir, that Mr. Watson's use of

17    the term "gap" was something out of the ordinary and

18    didn't mean the distance between the plates?

19         A     No.  It's very clear --

20         Q     Was it clear to you?

21         A     -- he has a gap.  He has a gap in the glass.

22         Q     And where is the gap, sir?

12:16P  23        A     The gap is right along the cut edge, and I

24    think he is referring to the area where the liquid

25    crystal resides, the gap in the glass.


                                                        92


1          Q     He's not talking about the gap where the seal

2     resides?

3          A     Well, this is a different place in the plane.

4     It's not the gap where the seal, the original seal

5     resides.  It's a gap interior to the cell.

6          Q     It says the gap between the fractures.  Isn't

                              Page 84

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

7    that the gap that exists along what I've been referring

8    to as the cut edge?

9        A    Yes.

10       Q    And so the seal as discussed here would be

11   positioned in the gap --

12       A    Right.

13       Q    -- and between the plates?

14       A    Right.  So he's going to seal that gap.

15       Q    Right.  The gap we're talking about is between

16   plates 12 and 13?

17       A    Did you hear my answer?

18       Q    I'm sorry?

19       A    Did you hear my answer?

20       Q    No.  Go ahead.

21       A    You have a gap like the gap in a door, the gap

22   in a window and a gap between the plates.  You could seal

23   that with tape.

12:17P 24    Q    Are you talking about the outside is the

25   definition of gap?

93

1        A    I don't know.  You tell me.

2        Q    Well, actually --

3        A    Where is this gap that you're asking me about?

4        Q    We talked about it before, and we went through

5    it in column 9.

6        A    I thought we did.

7        Q    Yes, we did.  It's in line 47 where you define

8    the cell gap as the space between the plates.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

9        A    Why won't you let me finish my answer.

10       Q    Go ahead.

11       A    A gap could be filled many ways.  It could be

12   sealed many ways.  One way to seal a gap would be to put

13   a cover over it like a gap in a door, tape, and another

14   way would be to fill it like putting silicone in the gap

15   of a door.  Between the plates is analogous to filling

16   the gap.

17            The tape on the outside is analogous to sealing

18   the gap a different way, but both of them have the effect

19   of sealing the gap, and they're both different.  Whether

20   you go and get a roll of tape to seal it or whether you

21   use a silicone gun and squirt it full of silicone depends

22   on your objective and what you're motivated to do.

12:18P  23       Q    It indicates -- if you look at the language in

24   the last sentence on page 13 of Exhibit 11, it refers to

25   the gap between the fracture as being sealed as described

94

1   above.  Do you see that?

2        A    Yes.

3        Q    And I just want to understand your position.

4   Your position is the description of sealing in the Watson

5   application at the gap would not necessarily mean that

6   the adhesive sealant was actually between the plates.  Is

7   that your position?

8        A    I don't know how to say that any stronger than

9   I did every time you ask me that question in every

10   different way.

11            MR. COHEN:  Let me also add an objection it's

Page 86

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

12    ambiguous.

13    BY MR. HOSMER:

14        Q    And as I understand, there is nothing unusual

15    about the word "gap" being used in the Watson application

16    as compared to the way in which you use the word "gap" in

17    your own patent?

18        A    It's the same gap, yeah.  It's the same cell

19    spacing.  It's the same space between the plates.  I call

20    it the space between the plates, and Watson calls it the

21    gap, but it's the same, I believe.

12:19P  22        Q    I apologize if I asked this.  I thought perhaps

23    I did, but am I correct that in the Watson application

24    that you have in front of you, Exhibit 11, that there is

25    no seal between the plates as we talked about that's

95

1    disclosed other than the one that we see shown in item 14

2    in figure 1?

3            MR. COHEN:  Objection.  Ambiguous.

4            THE WITNESS:  Well, this is a very important

5    area that you're asking me all these questions about, and

6    I answered seven different ways, and you come at it again

7    another way, and so I'm searching my mind what additional

8    are you looking for.

12:20P  9    BY MR. HOSMER:

10        Q    It's a little different question.

11        A    First we argued or discussed the word "gap."

12    In the displays industry people do not use the word

13    "gap."  They call it the space.  The gap is not the kind

Page 87

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

14    of jargon you would see down on the floor, but there is

15    no misunderstanding of gap in my mind what he's talking

16    about.

17         He's cut the display, and there is liquid

18    crystal in between the two plates, and now he has a hole

19    in the cell running the full length of the glass that he

20    called the gap.  Now he's going to seal that gap.  Well,

21    unless you tell a person, the seal will be done the most

22    straightforward way and there will be the minimum

23    disturbance to the plate.  If I start squeezing that

24    plate with that hole end open, I'm going to push liquid

25    crystal out and squeeze the spacers, and I'm going to do

96

1    all kinds of things that may not be recoverable.

2         So for one skilled in the trade they would  do

3    a minimum of squeezing, pushing, shoving and so on and

4    gently put the bead along the gap and quickly seal it

5    with UV.  And that act of applying the seal and curing --

6    the act of applying the seal would take maybe 10 seconds

7    or so, and the UV sealing may take another 10 seconds,

8    and so using that approach I can accomplish the sealing

9    of that gap in a minimum of time and a minimum of steps

10    and a minimum of disturbance on the cell, the lowest risk

11    for disturbing the cell.

12:22P    12    Q    As we talked about before, it would be within

13    the skill of a person, the ordinary skill of a person in

14    the art to be able to apply the adhesive while the plates

15    are under pressure to release the pressure and allow the

16    adhesive sealant to traverse into the gap?

Page 88

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

17    A    Okay.

18         MR. COHEN:  Objection.

19         THE WITNESS:  I want to be cooperative with

20  you.

21         MR. COHEN:  Objection.  Ambiguous.  Calls for

22  speculation.

23         Go ahead and answer the question.

24         THE WITNESS:  Okay.  It sounds like the exact

25  same question, but let me hear it again before I give

97

1  you --

2  BY MR. HOSMER:

3    Q    I just want to be sure that when we're talking

4  about item 14 in figure 1, which we have been speaking

5  of --

6    A    Let me go back to 14 and figure 1.

7    Q    All right.  My question, my specific question

8  was --

9    A    Item 14 is what?  Are you saying my

10  declaration?

11    Q    Item 14 in the Watson application, figure 1.

12    A    Okay.  Item 14 in figure 1.  Yes, I see that.

12:23P  13    Q    If you resize an LCD in the manner described in

14  the Watson application, in your view would it be within

15  the skill in the art for someone to place the plates

16  under pressure, apply the adhesive sealant along the cut

17  edge, release the pressure slightly on the plates and

18  have the sealant traverse inwardly into the gap as

Page 89

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

19    defined in the Watson application --

20         MR. COHEN:  Objection.  Ambiguous.

21    BY MR. HOSMER:

22    Q    -- to create a seal that is like item 14?

23         MR. COHEN:  Objection.  Ambiguous.  Asked and

24    answered.

25         THE WITNESS:  Can I answer?

98

1    BY MR. HOSMER:

2    Q    Yes.

3    A    Absolutely, unequivocally no.  And that is the

4    same question you've asked me several times.

5    Q    And --

12:24P  6    A    I can go further and say that the reason is

7    the seals are entirely different materials applied by

8    different techniques applied in different steps of the

9    operation.  It's not related at all other than they're

10    both -- other than this one is between the plates, and

11    you want -- you seem to think that Watson says that in

12    here, and Watson doesn't say it anyplace.

13         MR. COHEN:  Can I make a suggestion and go off

14    the record for a minute?

15         MR. HOSMER:  Sure.

16         (Lunch recess.)

1:18P  17    BY MR. HOSMER:

18    Q    Mr. Tannas, welcome back from lunch by the way.

19    A    Welcome back the same.

20    Q    This morning you were helpful in an exercise

21    where we walked through your patent, and you identified

Page 90

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

22    the various column and line numbers that relate to the

23    sealing of the resized plates.  Do you recall that we

24    went through that exercise?

25         A    Yes, I do.


99


1         Q    Okay.  I noticed in looking at some of the

2    citations over the lunch break, some of the columns and

3    line numbers that you mentioned make reference to the

4    seal in general, which I certainly appreciate, but I

5    would like for you to take a look at your annotated

6    patent that you based your earlier discussion on.  Now

7    could you take a few minutes, sir, and focus specifically

8    and strictly on the disclosure that you see that relates

9    to the methodology for applying the seal as opposed to

10    just references to the seal itself.  Do you understand

11    what I'm looking for?

12         A    I believe I do, and it is cited in many places,

13    and part of that is to create a motivation and a need to

14    get it between the plates, and where it's cited there's

15    two basic options.  One is to put the seal as a bead on

16    the outside or put the seal between the plates.

1:19P  17         Q    And my specific question to you is could you

18    point me to the column and line numbers specifically

19    where it talks about the step-by-step process in which

20    you actually do apply the seal and you cause the seal to

21    be positioned between the plates, and not just a

22    reference to the seal itself, but I'm looking for the

23    process steps of the methodology in your patent which I

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

24  assume is a subset of some of the citations you gave us.

25  If you could take a minute to do that, I would appreciate

100

1  it, and we'll put that on the record.

2      A    Okay.  I'll do that.  It's discussed in column

3  7, line 23 to 49.

1:20P  4      Q    And do you see any other references to the

5  methodology or process for applying the seal as opposed

6  to just a reference to the seal itself?

7      A    I think there are some, but this is the most

8  detailed, and other places it's more giving motivation

9  and purpose and direction rather than the actual method,

10  and so it's cited about ten or so other places.

11      Q    But I'm just referring to the method, the

12  steps, the process.  Am I right that the one citation

13  that you gave me, that is really the only place in which

14  you talk about the step-by-step procedure that you

15  contemplate for actually applying the seal to the cut

16  edge of the resized plate?

17      A    It could be, but I don't look at it that way

18  because right in the beginning it says -- okay, in the

19  abstract it says "Resealing the display to preserve

20  proper cell spacing and assure basic functionality."

21  That is the motivation.

1:22P  22      Q    That's a description of function that you want

23  to accomplish, right?  I'm looking for steps, the process

24  steps.

25      A    And I'm looking for the first time I say

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

101

1    "between the plates" because to a skilled operator one

2    skilled of -- skill as defined would immediately

3    understand that the seal is to go between the plates.

4    Therefore, I will have to do some extra things, and the

5    operator -- just the words "between the plates" would

6    have a meaning in terms of criteria, and the operator

7    probably would envision some things.

8         So the steps, without going over and making

9    sure every one is a step or not -- but I'll do that if

10   you like, if it's what you want me to do to see where

11   there is steps versus motivation versus criteria.

1:23P  12   Q    I'm interested in just the steps, and I think

13   you've answered my question, and I'll let you -- since

14   we need to move along with other matters, if you look

15   through the patent and you find descriptions of the

16   method steps, the methodology for applying the seal other

17   than the one citation that you gave us in column 7, I

18   certainly would welcome your letting us know about that

19   even after the deposition, but for now I would just like

20   to assume that the description that you rely upon to

21   describe the methodology appears in column 7 as you

22   cited.  Is that a fair characterization?

23   A    I'm not sure.  I better look through and see.

24   Q    Well, I tell you what.  I don't want to stop

25   you from looking through necessarily, but I'm afraid that

102

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

        1   I don't want you to have to take a break and spend

        2   another 20 or 30 minutes doing that.

1:24P   3       A    Okay.

        4       Q    If you can do it quickly, I think that you

        5   understand what I'm looking for.  I'm not just interested

        6   in references or citations to the seal itself in general,

        7   but I'm interested in descriptions other than column 7 in

        8   which you talk about how the seal is applied to the cut

        9   edge of the plates.

       10       A    Okay.  Well, let's go through this area that I

       11   cited.  That's where there's a major effort to describe

       12   the steps as opposed to secondary efforts to describe the

       13   steps.

       14       Q    I don't mean to cut you off, but actually we

       15   spent a good time yesterday and your counsel will remind

       16   us that we spent a good amount of time talking about

       17   that.  I'm just interested in knowing if that's the

       18   citation that you would yourself look to as disclosing

       19   how the epoxy adhesive is applied to the edge of a

       20   resized plate.

       21           MR. COHEN:  Objection.  It's ambiguous.  It's

       22   misstating the witness's testimony.

1:25P  23           THE WITNESS:  Well, I better -- since you

       24   asked, I'll look.  Okay.  Column 3, line 25 and 26, it

       25   says "To reseal the display an adhesive is applied along

                                                                    103

        1   at least the cut edge or edges."

1:26P   2   BY MR. HOSMER:

                            Page 94

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

3      Q    Yes.  I guess that does describe the initial

4    step, doesn't it, or at least one step in the sealing.

5    All right.  Is there anything else that you see?

6      A    Okay.  Column 4, line 9 to 15, correction, 11

7    to 15 another aspect involves customizing an electronic

8    display by cutting the display along desired dimensions

9    resulting in a target portion, and the next says "display

10   portion -- applying a first seal along an exposed edge of

11   the target display portion between the plates."

1:28P  12      Q    Any others that you see?

13     A    I'm continuing to look.  Column 7, line 8 to

14   12, says "Immediately or soon after the display is cut

15   either by direct cutting or by scribing and breaking, for

16   example, the display is oriented to prevent the liquid

17   crystal material or other image-generating media from

18   escaping due to any newly exposed unsealed edge."

1:29P  19      Q    Would that be a step that's prior to the actual

20   application of the adhesive seal on the cut edge?

21           MR. COHEN:  Objection.

22           THE WITNESS:  Well, it's a step, and it's

23   important.

24           MR. COHEN:  Objection.  Calls for speculation.

25   Ambiguous.  Go ahead.

                                                          104

1    BY MR. HOSMER:

2      Q    It's a step, and it's --

3      A    It's required to preserve the image-generating

4    material inside the gap or the cavity.

Page 95

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

5      Q    So you don't lose any liquid crystal material,

6  right?

7      A    Right.

8      Q    And that step takes place before the sealing,

9  correct?

10      A    But it's part of the steps --

11      Q    I understand.  Thank you.

12      A    -- to make the sealing go where you want it to

13  go.

14      Q    I understand.  Thank you.

15      A    Okay.  On column 9, line 45 to 58.  "The first

16  seal is an adhesive and serves the purpose of barricading

17  the image-generating media from leaking out as well as

18  mechanically holding the plates together at the proper

19  spacing."

1:31P  20      Q    All right.  I don't perceive that as describing

21  the step or part of the methodology.  I'm just looking

22  for the steps that relate to the application of the

23  adhesive.  I understand that describes the purpose of

24  the adhesive, but that doesn't necessarily describe the

25  steps, does it?

105

1      A    Well, one step here is adding the microspheres

2  to the adhesive --

3      Q    I see.

4      A    -- the glass beads or suitable objects may be

5  added to the adhesive material to aid in preserving the

6  minimum cell spacing.

7      Q    Good.  Thank you.  Go ahead and continue to

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

8    look and tell us whatever else you find.

9        A    I believe that's all I can find at this moment.

10       Q    All right.  Thank you.  I wanted to revisit

11   just momentarily one point that we covered in your

12   earlier examination, and I actually had the court

13   reporter read back the record to me to see whether or not

14   I asked you before.

15           And I believe that I didn't get a chance to

16   specifically ask the question or at least the answer that

17   you gave earlier I'd like to have clarified; and having

18   given you that background, could you take a look at

19   Exhibit 11 again, and I believe that's the priority

20   document that we have been talking about.  I just have

21   really one question that relates to that as a follow-up.

22   Yes, you have it there?

1:34P  23      A    Yes.

24       Q    That's fine.  We were talking and if you could

25   turn to the back again and take a look at the figures,

106

1    particularly figure 1, all of the figures, but in

2    particular figure 1 --

3        A    Yes, I have it before me.

4        Q    All right.  Actually 1 through 5 are the

5    figures I would like you to focus on.

6        A    I have them all.

7        Q    All right.  And apart from the resizing

8    technique in which you would actually be tiling the LCDs

9    in order to increase the size of the LCD, apart from that

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

10   embodiment in the Watson application, as you look at the

11   figures, do you see any kind of seal in the figures, and

12   I'm excluding now the tiling kind of sealing that we

13   spoke of and you talked about earlier, do you see any

14   other kind of seal disclosed in any of those figures

15   other than the type of seal that is shown by item 14 in

16   figure 1?

1:35P   17          MR. COHEN:  Objection.  Ambiguous.

18          THE WITNESS:  I don't see any seal or any

19   callout for a seal.

20   BY MR. HOSMER:

21      Q    There is the seal of item 14 in figure 1, but

22   other than that one, do you see any others?

1:36P   23      A    No, I don't.

24      Q    All right.  Let's look at your declaration

25   again, and I think you have that in front of you.


                                                      107


1       A    Yes.

2       Q    What number is that for the record, Mr. Tannas,

3   sorry?

4       A    Number 1.

5       Q    I think it's Exhibit 8.  I believe it's Exhibit

6   8.

7          MR. COHEN:  You asked him a question.

8          MR. HOSMER:  Tannas Exhibit 8.

9          THE WITNESS:  Here it is.

10          MR. HOSMER:  Great.

11          MR. COHEN:  I think Exhibit 1 was the notice of

12   deposition.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

13          THE WITNESS:  Yes, 8.

14    BY MR. HOSMER:

15          Q    Great.  If you would turn to page 4, I'm

16    focused on paragraph 15 of your declaration.

17          A    Item 15?

1:37P  18          Q    Yes.  Do you see that?

19          A    Yes.

20          Q    All right.  I'd like to read into the record a

21    portion of 15.  I have a couple of questions.  "Based

22    upon my review of the Watson applications a person of

23    ordinary skill in the art would also understand that

24    there is also no disclosure of 'reestablishing electrical

25    continuity for the electrical circuits that are cut' or


108


1     of 'reestablishing continuity of the internal

2     electronics' when the LCD is resized."  Do you see that

3     sentence?

4          A    Yes.

5          Q    Is it your opinion that there is no disclosure

6     whatsoever in the Watson applications, any one of them,

7     that relates to the reestablishment of electrical

8     circuitry for a resized LCD?

9          A    Yes.  I could not find a single sentence

10    related to reestablishment.

1:38P  11          Q    Your declaration says "In fact, the Watson

12    applications mention nothing about the electrical

13    circuits of the LCD except that the 'cut must be beyond

14    any tracking associated with connections to the operative

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

15 region 24 that is to be retained.'"  Do you see that?

16    A    Yes, I do.

17    Q    Is that your view as we sit here today based on

18 your review of the Watson applications?

19    A    Yes, it is.

20    Q    And you use the word "nothing."  Does that mean

21 you didn't find any disclosure of any kind or nature that

22 related to the electrical circuits other than the fact

23 that they should be cut in a resizing operation?

24    A    Nothing relating to reestablishing electric

25 circuits.

109

1    Q    Well, I'm having a little trouble with the

2 sentence here that says "The Watson applications mention

3 nothing about the electrical circuits of the LCD except,"

4 and then you go on to talk about the cutting.  Are you

5 saying that that sentence should be modified slightly to

6 reflect the fact there is nothing about the reconnection

7 or I'm asking what the word "nothing" means in your

8 declaration?

1:39P    9    A    Where?

10    Q    In that sentence that I just read, the second

11 sentence in paragraph 15.

12    A    Right.

13    Q    As we sit here today, is that still your view?

14        MR. COHEN:  Objection.  Asked and answered.

15        THE WITNESS:  There might be the word

16 "electricity" in there someplace, but in the context of

17 the paragraph I was talking about nothing about

Page 100

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

18    reestablishing.

19    BY MR. HOSMER:

20        Q    In other words, should we read this sentence in

21    your declaration paragraph 15 to mean that you're talking

22    about nothing, that the word "nothing" relates to the

23    reestablishment of electrical circuitry?

24            MR. COHEN:  Objection.  Asked and answered.  It

25    mischaracterizes the witness's testimony.


                                                          110


1    BY MR. HOSMER:

2        Q    Do you understand my question?

3        A    I do understand the question, and the second

4    thought I think I could find absolutely nothing except as

5    related to what to do with the excess TABs and electrical

6    circuitry and what to do in terms of preserving

7    electrical circuitry.  Outside of those concepts I could

8    find nothing about electric circuitry.

1:41P  9            MR. HOSMER:  All right.  Could you read that

10    back to me.

11            (Record read.)

12    BY MR. HOSMER:

13        Q    Thank you.  In looking at Exhibit 11, the

14    priority document that we have been talking about, if you

15    would put that in front of you now, Mr. Tannas, and turn

16    to page 11 of the priority document.

17        A    Yes, I have that before me.

1:42P  18        Q    If you would focus on the paragraph beginning

19    on line 15 on page 11 and read that paragraph and then

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

20    when you have read it, I have a question.

21        A    Yes, I read it.

22        Q    Am I right that that paragraph there does refer

23    to the electrical circuits of the LCD in some manner.

24    Would you agree with me on that?

1:43P    25        A    No, I wouldn't.

111

1        Q    You would not.  What is the reason you don't

2    agree with that?

3        A    Because this is one step away from the LCD.

4    This is on the circuitry on the TABs on the LCD.

5        Q    But isn't that a part of the electrical

6    circuits of the LCD?

7        A    I would say no, it's not.

8        Q    Well, how would you define the electrical

9    circuits of the LCD then, and I'm using that phrase

10    directly out of paragraph 15 in your declaration.  What

11    do you mean by that phrase "electrical circuits of the

12    LCD" in paragraph 15?

13        A    Yes, the circuitry of the LCD would relate to

14    the traces and lines and transistors and other things

15    that were on the LCD or immediately attached to the LCD

16    such as the TABs.

17        Q    And you don't consider the driver cards to be

18    within that definition?

19        A    Well, Mr. Watson's choice of words is sometimes

20    a little different than what is used in the industry.

21    The circuit cards that he's referring to, and I believe

22    if we look at figure 2, they are items 19 and 20, and the

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

23    TABs are labeled 21.  So the TABs are connected to the

24    glass, but the circuit cards are not connected to the

25    glass.  They're connected to the TABs on the other end,

112

1     and so I would not consider them part of the LCD

2     circuitry.

1:45P    3         Q    When you make an operative device according to

4     your invention in your patent, did you contemplate that

5     you might necessarily have to reconnect electrically the

6     driver cards and to reconnect electrically the TABs and

7     other electrical components?

8         A    Okay.  He calls them driver cards, but they're

9     not driver cards first of all.  The drivers are on the

10    TABs.  Yes, I contemplated, as anyone would looking at

11    this, that these circuit cards attached to the TABs are

12    there, and replacing them or not replacing them has

13    nothing to do with the liquid crystal display.

14        Q    Well, I want to be sure I understand you.  You

15    think that the word "driver cards" here more properly

16    would be referring to the TABs themselves?

17        A    No.

18        Q    No?

1:46P    19        A    The TABs are flexible and usually not referred

20    to as a card.  The circuit boards are -- printed circuit

21    boards are referred to as a card.  They're stiff, and so

22    that would be items number 20 and 21 whereas -- 19 and

23    20 -- whereas the TABs the flexible part that's attached

24    to the display is item 21.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

25          Q     In a resizing operation if you cut through what

113

1     they refer to as the driver cards and the TABs, am     I

2     correct in a very layman sense that both of those

3     electrical components would need to be reengineered or

4     reconnected in order to make an operative device?

5          A     That is correct.

6          Q     I had assumed, sir, that in looking at your

7     invention in your patents that you contemplated that

8     after the resizing was completed that a person skilled

9     in the art would do whatever is necessary in order to

10    reconnect the electrical circuitry to make an operative

11    LCD.  Is that corrrect?

1:47P   12          A     That is correct, and where the misunderstanding

13    comes about is that the technology of attaching TABs to

14    cards is in the electronic circuit board industry and is

15    not a technology of the liquid crystal display industry,

16    but attaching the TABs to the glass is a technology in

17    the liquid crystal industry and so major manufacturers,

18    for example, the liquid crystal manufacturer may attach

19    TABs and may send it to a vendor to attach the cards.

20          Then it would be sent to another vendor to

21    attach to a computer.  You see it's one step removed from

22    the liquid crystal display and its manufacturing and its

23    technology and its skill levels.  For example, 21 is

24    typically soldered to the card the way circuits are

25    normally soldered to circuit cards whereas to the glass,

114

1    it's put down with an anisotrophic adhesive that is

2    unique to the display industry.  In fact the pitch far

3    exceeds anything that's ever been done in the circuit

4    card industry in terms of attachments, and so it's a

5    unique thing with liquid crystals and liquid crystal

6    manufacturing whereas attaching to the circuit card is

7    not unique at all to the liquid crystal industry.

1:48P   8       Q    Do you believe that in the resizing operation

9    that's described in your patent that a person skilled in

10    the art would understand that if you cut through the TABs

11    in addition to the LCD itself that they would have the

12    skill in order to reconnect the electrical circuitry?

13       A    That's a specialty and they would know how to

14    do it, but maybe not have the personal skill, and so they

15    would take it to a person in the factory that had that

16    skill level as opposed to another person who had the

17    skill level of putting down and operating the vacuum

18    chambers and another skill level of filling the cell and

19    another skill level of cutting the cells, yes.  They

20    would have that skill level.

21       Q    And would that same person or group of persons

22    in reviewing the Watson application, particularly as we

23    look at figure 2, for example, which shows the X-X cut

24    line and the resizing that goes through TABs 21 and

25    through driver card 20; is that right?

115

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

1          A    Yes.

1:49P    2          Q    And would that person of ordinary skill in

3    the art in looking at figure 2 and reading the Watson

4    application understand that after the resizing were

5    complete that you could reconnect the electrical

6    circuitry without undue experimentation, for example?

7                 MR. COHEN:  Objection.  Ambiguous.

8                 THE WITNESS:  Well, that's a long question.

9    First of all, you persist to call it a driver card, and

10   it's not a driver card, but Watson calls it a driver

11   card, and so we'll go with that word, but it's not a

12   driver card.

13   BY MR. HOSMER:

14         Q    I understand.

15         A    And one skilled in the industry would say "Oh,

16   that's not a driver card.  That's a circuit card."  The

17   drivers are on the TABs 21.

18         Q    My question is would a person skilled in the

19   art with a resized LCD in a cut along the X-X line shown

20   in figure 2 and resealed in a manner that we talked about

21   today understand how to reconnect the electrical

22   circuitry as you see it in figure 2 here and understand

23   how to do that?

24                MR. COHEN:  Objection.  Ambiguous.

1:50P    25                THE WITNESS:  Well, there are lots of things

116

1    that have to be done to make the display function after

2    you've resized the display, and one thing outside of the

3    display itself would be the electronics coming to the

Page 106

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

4   display. The circuit card is the electronics coming to

5   the display. So the circuit card is not a discipline or

6   technology that a liquid crystal manufacturer would be

7   concerned with.

8   BY MR. HOSMER:

9       Q    But as far as you're concerned given the level

10  of skill of those who understand the electronics of LCDs,

11  I take it you would agree with me that a person of

12  ordinary skill in the electronics aspect of LCDs could

13  take a resized LCD and reconnect the electrical circuitry

14  without much problem?

1:51P  15       A    Well, that's a very broad task. The Watson

16  patent describes cutting glass. It doesn't discuss the

17  electronic circuitry at all. My patent discusses cutting

18  the whole thing, electronics and glass.

19       Q    Yes.

20       A    Okay. So ask me the question again maybe a

21  little shorter.

22       Q    My question was a person skilled in the art who

23  is looking at this particular application, and figure 2

24  in particular, and was dealing with a resized and

25  resealed LCD that had its electrical circuitry cut in a

117

1   manner that we have talked about, would that person have

2   the ability to reconnect the electrical circuitry to make

3   an operative device?

1:52P  4                MR. COHEN: Objection. Ambiguous. Calls for

5   speculation. Incomplete hypothetical, and it

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03
6  mischaracterizes the previous testimony.

7          THE WITNESS:  Well, if we're talking about this

8  figure -- are we talking about figure 2 in the Watson

9  patent?

10  BY MR. HOSMER:

11      Q    Let's focus on that.

12      A    If we're talking about that figure in the

13  Watson patent, it says I'm going to cut the display in a

14  way I don't disturb the electronics so after the cut is

15  done and the seal and everything is done, it's passed on

16  to somebody else to work on it, and the question might

17  be "Did you do anything to disturb the electronics?"

18          "No.  According to the Watson patent I cut it

19  so I didn't disturb the electronics."

20      Q    Now would you take a look actually since you

21  mentioned that on page 7 of Exhibit 11 and beginning on

22  about line 11 --

1:53P  23          MR. SPOONER:  10.

24  BY MR. HOSMER:

25      Q    -- or 10.


                                                           118


1      A    Okay.

2      Q    And let me read it into the record so that the

3  reader might be clear.  It says "the vertical driver card

4  20 may be held in an unshown support fixture and a fine

5  tooth saw may be used to cut through the vertical driver

6  card 20 along the line X-X.  This cut must be beyond any

7  tracking associated with connections to the operative

8  region 24 that is to be retained.  Any rough edges can be

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

9    filed to get any track cut from shorting."

10    Now using that description of the way in which

11    a cut is made with respect to figure 2, am I correct that

12    a person skilled in the art of electronics at this

13    particular time frame in 1997 would understand that a

14    resized and resealed LCD could have its electrical

15    connections as cut here reconnected and make the LCD

16    operable?

1:54P    17    MR. COHEN: Objection. Ambiguous.

18    THE WITNESS: And my answer is that this

19    specifically says that I'm going to cut the display in a

20    way not to disturb the electronics. Some of the words

21    are not the words that are generally used, but tracking

22    is probably trace or circuit line conductor, and the saw

23    is going to be used to cut through the circuit board.

24    Now in the industry people do not use saws to cut circuit

25    boards, but you could use a saw if you want. They use a

119

1    mill, but that's okay.

2    The vertical driver card -- it is not a

3    vertical driver card. It's a circuit card. The vertical

4    drivers are on the TABs. And you can hold it in some

5    fixture. That's fine. A fine tooth saw is fine. It may

6    be cut through the vertical card along line X-X. Fine.

7    This cut must be beyond any tracking or circuit

8    associated with connections to the operating region 24.

9    So he's saying I'm cutting it beyond so that I

10    do not disturb anything on the portion of the display.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

11    I want to preserve, and I think that's clear and obvious

12    once you translate some of his words to the language that

13    is used in the industry.

1:56P    14    BY MR. HOSMER:

15        Q    With respect to this particular embodiment that

16    we're talking about here under these circumstances, would

17    you agree with me that a person of ordinary skill in the

18    art of electronics could reestablish the circuitry

19    without undue difficulty?

20        A    Are we now looking at the Watson patent as a

21    teaching?

22        Q    Yes.

23        A    There is no teaching in here to do that; but if

24    I'm sitting back here and you say could an electrical

25    engineer reconnect something?  Yeah, probably.  There is

120

1    nothing in the Watson patent that helps me in any way or

2    relates or makes any statement about reconnecting

3    anything electrically.

4        Q    Would you at least agree with me that in order

5    to make a resized LCD that could be used by someone that

6    it would be necessary for the electrical circuitry to be

7    reconnected after the resizing operation in order to make

8    it an operative device?

1:57P    9        A    It would be necessary --

10            MR. COHEN:  Hold on.  Objection.  Ambiguous.

11    Calls for speculation.

12            THE WITNESS:  It would be necessary if you

13    removed the connection or changed a connection, but in

Page 110

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

14    the Watson patent he purposely says I'm not going to do

15    that, and so nothing needs to be reconnected.

16    BY MR. HOSMER:

17        Q    And still we have a resized LCD that's been

18    resealed.

19        A    Yes.

20             MR. HOSMER:  All right.  Just a second.  Could

21    we take just a one-minute break?

1:58P    22             MR. COHEN:  Sure.

23             (Recess.)

24             (Tannas Exhibit 12 was marked for

25             identification by the court reporter.)


                                                121


2:07P    1    BY MR. HOSMER:

2        Q    Mr. Tannas, I'm handing you what I had the

3    court reporter mark as the next Exhibit Number 12, and I

4    would ask you if you could identify that for us on the

5    record.

2:09P    6        A    I don't recollect seeing it, but it looks like

7    the initial writing of my patent.

8        Q    Actually I don't want to mislead you, but that

9    is a copy of the prosecution history of the proceedings

10    in the United States Patent Office that relates to the

11    906 patent, and I do not need to ask you about a number

12    of things in that document, but I just have some specific

13    questions about the two items which are tabbed there.

14        A    Okay.

15        Q    The first is a preliminary matter.  Let me ask

                            Page 111

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

16    you apart from the participation in preparing and filing

17    your patent application, were you involved in any way

18    in the activities that related to what we call the

19    prosecution of your application as it matured into a U.S.

20    patent?

21              MR. COHEN:  Objection.  This is beyond the

22    scope of the permissible discovery by the APJ's order.

23    I would normally instruct the witness not to answer the

24    question; but based on the conference today, I withhold

25    my instruction.

122

2:10P    1              THE WITNESS:  Okay.  I don't know what involved

2    means.  I took it to Lyon and Lyon.  I had a draft and

3    asked them to make the application, and so my connection

4    was just with the attorney.  I gave him power of

5    attorney, so --

6              MR. COHEN:  I also would add an objection to

7    the extent it calls for any privileged information under

8    the attorney-client privilege.

9    BY MR. HOSMER:

10       Q    Mr. Tannas, I do not want you to reveal any

11    kind of communications that would relate to your

12    involvement with the patent attorneys at Lyon and Lyon

13    that relates to the application, but could I ask you do

14    you recall when you first went to the patent attorneys at

15    Lyon and Lyon to discuss the possibility of preparing and

16    filing an application for your invention as related to

17    the 906 patent?

18              MR. COHEN:  I'll renew my same objections as to

Page 112

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

19    the APJ's order, and I'll use that for shorthand.

2:11P    20        THE WITNESS:  I'd have to refer to my calendar.

21    BY MR. HOSMER:

22        Q    Well, can you give any kind of an estimate in

23    terms of months, years, whatever it is before the

24    application was actually filed?

25        A    It was months.

123

1        Q    Months?

2        A    And --

3            MR. COHEN:  I renew my objection on this whole

4    line of questioning, okay?

5            MR. HOSMER:  I understand.

6        Q    Do you have a draft of your application that

7    you had prepared that you presented to the patent

8    attorney to look at as you worked through to prepare and

9    file an application?

10        A    According to the patent attorney at that time

11    he considered it a pretty mature draft and actually --

12            MR. COHEN:  Objection to the extent that it's

13    calling for attorney/client privileged information.

14            I will instruct you not to answer on any

15    communications that you actually had with your attorneys

16    at the time.

17    BY MR. HOSMER:

18        Q    I'm not really interested in the communications

19    at all, what you said to them and what they said to you,

20    written communication and letters and so forth back and

Page 113

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

21    forth.  I just want an understanding of the basic

22    chronology of events.  You went with an application that

23    they considered to be relatively complete in form.

2:12P    24         A    It was typed.  I proofread it a couple of

25    times.  It was revised a couple of times and had figures

124

1    attached that I had drawn personally.

2         Q    And eventually they prepared more formal

3    drawings for inclusion in the application before it was

4    filed?

5              MR. COHEN:  Same objections.

6              THE WITNESS:  Of course.

7    BY MR. HOSMER:

8         Q    And did you review the various drafts and then

9    finally after reviewing the final drafts, do you recall

10   signing and dating the application and returning it to

11   the attorneys for filing in the patent office?

12        A    Yes.

13             MR. COHEN:  Same objections.

14   BY MR. HOSMER:

15        Q    During the course of the proceedings in the

16   patent office did Lyon and Lyon keep you advised of the

17   activities of the patent office, namely, the response to

18   the patent office and so forth?

19             MR. COHEN:  Objection.  It calls for privileged

20   communications, and I'll instruct the witness not to

21   answer the question.

22             MR. HOSMER:  I'm just asking for a yes-or-no

23   answer.  I'll rephrase the question.

24      Q    Did you receive copies of communications from

25  the patent office as it related to the prosecution of

125

1  your application?

2:13P    2            MR. COHEN:  Objection other than to the extent

3  it calls for a yes-or-no answer.

4            THE WITNESS:  Yes.

5  BY MR. HOSMER:

6      Q    And did you have an opportunity to review the

7  official actions as they're called from the patent office

8  as it related to your application?

9            MR. COHEN:  Same objections regarding the APJ's

10  order.

11  BY MR. HOSMER:

12      Q    And you can answer that question yes or no.

13      A    Well, review is a pretty big word.  I'm not

14  skilled in patent law.

15      Q    I understand.

16      A    As an inventor I reviewed them, yes.

17      Q    And I'm asking for a yes-or-no answer here too.

18  Did you communicate with your attorneys with respect to

19  your views as to, for example, prior art references cited

20  by the patent office relative to your invention?

21            MR. COHEN:  Same objections regarding the APJ.

22            THE WITNESS:  Yes.

23  BY MR. HOSMER:

24      Q    Did you assist the attorneys in some way in

25  preparing the responses to the official actions from the

126

```
       1    patent office --
       2           MR. COHEN:  Same objections.
       3    BY MR. HOSMER:
       4       Q   -- as it relates to your application?
       5           MR. COHEN:  Same objections regarding the APJ
       6    and the privileged communications to the extent it
       7    requires anything beyond a yes-or-no answer.  I will
       8    instruct you not to answer other than yes or no.
2:14P  9           THE WITNESS:  Yes.
      10    BY MR. HOSMER:
      11       Q   Did you have an opportunity to review what
      12    we call the cited references that related to your
      13    application, and by cited references I mean those prior
      14    patents that were cited by the patent office examiner in
      15    connection with your invention?
      16       A   Yes.
      17           MR. COHEN:  Objection regarding the APJ.
      18    BY MR. HOSMER:
      19       Q   Did you communicate your thoughts on those
      20    references, and I'm not asking for the thoughts
      21    specifically, sir, but did you communicate your thoughts
      22    on those references to the patent attorney at Lyon and
      23    Lyon who was handling the prosecution of your case?
      24       A   Yes.
      25           MR. COHEN:  Same objections regarding the APJ.
```

127

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

1          THE WITNESS:  Yes.

2    BY MR. HOSMER:

3      Q    Did you have an opportunity then to review the

4    formal written response that was prepared by Lyon and

5    Lyon before it was filed in the patent office?

6          MR. COHEN:  Same objections regarding the APJ.

7          THE WITNESS:  Yes.

2:16P   8    BY MR. HOSMER:

9      Q    Now in Exhibit 12, Mr. Tannas, I placed a tab

10   in a couple of locations there for you.

11     A    Yes.

12     Q    They hopefully are consistent with what we have

13   been talking about here.  Turn to the first tab.

14     A    Yes.

15     Q    It's identified there.  You can see it's called

16   "Paper Number 6" with a date of August 8th, 2000.  Do you

17   see that?

18     A    Yes, I do.

19     Q    Do you recognize that as a copy of the official

20   action from the patent office examiner with respect to in

21   fact the first official -- I think it's the first

22   official action.  Well, I'll just say it this way.  Let

23   me rephrase the question.  Do you recognize that as an

24   official action from the patent office examiner who was

25   assigned to examine your application?

128

1          MR. COHEN:  Objection.  Calls for speculation.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

2:17P    2        THE WITNESS:  Yes.

3    BY MR. HOSMER:

4        Q    And based on what you told us before, do you

5    recall as we sit here today receiving a copy of that

6    action and reviewing it?

7            MR. COHEN:  Objection.  APJ.

8            THE WITNESS:  Well, in my memory there were

9    quite a few of these, and so whether I got this exact

10   one -- I believe I did.

11   BY MR. HOSMER:

12       Q    The second tab that you see there, turn to

13   that.

14       A    Uh-huh.

15       Q    It's entitled "Amendment," and I can't --

16       A    Uh-huh.

17       Q    -- read the date, but I'd like to for the

18   record.  I believe it's October 27, 2000.  Excuse me.

19   I'm sorry.  It's November 1, 2000.  I believe that may be

20   the date of the amendment.

2:18P   21           MR. COHEN:  Just for the record let's clarify

22   we're talking about the certificate of mailing, the

23   certificate of transmission on the bottom of the first

24   page.

25   BY MR. HOSMER:

129

1        Q    The certificate of transmission that I tabbed,

2    Mr. Tannas, has a November 1, 2000 date.  Are we on the

3    same page here --

4        A    Yes, we are.

Page 118

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

```
 5      Q    -- literally and figuratively?

 6      A    Yes.

 7      Q    And it's entitled "Amendment."  Do you recall

 8  that amendment was filed by Lyon and Lyon in response to

 9  the official action that we had, and it's shown as the

10  first tab that we talked about?

11           MR. COHEN:  Objection.  APJ.

12           THE WITNESS:  Yes, I do.

13  BY MR. HOSMER:

14      Q    And do you recall that there were two prior art

15  references which were discussed and distinguished by your

16  patent attorneys as part of the amendment and response

17  filed in the patent office?

18           MR. COHEN:  Objection.  APJ.

19           THE WITNESS:  I recall there were some.

20  BY MR. HOSMER:

21      Q    If you would turn to page 11 in the portion

22  that has the second tab that I've identified there, and

23  we're on page 11 of the amendment.

24      A    The number at the bottom of the page?

25      Q    Yes.  The number at page 11.
```

2:19P

                                                              130

```
 1      A    Yes.

 2      Q    It says "Remarks" at the top.  Do you see that?

 3      A    Yes, I do.

 4      Q    Now could you look through the remarks section

 5  there on pages 11 and 12 -- well, actually 11 through

 6  14 -- and just quickly look through that and see if you
```

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

7   recognize that as a document that you had an opportunity

8   to review before it was filed in the patent office by

9   Lyon and Lyon.

10          MR. COHEN:  Objection.  APJ.

11          THE WITNESS:  Okay.

2:20P  12          MR. COHEN:  While he's reading that, let me

13   clarify for the record that my shorthand "Objection, APJ"

14   is the entire objection including the normal instruction

15   I would give not to answer.

16          THE WITNESS:  To help my memory I would need

17   the references of Hinata and Matsuyama.

18          MR. HOSMER:  Let's mark for the record the next

19   exhibits which is 13 and 14; is that right?

20          THE REPORTER:  Yes.

21          MR. HOSMER:  13 will be U.S. Patent Number

22   56107422 Hinata, et al., and 14 will be Japanese

23   publication 61210326A, and the name is Matsuyama.

2:21P  24          (Tannas Exhibits 13 and 14

25          were marked for identification

131

1          by the court reporter.)

2   BY MR. HOSMER:

3          Q    We can come back to my earlier question,

4   Mr. Tannas, about the amendment.  I guess the threshold

5   question is in looking at the Matsuyama and the Hinata

6   references, did those look like the same two references

7   that you had a chance to review during the prosecution of

8   your patent application?

9          A    I recognize them, but I'm not sure what the

Page 120

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

10    point was.

11         MR. COHEN:  Objection.  APJ.

12    BY MR. HOSMER:

13    Q    Okay.  If you look at tab 1 back again here in

14    the prosecution history, Mr. Tannas, for just a second --

15    A    Your yellow tab?

16    Q    Yes, the yellow tab.  Could you turn to the

17    page that in the upper right-hand corner that says page

18    2.

2:23P 19    A    Yes.

20    Q    It bears a heading "Detailed Action."

21    A    Yes.

22    Q    If you look down in paragraph 4 claims, it

23    talks about claims 1 through 3 and so forth.

24    A    Yes.

25    Q    And if you would just read to yourself the

132

1    entirety of what you see there for paragraph 4 and

2    bridging over to part of page 3 down about two

3    paragraphs, and just read that to yourself.  My question

4    to you is with that in mind, does reading that refresh

5    your recollection that you had an opportunity to look at

6    the Hinata and Matsuyama references to provide input to

7    your attorneys with respect to those references?

8         MR. COHEN:  Objection.  APJ.  Objection to the

9    extent it calls for anything beyond a yes-or-no answer.

10    Attorney-client privilege.

2:25P 11    MR. HOSMER:  Could you read back the question?

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

12          (Record read.)

13          MR. SPOONER:  It sounds like a yes or no to me.

14  Neal knows that.

15          THE WITNESS:  Maybe you could help me along.

16  It's referring to --

2:29P  17          MR. COHEN:  I'm going to instruct you not to

18  answer the question beyond a yes or no.

19          THE WITNESS:  But I'm trying to find out what

20  it's about to refresh my memory.  I can't even remember

21  what the issue was on this.  It says "Per claim 5 see the

22  figure substrates 15 are different sizes."  Where is the

23  figure with substrate 15?  Is it in here or is it Hinata?

24  BY MR. HOSMER:

25      Q    You're looking at the official action?

133

1       A    Page 3 near the bottom "Per claim 5 see the

2   figure substrates 15 are different sizes," and I can't

3   find that.

2:30P  4       Q    That's actually past where I hoped you would

5   look at.  I don't really need or I don't think it's

6   necessary, Mr. Tannas, for you to look at all the

7   details.  I'm just trying to understand the very basics

8   of the procedure that was involved in the prosecution

9   of your application.

10          I'll rephrase the question for you.  In looking

11  at these materials, am I correct that you did have an

12  opportunity, and hopefully your recollection is

13  refreshed, to look at the Hinata and Matsuyama references

14  in front of you, and you can answer yes or no.  Does what

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

15    is in front of you refresh your recollection you did look

16    at those references and did provide some input to your

17    attorneys about those references?

18              MR. COHEN:  Objection.  APJ.

19              THE WITNESS:  Yes.

20    BY MR. HOSMER:

21        Q    Okay.  Would you take now a look at the --

22    excuse me.  Take a look at tab 2 here in the prosecution

23    history for just a moment.  Turn to page 12, and for the

24    record page 12 of the amendment that was filed in the

25    response to the official action.  Do you have that there,

134

1    page 12?

2:31P    2        A    Page 12 of Exhibit 12?

3        Q    Yes.  That's the --

4        A    Second tab.

5        Q    -- second tab which is the amendment that was

6    filed in response to the official action.  I'd like to

7    focus your attention for a moment on the second paragraph

8    of that textual material in the amendment, and let me

9    just read it.

10              "With respect to cited references the Hinata,

11    et al. reference discloses a method for manufacturing a

12    new," and the word "new" is underscored, "LCD display and

13    does not teach or suggest a method for changing the

14    physical shape of an existing display as claimed in the

15    present application."  Then he goes on.  Do you see that?

16        A    Yes, I do.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

17    Q    Do you recall in hearing that and reading it

18    that that was the only point of distinction that you made

19    with respect to the patent office's citation of the

20    Hinata, et al. reference during the prosecution of your

21    reference?

2:32P    22        MR. COHEN:  Objection.  APJ.  Calls for

23    speculation.  Calls for a legal conclusion.

24        THE WITNESS:  I have trouble with the word

25    "only."

135

1    BY MR. HOSMER:

2    Q    I looked through the amendment, and I confess

3    that I've had an opportunity to look at it, but I didn't

4    find any other distinction about Hinata that was

5    verbalized in any of the amended papers.

6    A    I remember this one, yes.

7    Q    Well, is it correct to say though the Hinata,

8    et al. reference could be distinguished from your

9    invention here because Hinata is talking about a method

10    for manufacturing a new LCD display as opposed to a

11    method for changing the physical shape?

12        MR. COHEN:  Same objections.

13        THE WITNESS:  That's my recollection.

14    BY MR. HOSMER:

15    Q    And as you look at these materials, I did not

16    find any reference in the amendment or the remarks or any

17    of the papers, Mr. Tannas, that related to the use of an

18    adhesive seal positioned between the plates as a

19    distinction between Hinata and your invention.  Would you

Page 124

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

20    agree with that?

2:34P    21        MR. COHEN:  Objection.  Ambiguous.  APJ.

22        THE WITNESS:  I don't remember that one.  I

23    would have to go back.

24    BY MR. HOSMER:

25        Q    If it doesn't --


136

1        A    Only to be fair to myself, I really shouldn't

2    answer that without refreshing my memory more than I am

3    right now.

4        Q    As we sit here today, do you recall having any

5    discussions with your attorneys, any reference whatsoever

6    to the possibility of distinguishing Hinata based on the

7    position of the adhesive seal between the plates?

8        MR. COHEN:  Objection.  APJ.  Objection.

9    Attorney-client privilege to the extent it calls for

10    anything beyond a yes-or-no answer.

11    BY MR. HOSMER:

12        Q    My question is do you recall any discussions

13    about that subject, yes or no?

14        A    I don't remember.

15        Q    Okay.  And still on page 12 of the amendment

16    there is another paragraph that talks about the Matsuyama

17    reference, and it says "Similarly, the Matsuyama

18    reference is also directed to performing a new LCD

19    display, as demonstrated by the statement in the

20    constitution portion of the abstract," and so on.

21        Now as we sit here today, do you recall any

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

22    discussion at all with your counsel about distinguishing

23    the Matsuyama reference based on the position of the

24    adhesive seal either between the plates or otherwise?

2:35P    25        MR. COHEN:  Objection.  APJ.  Attorney-client

137

1    privilege to the extent it calls for anything beyond yes

2    or no.

3        THE WITNESS:  What is the question?

4    BY MR. HOSMER:

5    Q    I'm asking if you recall any discussions of any

6    kind regarding a distinction of Matsuyama other than what

7    you see there, that is, that it related to forming a new

8    LCD display.

9    A    Yes, sir.

10    Q    You do.  Were there other distinctions in

11    Matsuyama that you recall?

12    A    Yes.

13    Q    And do you see them written in any textual

14    material here, the ones you have in mind?

15        MR. COHEN:  Objection.  APJ.

16        THE WITNESS:  Not so far.

17    BY MR. HOSMER:

18    Q    Let's look for just a moment, Mr. Tannas, at

19    the -- you can go ahead and look to see whether or not

20    the other distinctions are mentioned there if you want

21    to.

2:36P    22    A    I see another one.

23    Q    You do, and where is that?

24    A    Page 12.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

25        Q    Yes.  Read what you're thinking of.


138


1         A    Well --

2              MR. COHEN:  Objection.  APJ.

3              Go ahead.

4              THE WITNESS:  "Breaking the perimeter seal.

5    Applying a first seal between the plates."  This sounds

6    like my text, so maybe the examiner brought my text into

7    this.  This last paragraph I believe is my text.  Yes,

8    it's claim 1.

9    BY MR. HOSMER:

10        Q    I see.  And you're talking about your own

11   application in your own invention there, right?

12        A    Yes.  You directed me to the first paragraph.

13        Q    Yes.  I was actually looking for any

14   distinctions about the Matsuyama reference other than the

15   fact that it related to the production of a new LCD

16   display as opposed to a reshaped LCD.

2:37P   17        A    I remember --

18              MR. COHEN:  Hold on.  Objection.  APJ.

19              THE WITNESS:  I remember three or four

20   things --

21   BY MR. HOSMER:

22        Q    You do.

23        A    -- that were distinguished that we discussed.

24        Q    Okay.  If you have an opportunity, and I think

25   we are running short of time; but if you have an

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

139

1    opportunity to take a look at this amendment, Mr. Tannas,
2    and if you know of any other written differences that
3    were discussed between Matsuyama and your invention,
4    would you be good enough to point those out to your
5    counsel, and we can make those part of the record in some
6    way.
7        A    Yes.
8        Q    I'm looking for other differences other than
9    the distinction that was made, namely, that Matsuyama was
10   involved in new as opposed to reshaped LCDs, okay?
11       A    Okay.
12       Q    Let's take just a moment to look at the Hinata
13   references that are there in front of you.  We marked
14   those.
15           MR. COHEN:  They're not a reference.
16           MR. HOSMER:  You said references.
17           MR. COHEN:  Hinata reference.
18           MR. SPOONER:  Exhibit 13.
19   BY MR. HOSMER:
20       Q    Do you have Exhibit 13 in front of you?
2:38P    21       A    Hinata, I have that.
22       Q    Okay.  I'd like for you to focus, Mr. Tannas,
23   on figure 1 of Hinata which is a couple of pages in.
24       A    I am.
25       Q    And specifically I'm interested in item 15 in

140

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

1    figure 1 which is on the right-hand side.

2        A    Yes.

3        Q    If you'll just keep your finger there and flip

4    over to column 4 for just a moment --

5        A    Yes.

6        Q    -- you'll see down about on line 35 and 36

7    where it defines item 13.

2:39P    8    A    Yes.

9        Q    Then if you go back to figure 1 -- let me just

10    read it.  It says "As shown in figure 1," and I'm reading

11    from line 33 in Hinata, column 4, "As shown in figure 1

12    the liquid crystal cell is subjected to a gas barrier

13    treatment in which an epoxy system adhesive 13 is applied

14    to both edges of the liquid crystal cell and then

15    hardened."

16            Now if you'll turn back to figure 1 and item

17    13, and I'm asking for your view based on what you see

18    in Hinata, am I correct that the epoxy adhesive 13 is

19    positioned such that at least a portion of it is

20    juxtaposed between plates one and two substrates or

21    plates identified by item 1?

2:40P    22    A    Well, there is not enough to tell.  Figure 1 is

23    kind of a schematic.  It doesn't show any dimensionality

24    at all, and so lacking in dimensionality, it's really not

25    clear where it is.

141

1        Q    At least with respect to the figure would you

2    agree with me there is a suggestion that the epoxy

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

3  adhesive 13, at least a portion of it, is not only

4  outside of the periphery of the plates but also is

5  positioned in between what we call the gap between the

6  plates?

7      A    Based on the dimensionality I'd say one skilled

8  in the trade really couldn't tell.

9      Q    Would you at least agree with me that based on

10  figure 1, assuming even that figure 1 is schematic in

11  nature, it appears the epoxy material of 13 as shown in

12  figure 1 has penetrated the plane of the two cut glass

13  plates -- the edges of the two plates.

2:42P  14      A    Yes, but my problem is the proportionality of

15  the degree as shown between the plates is much less than

16  the gap itself.  So generally we consider that kind of

17  the undefined region.

18          It's really not in there in a practical way.

19  To be in there in a practical way, it would have to be

20  maybe three times the gap size, and it's clearly less

21  than the gap size, and so you could equally conclude that

22  it's not there.  I mean if you were to ask me it shows

23  that it's not between the plates.  Yes, it's kind of at

24  the edge.

25          So I don't think it teaches that unless there

142

1  are words to go along with it that says it was between

2  the plates.  If there are words to go along with it, then

3  it would be between the plates.

4      Q    Thank you.  If you take just a moment to look

5  at the second reference, the Matsuyama reference.

Page 130

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

2:43P  6    A    Yes.

7    Q    I'm looking at the front page of what we call

8    the abstract.  Do you see that in English?  It's on the

9    front page, sir.

10   A    Yes.

11   Q    On the third line it talks about electrodes

12   11A and 12A with a sealing material 13.  Do you see that?

13   A    I see 11B of the downward substrate 12.

14   Q    It's up above that.

15   A    11A.

16   Q    Let me read the sentence so it's clear for

17   the record.  "An envelope is formed by bonding a

18   circumference of the upward and downward electrodes 11,

19   12 composed of polarizing plates forming each upward and

20   downwards electrode 11A and 12A with a sealing material

21   13."  Do you see that?

22   A    Yes.

23   Q    And if you look at the figure that's in the

24   third page of the reference in front of you --

2:44P  25   A    I have a figure on my second page.


143


1    Q    Yes, it's the second page.  I'm sorry.  Thank

2    you.

3    A    It has 152 on the bottom.

4    Q    Yes.  I'm just trying to make sure that I'm

5    looking at it in the same way that you would, and that is

6    looking at item number 13 in the figure at the bottom of

7    the page there --

Page 131

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

8      A    Yes.

9      Q    -- am I correct that that's sealing material

10   that is in this case positioned between electrode 11 and

11   electrode 12?

12             MR. COHEN:  Objection.  Calls for speculation.

13             THE WITNESS:  If I may answer it --

14   BY MR. HOSMER:

15     Q    Yes.

16     A    -- it appears that the author may have had that

17   in mind.

18     Q    Okay.  Thank you.  Is your CV still here on the

19   table in front of us?

2:47P   20     A    Yes.  I have a copy of that here.

21             MR. COHEN:  Exhibit 2.

22   BY MR. HOSMER:

23     Q    Exhibit Number 2, right.

24     A    I'm looking for Exhibit 2 here.

25     Q    Thank you.  Great.  I want you to have it in

144

1    front of you for a moment.  We had talked about your

2    background, and I just wanted to identify a couple of

3    final questions that related to that.  On page 6 of 10

4    of the CV that you have in front of you, Mr. Tannas --

5      A    Yes.

6      Q    -- and I think we're looking at a listing of

7    publications that you had authored at one time or another

8    in your career; is that right?  That's a partial listing?

2:49P   9      A    Yes, of publications and seminars, yes, short

10   seminars as opposed to full classes.  It's invited

Page 132

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

11  papers, oral presentations as well as publications.

12      Q    And the third entry that you see on page 6 of

13  10 there is dated November 16-17, a two-day class with

14  notes "Advanced Cockpit Displays."  Do you see that?

15      A    There is a couple of those.  Which one are you

16  referring to?

17      Q    The third entry on page 6.

18      A    Starting from the top?  I'm on the wrong page.

19      Q    Thank you.

20      A    Okay.  "Advanced Cockpit Displays at London

21  with H.L. Silver & Associates."

22      Q    Now do you recall the presentation in London --

23      A    Yes.

24      Q    -- back in November of 1998?

25      A    Yes, I do.


                                                        145


1      Q    And was there a written paper created entitled

2  "Advanced Cockpit Displays" that was presented at that

3  particular occasion?

2:50P   4      A    There was a document that was passed out to the

5  students, and it was a copy of all of my view foil

6  presentations, and so it would not be proper to call it

7  written.  It would be that it's a copy of a PowerPoint

8  presentation.  It actually was view foils.

9      Q    Yes, and it does say it's a two-day class with

10  notes in the entry here in the CV Exhibit 2.  Could you

11  tell me what the notes mean?

12      A    They were notes on the presentation, and there

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

13    were technical papers included in that.

14        Q    I see.  Did you give a presentation that was

15    along the lines of the materials in the advance cockpit

16    displays material?  In other words, did you give an oral

17    presentation that was related to the written submission

18    called "Advanced Cockpit Displays"?

19        A    Yes.  My presentation was a PowerPoint kind of

20    presentation, and there was about an inch-thick stack of

21    copies of all of the PowerPoint figures plus technical

22    papers that were referred to in the PowerPoint.  So

23    embedded in that were maybe three or four technical

24    papers as well.

25        Q    I see.  And at this point in time in November

146

1    of 1998, if I remember your testimony from yesterday, you

2    already are at a point where you have about 25 or so

3    years of experience in LCD technology already.

2:51P    4        A    More than that.  I started as a consultant in

5    1973 part time while working for Rockwell International,

6    but I made my first LCD in 1969, and so that would be 34

7    years.

8        Q    When I spoke with you yesterday, I think we

9    agreed that you were familiar enough with the technology

10    to consider yourself to be an expert in the field.

11        A    Yes.

12        Q    And I know this is 2003.  Would it be true in

13    November of '98 at that point in time with your extensive

14    experience you felt that you were an expert in the field

15    at that time as well?

Page 134

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

16    A    Yes.

17         MR. HOSMER:  All right.  Let's go ahead and

18  mark as the next one Exhibit 15.

19         (Tannas Exhibit 15 was marked for

20         identification by the court reporter.)

21         MR. COHEN:  I would like to make a statement

22  for the record --

23         MR. HOSMER:  Sure.

24         MR. COHEN:  -- that timewise we're getting

25  close to the end, but we are already well past seven


147


1  hours when you take away all the breaks and everything,

2  so --

3         MR. HOSMER:  We should be done in a few

4  minutes.

2:52P  5         MR. COHEN:  Thank you.  I appreciate it.

6  BY MR. HOSMER:

7    Q    Mr. Tannas, do you recognize Exhibit 15?

8    A    Yes, I do.

9    Q    And what is it?

10   A    It's a part of the notes that were passed out

11  for the two-day presentation.

12   Q    And the two-day presentation being November 16

13  and 17, 1998?

14   A    On the subject "Advanced Cockpit Displays."

15   Q    Now who was in the audience for the

16  presentation?

17   A    Oh --

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

18    Q   And by that I don't mean to be vague, I'm

19  sorry, but who generally was present at the conference

20  that you were making a presentation?

2:53P  21         MR. COHEN: Objection. Calls for speculation.

22         THE WITNESS: Well, as an instructor you have

23  to figure that out so that you're teaching at the right

24  level. So I asked them, and they were advanced engineers

25  and managers of the European aerospace industry. Most of

148

1  them were senior people but in classes like this where

2  anyone can sign up, sometimes people go to the class just

3  because they're starting in the industry and they use the

4  class as a way to get started.

5         Then sometimes marketing people are sent to

6  these classes just to learn the nomenclature. They

7  just want to learn the language and the lingo, but the

8  majority of this class, and it was an expensive class,

9  several thousand dollars --

10  BY MR. HOSMER:

11    Q   For each participate?

12    A   Pardon?

13    Q   Each participant paid several thousand dollars?

14    A   Several.

15    Q   Yes.

16    A   It was more than $1,000 a day as I remember.

17    Q   Okay

2:54P  18    A   And H.L. Silver who coordinated these classes

19  was very concerned that the instructors would get the

20  names of the students and their companies and then

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

21    solicit them independently and offer the class at a more

22    reasonable price.  So literally H.L. Silver would not

23    give me the roster.

24           Some of them handed out business cards if they

25    felt motivated to, and some of them, I think, just wanted

149

1    to remain anonymous.  They didn't care whether I knew

2    them or not.

3        Q    And were there other experts who made

4    presentations other than yourself?

5        A    No.  I did this entirely myself two days.  It

6    was over 12 hours of lecture.

7        Q    Did the subject of custom displays for avionics

8    come up during the course of your presentation?

9        A    Yes, it did.

10        Q    And what was the nature of the discussion or

11    your presentation with respect to custom displays?

2:55P  12        A    Flipping through this there was one paper that

13    I recently had written, and this drew a lot of attention.

14    It's one called "Application of Backlit AMLCDs to

15    Avionics."

16        Q    I'm not sure where you are.

17        A    Well, this is one paper, and it was a paper

18    that I gave SID and a couple of places, and the pages

19    aren't numbered here.

20        Q    I think I see it.  Yes, I see it.  It's about

21    10 pages from the back entitled "Application of Backlit

22    AMLCDs to Avionics"?

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

23      A    Yes.

24           MR. COHEN:  It's not the same thing you are

25    looking at.


                                                      150


 1           MR. HOSMER:  Yeah, I think so.  Thank you.

 2    Let's see.

 3           MR. SPOONER:  Go in advance where it says of

 4    that.

 5           MR. COHEN:  This way.

 6           MR. SPOONER:  Four pages back.

2:56P  7     MR. COHEN:  Right there.

 8           THE WITNESS:  Okay.  The explanation is --

 9           MR. COHEN:  Hold on.  Is there a question

10    pending right now?

11           THE WITNESS:  I think I'm answering did I

12    discuss advanced liquid crystal displays, and this is one

13    example of that discussion.

14    BY MR. HOSMER:

15      Q    Actually I think my question related to custom

16    displays, but that was the subject that -- was that a

17    separate subject that came up during the course of the

18    presentation, custom displays?

19      A    Yes.  Now that was discussed as a historical

20    overview, and I went through that list of custom -- these

21    are all custom display manufacturers.

22      Q    What is meant by -- what do you mean by the

23    term "custom display"?

24      A    It's a unique size for a very small market.

2:58P  25    Q    Was that a subject that received interest from

                          Page 138

151

1    the participants at the conference?

2        A    Oh, yes.  This was one of the most pregnant

3    subjects in the whole industry.

4        Q    And why was it so pregnant?

5        A    Because as exemplified in this chart companies

6    started out and then quit, and to the aviation industry

7    that is just heresy because I have an airplane that's

8    going to have a product life of 20 to 40 years, and I buy

9    a custom display from you and then you quit manufacturing

10   in three years.  What am I supposed to do because I'm

11   guaranteed a product life of 20 years, and I can't get a

12   key component anymore.

13           So that was one of the things that was

14   uppermost in people's minds.  So to explain the nature of

15   the industry and what was going on, I developed this

16   chart, this historical overview.  It was very well

17   received as who were the manufacturers from the beginning

18   in, and I cite the beginning as 1984.

2:59P  19    Q    I see.  Just for the record let's count back

20   the number of pages in the exhibit to make sure we're

21   on -- that the reader will be able to follow what it is.

22   I'm on the eighth page back from the back of the Exhibit

23   15; is that right?

24       A    Right, and the particular chart is titled

25   "Historical Overview."

152

1      Q    And what was the purpose of the chart again?

2    I'm sorry.

3      A    To show the turmoil in the industry providing

4    custom displays for avionics.

5      Q    Yes, I see the legend "Custom Displays For

6    Avionics" with some bullet points.  Do you see that?

7      A    Yes.

8      Q    The first one is "Don't ask."

9      A    Yes.

10      Q    If you can remember, and I realize it's five

11    years ago --

12      A    I can remember it very well.

13      Q    -- but when that came up with your overhead

14    display, whatever it is, what did you say about the

15    phrase "Don't ask"?

3:00P  16      A    I probably would describe this display in a

17    half-hour discussion describing the problem of each one.

18    And this is one of my expertise for the industry and why

19    I got invited to so many conferences to talk about the

20    status of custom displays for avionics and about why is

21    there a turmoil.

22          Custom displays for avionics, and these are the

23    points that engineers would run into and why the Japanese

24    or anyone, this is particularly the Japanese at this

25    point in time because this is 1999 now, or '98, and the

153

1    Japanese were no longer making liquid crystal custom

**Page 140**

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

2    displays.

3        Q    So the phrase "don't ask" means that you don't

4    have a chance of finding one out there in the industry?

5        A    I tell a little story of where I had taken a

6    group that engaged me as a consultant to travel to Japan

7    and search with all of the major manufacturers of liquid

8    crystal displays literally, eight or ten.  And when I

9    went to Sharp, an associate there that I knew, he took

10   me to the side, and he said, "Larry, don't bring these

11   people around anymore" meaning don't bring the avionic

12   custom low volume people who fit this description.  Don't

13   bring them anymore.

14           So I was telling my audience that was European

15   aerospace "Don't go to Japan and ask anymore."  I said

16   when I was doing this back in '84, the Japanese were very

17   excited about some possible American aerospace company

18   using a Japanese-made custom liquid crystal display, and

19   I explained why the industry had changed, why the

20   Japanese industry had changed.

3:02P    21        Q    I understand.

22        A    These set of bullets hit each of the points,

23   and I hoped to convince him when I got through that don't

24   ask anymore.  It's over.  The Japanese are not going to

25   participate.

154

1        Q    It's very difficult to find custom size

2    displays then commercially is what you're saying.  It's a

3    difficult problem.

Page 141

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

4    A    Yes.

5    Q    Down there I see another bullet point in the

6    listing under custom displays that says "COTS maybe." Do

7    you see that?

8    A    Yes.

9    Q    And COTS stands for commercial over-the-counter

10   displays?

11   A    Usually it's commercial off-the-shelf.

12   Q    Excuse me.

13   A    So US DOD coined that term across the board for

14   all kinds of electronics.  In Desert Storm they found

15   they had taken video cameras and things like that, and

16   nobody could watch them because they had custom ways of

17   viewing the video, custom formats and things like that.

18           Apparently, I forgot, the Navy or Army or one

19   of them, used off-the-shelf Sony camcorders, and the Sony

20   camcorders they could get shown in Washington and around

21   the world within minutes whereas all the custom things

22   that the Army and the Navy and Air Force had, it was an

23   inordinate amount of time for anybody to see those films.

24           And to reduce the NRE, the procurement back in

25   1990 under Bush and going into Clinton was to reduce the

155

1    cost, don't do any more custom things and don't do --

2    minimize NRE, and so as far as the displays are

3    concerned, the Japanese were providing displays; and if

4    they weren't told it was used for military, you could

5    take that cost display and ruggedize it, and it was

6    coined once that I said that we could do ROTS, ruggedized

Page 142

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

7    COTS, kind of a play on words.

3:04P    8        Q    If I hear you correctly, what you are telling

9    the participants here is there might be commercial off-

10   the-shelf displays rarely that would be satisfactory for

11   their needs because the market had basically dried up for

12   that.

13       A    Okay.  There was another element of the course,

14   and that was you, aerospace, you want a special size and

15   special things like this.  If you could stretch your

16   requirements, change your requirements to accept the

17   commercially available things that are manufactured in

18   high volume, change your specs to accept a commercial one

19   which typically are rectangular and then ruggedize it

20   because COTS itself, an off-the-shelf display will not

21   work in an airplane.  It has to be ruggedized.

22       Q    By ruggedized you mean made it acceptable for

23   severe conditions related to avionics applicability.  Is

24   that what you mean by ruggedized?

3:05P    25       A    Exactly, environment and the backlight

156

1    performance had to be changed and improved, and there

2    are other military things, sensitivity to night-vision

3    goggles.  There had to MBG filters put on, and the

4    dimming range had to be 2,000 to 1 versus in a COTS

5    display it was only maybe 1 to 10.

6        Q    I see.  Okay.

7        A    There were significant changes.

8        Q    What I'm trying to get at, and I hate to be so

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

9    simplistic, but was the message to the participants of

10   the conference that it's very difficult to find and

11   utilize custom displays in a market as you saw it there

12   at that particular point in time in 1998?

13       A    Well, you can be even more distinct than that.

14   There was no COTS display that would meet any of the

15   aerospace requirements, period.

16       Q    Okay.

17       A    And there was no chance of them meeting them.

18   So the specification had to change to accept a different

19   kind of image in terms of resolution and pixel

20   arrangements and things like that and a brand-new

21   backlight concept, a brand-new filter in the front and a

22   brand-new filter in the back all laminated in a special

23   way plus a dimming mechanism and a whole bunch of things.

24   So this was a giant thing for the aerospace industry to

25   accept.

157

3:07P    1       Q    And this reflects the concern in the industry

2    about being able to have I guess what we call custom

3    displays that they could use, apply efficiency, timely

4    and economically.  That was a problem.

5        A    Yes.

6        Q    Now during the course of this conference on

7    November 16 and 17, did you discuss anything about the

8    resizing technique which later became the subject of your

9    patents, the 609 and the 999 patents?

10       A    Absolutely not a single word.

11       Q    Even though this was a significant problem that

Page 144

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

12    was being addressed during the conference, you didn't

13    make any mention of that during the course of the

14    conference as far as you know?

15        A    No, and I can give you a short explanation, but

16    I'm going to have to take a quick break.

17        Q    Sure.

3:09P    18        (Recess.)

3:12P    19        (Record read.)

20    BY MR. HOSMER:

21        Q    I'd like to hear the explanation, and I'll put

22    that in the form of a question.

23        A    Yes.  This is a major part of my consulting

24    activities.  Some of the people may have come to the

25    class just to hear this section because they had

158

1    airplanes that they are going to have to fly, and they

2    wanted someplace to get displays.

3        And at the same time when the Clinton

4    administration came to power, they had the platform of

5    government-guided industry, and so they decided to use

6    the flat panel display industry as the government-guided

7    industry to get the industry back to Japan.  The Air

8    Force said, "Our pilots have to have the very best," and

9    so the combination of all those things led to the fact

10    that the displays have to be manufactured in the United

11    States, the custom displays.

12        And the Japanese when they would make a COTS

13    display, there would be a page in there that says "This

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

14    display cannot be used in the aviation or aerospace

15    industry." So no one wanted to really consider resizing.

16    They wouldn't even consider COTS, and OIS was still

17    providing displays and Thompson LCD.

18         So there were still a few providing displays.

3:14P 19    So to ask them to consider something that was even in the

20    less of an acceptable condition than they would accept

21    was futile, and besides that this was a class and not me

22    selling something that they wouldn't accept in the first

23    place.

24         Q    And you don't think they would be interested in

25    this resizing solution as being something of interest to

159

1    them commercially? Is that what you're saying?

2         A    Commercially? We're talking aerospace.

3         Q    Aerospace --

4         A    Yes.

5         Q    -- the aerospace industry.

6         A    No. They didn't want to even consider COTS.

7    They were still hanging on to their last hope that OIS

8    would get its act together and Thompson LCD. And Toshiba

9    and Philips were starting to make displays, and Xerox had

10   a big program funded by the government, and Image Quest

11   had a program funded by the government. So they were

12   still -- the aerospace people were still hanging on for

13   their idealized display.

3:15P 14    Q    So if I understand, you didn't bring up the

15   subject of resizing, based on the technique we have been

16   talking about for the last couple of days, because you

Page 146

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

17    believed that your audience would not be interested in

18    that solution?

19        A    Right.

20        Q    I meant to ask you as you came back in, you've

21    heard me caution you about having conferences with your

22    counsel during breaks.  Did you talk about this

23    particular answer and my question during the last break?

24        A    No.  I said, "Neal" --

25            MR. COHEN:  Objection.  It's a yes-or-no

160

1    question.  Anything else I'll object to.

2    BY MR. HOSMER:

3        Q    You can answer it yes or no.

4        A    No.  We didn't talk about any subject that

5    we're discussing.

6        Q    It didn't relate to any subjects in the

7    deposition?

8        A    Right.

9        Q    Would that answer apply with respect to all of

10    the conferences of whatever nature during the course of

11    the last two days you had with counsel?

12        A    Yes --

13        Q    All right.

14        A    -- it would.

3:16P  15        Q    Now after the November 17, November 18, 1998

16    conference, do you recall what your activities were

17    immediately following the conference?

18            MR. COHEN:  Objection.  APJ.  Actually I'll

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

19    instruct the witness not to answer that question as well.

20    That really is going to derivation and priority.

21          (Instruction not to answer.)

22          MR. HOSMER:  All right.  Well, let me ask a

23    couple of questions and see whether or not you continue

24    your instruction.

25      Q    Do you recall, Mr. Tannas, that you were


                                                    161


1    invited to visit GEC Marconi's facilities in England --

2    in Scotland, excuse me, the day after the conference

3    ended?

4          MR. COHEN:  Objection.  I will instruct the

5    witness not to answer.  APJ.  Actually not APJ.  This is

6    derivation of priority.

7          (Instruction not to answer.)

3:18P  8    BY MR. HOSMER:

9      Q    Do you recall that you did in fact visit the

10    GEC Marconi facility in Scotland a day later?

11          MR. COHEN:  Objection.  I'll instruct the

12    witness not to answer based on the derivation and

13    priority order.

14          (Instruction not to answer.)

15    BY MR. HOSMER:

16      Q    Finally, do you recall you had an opportunity

17    to observe an operation related to the resizing of LCD

18    plates in your visit to the GEC Marconi facility in

19    Scotland on November 19?

20          MR. COHEN:  Objection.  I will instruct the

21    witness not to answer based on the derivation and

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

22    priority order -- derivation and inventorship order.

23         (Instruction not to answer.)

24    BY MR. HOSMER:

25    Q    Finally, Mr. Tannas, during your visit to the


162


1    GEC Marconi facility on November 19th, did you see sealed

2    LCD plates that had been cut and resized and then sealed?

3:19P  3         MR. COHEN:  Objection.  I'll instruct the

4    witness not to answer based on the derivation and

5    inventorship order.

6         (Instruction not to answer.)

7    BY MR. HOSMER:

8    Q    And now finally for real, Mr. Tannas, did your

9    visit and observations at the GEC Marconi facility on

10    November 19th help you to formulate the basis for your

11    solution with respect to resizing the LCDs?

12         MR. SPOONER:  No.

13         MR. COHEN:  Objection.  I will instruct the

14    witness not to answer based on the derivation and

15    inventorship order.

16         (Instruction not to answer.)

3:20P  17    BY MR. HOSMER:

18    Q    Did the visit to Scotland have anything to do

19    with the basis for your experience as an expert in

20    sealing LCDs?

21         MR. COHEN:  Objection.  I'll instruct the

22    witness not to answer on the same grounds.

23         (Instruction not to answer.)

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03
24          MR. HOSMER:  All right.

25          THE WITNESS:  I would like to make a comment.


                                                        163


1           MR. COHEN:  No.  I'll instruct you not to.

2           (Discussion off the record.)

3           MR. HOSMER:  All right.  On the record I think

4    that we're obligated to actually adjourn and call the --

5           MR. SPOONER:  You've instructed him not to

6    answer, so are you suspending this deposition at this

7    point?

8           MR. COHEN:  Only if you want to disagree with

9    my instruction.

10          MR. SPOONER:  Yes, we do.  So we have

11   instructed the witness to answer, and you've instructed

12   him not to.  You have the obligation to place the

13   conference call with the judge immediately.  So go do it.

3:21P  14          MR. COHEN:  Are we on the record right now?

15          MR. SPOONER:  Yes, I hope so.

16          MR. COHEN:  For the record you are disagreeing

17   with my instruction for him not to answer on the basis of

18   an order preventing you from asking questions regarding

19   derivation and inventorship?

20          MR. SPOONER:  Yes.

21          MR. HOSMER:  Which question are you referring

22   to?

23          MR. SPOONER:  Any of the questions in which you

24   objected to based on the allegation that they reflect

25   inventorship or derivation.  We're asking from the

                              Page 150

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

164

1    standpoint of his experience as an expert, and he's been
2    testifying for two days as an expert in the field of
3    sealing LCDs.
4         We have information and belief to indicate that
5    he saw sealed recut LCDs, and that formed some of the
6    basis of his experience upon which he has testified for
7    two days.  We're entitled to find out about that.  We're
8    not asking whether he was an inventor of that sealing,
9    and we're not asking whether he derived it.  We're
10   seeking to understand what the basis of his knowledge was
11   as an expert, and I think that we're entitled to that.
3:22P  12        MR. COHEN:  Okay.  We disagree.  I will place a
13   call.
14        MR. SPOONER:  Go ahead.
15        MR. HOSMER:  Could you read back the last two
16   questions and answers for my own edification?
17        (Record read as follows:
18             "Did your visit and observations at
19             the GEC Marconi facility on November 19th
20             help you to formulate the basis for your
21             solution with respect to resizing the LCDs?
22             "Did the visit to Scotland have anything
23             to do with the basis for your experience as
24             an expert in sealing LCDs?")
25        MR. HOSMER:  The question before that is not

165

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

1   one that we're going to present to the judge, but the

2   last question and the first three are the only ones.

3              (Discussion off the record.)

4              (Deposition Exhibit 16 was marked for

5              identification by the court reporter.)

6   BY MR. HOSMER:

7       Q    Let me show you what we marked as Exhibit 16

8   which appears to be a sign-in sheet entitled "Visitor

9   Management Register" and ask you if you recognize it.

3:28P   10        MR. COHEN:  Before we get to that, I want to

11  clarify the off-the-record discussion we had, and we have

12  agreed to allow Mr. Tannas to answer certain questions

13  that we believe we previously objected to before the

14  break on the condition that opposing party agrees that

15  we're not opening any doors to further questioning by

16  allowing these questions to be asked, and also we

17  maintain our objection, and we will preserve our rights

18  based on the APJ's order and ruling on the conference

19  call including this Exhibit 16; is that correct, Counsel?

20             MR. HOSMER:  That's right.

21             MR. COHEN:  Okay.  Repeat the question.

22  BY MR. HOSMER:

23      Q    My question was do you recognize that?

24      A    Exhibit 16?

25      Q    Yes.

166

1       A    Is this all of it?

2       Q    This is a sheet of the visitor management

Page 152

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

3      register.

3:29P  4          A    Is this all that relates to me?  Was there a

5      second page or more columns or something?

6          Q    No.  This is the entirety of the page that's

7      copied.  Just for the record it has various columns, the

8      first of which is titled "Date, name, company visiting,

9      visitor/contractor, time in and time out, pass number and

10     vehicle number and then the visitor's signature."

11         A    Yes, I recognize this.

12         Q    And does this appear to be the visitor

13     management register that relates to a visit that you made

14     to the GEC Marconi facility in Scotland on November 19,

15     1998?

16         A    It does look like it, yes.

17         Q    And is that your handwriting down there where

18     it says "L. Tannas, Tannas Electronics"?

19         A    There is only one line, right?

20         Q    Yes.

21         A    That appears to be my handwriting.

22         Q    And it indicates that has the date of

23     November 19, Tannas Electronics, and there's the name

24     Stewart Miller.  Do you see that?

3:30P  25         A    Yes.

167

1          Q    Is that the individual at GEC Marconi that you

2      visited?

3          A    Yes, it is.

4          Q    And what does the check mark mean in the

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

5    "Visit/Contractor" column?  Do you know?  If you don't

6    know --

7        A    I don't know.

8        Q    All right.  And the time is listed as 1:15.

9    Does this refresh your recollection the visit occurred

10   about 1:15 in the afternoon on November 19th?

11       A    If you were to ask me before seeing this, I

12   would have probably thought it was a little earlier, but

13   I have no reason to doubt it was after lunch it looks

14   like, yes.

15           MR. HOSMER:  All right.  As to the questions

16   that I think were pending, I think we have agreed there

17   were four that we can get an answer to.

3:31P  18        MR. COHEN:  Ask the questions one at a time.

19           MR. HOSMER:  Did you get his last comment?

20           THE REPORTER:  No.  I was scrolling up to the

21   question.

22   BY MR. HOSMER:

23       Q    Would you repeat your comment?

24       A    I was surprised.

25       Q    At what, sir?


                                                        168


1        A    That my signature is not on here.

2        Q    It's in your handwriting, but it's not your

3    signature.  Is that what you're saying?

4        A    Yes, and that's a surprise that my signature is

5    not there.

6        Q    Do you have any explanation for why that's the

7    case?

                        Page 154

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

8     A     No.

9     Q     Okay.

10          (Discussion off the record.)

3:33P  11          (Record read as follows:

12               "Finally, do you recall you had an

13          opportunity to observe an operation

14          related to the resizing of LCD plates in

15          your visit to the GEC Marconi facility in

16          Scotland on November 19?")

17          MR. COHEN:  Answer that question subject to the

18     objections.

19          THE WITNESS:  My mind was someplace else.

20     Could you repeat it?

21          (Record read as follows:

22               "Finally, do you recall you had an

23          opportunity to observe an operation

24          related to the resizing of LCD plates in

25          Your visit to the GEC Marconi facility

                                                              169

1               in Scotland on November 19?")

2          MR. COHEN:  Same objections and ambiguous.

3          You can answer the question.

3:34P  4          THE WITNESS:  The question was very long and

5     had a lot in it, so I would like to answer the question,

6     but I want to answer it correctly.  You have to break

7     that out as a couple of questions.

8               Could you read that again for me?  I don't mean

9     to be obstructive, but I was thinking of something else;

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

10    and if you're actually writing, we might take care of the

11    something else relating to this sheet.

12    BY MR. HOSMER:

13        Q    Exhibit Number 16?  Go ahead.  Whatever

14    clarification you want to make.

15        A    And it's really important to me because I was a

16    visitor and not a contractor.  I was a guest at my own

17    expense and not a contractor not working for them.  I was

18    simply a guest visitor.

19        Q    Yes, and your counsel kindly pointed out off

20    the record that in the "Visitor/Contractor" column there

21    is the letter V which indicates visitor; is that right?

3:35P    22        A    Yes.  Now that's off my back.

23        MR. HOSMER:  Let's see if we can go through

24    those questions.

25        (Record read as follows:

170

1            "Finally, do you recall you had an

2            opportunity to observe an operation

3            related to the resizing of LCD plates

4            in your visit" --)

5        THE WITNESS:  Stop right there.  I did not have

6    an opportunity to visit to see resized displays the way

7    you wrote that question.  Let's go on with the rest of

8    the question.

9            (Record read as follows:

10            "Finally, do you recall you had an

11            opportunity to observe an operation

12            related to the resizing of LCD plates

Page 156

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

13          in your visit to the GEC Marconi facility

14          in Scotland on November 19?")

3:37P 15          THE WITNESS:  Okay.  The reason that I was very

16     careful is because when I was invited, the purpose of the

17     visit was related to the context of the class, and I

18     knew that Marconi had more advanced displays than I was

19     lecturing on.  I was lecturing on the technology as

20     developed by Kaiser; and when Stewart Miller invited me,

21     I could see that I was going to see the helmet-mounted

22     display that Marconi was developing for the Euro fighter

23     which was ahead of the context of my class.  So I was

24     hoping to upgrade my class by learning about people in

25     what they wanted to tell me about their helmet-mounted

171

1     display.

2     BY MR. HOSMER:

3          Q     Maybe I can cut to the chase.  I don't want

4     to create another controversy, but let me ask a basic

5     question that I think will make it easier for all of us.

6     I'm really interested, Mr. Tannas, in just knowing what

7     it is that you saw during your visit.  If you could

8     describe that to me, and your counsel will let you do

9     that, and again this is regarding resizing.

10          MR. ENGLISH:  We will maintain our objection on

11     relevance, but we'll let you ask the question.

12     BY MR. HOSMER:

13          Q     And my second question is --

14          MR. ENGLISH:  Well, let him answer the

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

15  question.

3:39P  16         THE WITNESS:  I came to the lobby and signed in

17  and waited, and they called Mr. Stewart Miller, and he

18  came out and brought me in.  We talked about several

19  things, and he was giving me a tour.  And as we were

20  walking down the halls, he said, "And here's where we

21  have some new developments."

22         And he took me into that room and he said,

23  "Here we have a resized display in an instrument."  I saw

24  the instrument operating in an avionics mode which is

25  something I had never seen before, and they told me it

172

1  was resized, and I had no reason to doubt they had

2  resized it.  I think they used a different word than

3  resized.  I think they used remanufactured or something

4  like that.

5         Now I had no reason to doubt that, but I did

6  not see the component itself.  What I saw was an avionics

7  box with a display in it showing avionics imagery that

8  would be typical of primarily a flight instrument, and

9  they told me that it was remanufactured.

3:40P  10  BY MR. HOSMER:

11     Q    Okay.  And my second question -- thank you --

12  is what do you recall about your discussions relating to

13  resizing during your visit to Scotland in 1998?

14         MR. COHEN:  Same objections.

15         THE WITNESS:  Well, there are a couple of

16  things.  One, I said, "Gee, that's very interesting.

17  I've never seen that before.  Is this proprietary?"

Page 158

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

18          And they told me it was not proprietary.  I

19   said, not at the same moment, but because of the nature

20   of some of the negotiating documents that you sent to me,

21   I asked a couple of times about that, and later in the

22   day Stewart took me to his manager, and I told his

23   manager -- complimented him on the demonstration and that

24   I had never seen it before which I had not, an avionics

25   box with a display that purportedly was resized.

173

3:41P    1          I asked him if he minded if I used it in my

2   classes.  He said, "No.  You may use it in your classes.

3   However," he said, "don't tell Bill Dunn about it," and

4   Bill Dunn we both mutually knew as a person in the

5   industry that was ruggedizing COTS displays and was

6   negotiating with the Koreans on ways to get displays.

7          Now I'm not sure what Bill Dunn's role was in

8   this context, but Bill Dunn would have been a competitor

9   to GEC Marconi.  So from a marketing standpoint he did

10   not want me to tell Bill Dunn, and not that there was any

11   particular opportunity because Bill Dunn's office was in

12   Atlanta, and my office was in California.  So that was

13   the only characterization as to who I could not tell it

14   to.  The other thing -- that was about it.  Yeah.

3:42P    15   BY MR. HOSMER:

16     Q    You mentioned that you had not seen something

17   before, and I wanted to know what that was.  You said you

18   had not ever seen --

19     A    Avionics box.

Page 159

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

20        MR. COHEN:  Same objections.

21        THE WITNESS:  I had not seen an avionics box

22   operate with a reported resized display in it.  And

23   they were a systems house, so I characterize them as

24   interested in showing me systems and not components.  And

25   so they showed me a system that gave them more

174

1    flexibility as a system house using a component that they

2    said they had made.

3         MR. HOSMER:  All right.  Thank you, Mr. Tannas.

4    That's my last question.

3:43P   5         MR. COHEN:  Before we adjourn I would like to

6    make a statement on the record that we will invoke our

7    right to have Mr. Tannas review the transcript and make

8    any necessary corrections.

9         MR. HOSMER:  Great.

10        MR. COHEN:  Is there anything else?

11        MR. HOSMER:  Just very quickly we have asked

12   for an expedited, a moderately expedited transcription

13   of the deposition, Mr. Tannas, and I would request on

14   the record here that you try to obtain a copy of the

15   transcript just as soon as it's available, in about a

16   week, and if you could to try to make your corrections to

17   the transcript within a day or so if at all possible.  So

18   I would request that you try to do that, the reason being

19   that there is a briefing schedule and a time frame that

20   requires that we have the deposition and file papers in

21   the proceeding in the very near future so --

3:44P   22        THE WITNESS:  Okay.

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

23        MR. COHEN:  That's a request and not a

24  question, right?

25        MR. HOSMER:  That's a request.

175

1        MR. COHEN:  And then regarding the expedited

2  transcript you made a specific request for that already?

3        MR. HOSMER:  We would like --

4        MR. COHEN:  We talked about who is paying for

5  that, and we are not willing to pay for it.

6        MR. SPOONER:  Call the judge.

7        MR. HOSMER:  We need an expedited transcript.

8        MR. COHEN:  We don't need this to be on the

9  record.

10       MR. HOSMER:  No, we don't.  The deposition is

11  adjourned.

12  //

13  //

14

15

16

17

18

19

20

21

22

23

24

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

25

176

1

2

3

4

5

6

7

8

9          I, LAWRENCE E. TANNAS, JR., do hereby

10   declare under penalty of perjury that I have read the

11   foregoing transcript; that I have made such corrections

12   as appear noted, in ink, initialed by me, or attached

13   hereto; that my testimony as contained herein, as

14   corrected, is true and correct.

15          EXECUTED this _____ day of _____

16   20___, at _____,_____.

                   (City)                    (State)

17

18

19          _____
            LAWRENCE E. TANNAS, JR.
            Volume 2

20

21

22

23

24

25

Watson Ex 1019 - Tannas Deposition Volume 2 9-17-03

177

1

2

3              I, the undersigned, a Certified Shorthand

4   Reporter of the State of California, do hereby certify:

5              That the foregoing proceedings were taken

6   before me at the time and place herein set forth; that

7   any witnesses in the foregoing proceedings, prior to

8   testifying, were placed under oath; that a verbatim

9   record of the proceedings was made by me using machine

10  shorthand which was thereafter transcribed under my

11  direction; further, that the foregoing is an accurate

12  transcription thereof.

13              I further certify that I am neither

14  financially interested in the action nor a relative or

15  employee of any attorney of any of the parties.

16              IN WITNESS WHEREOF, I have this date

17  subscribed my name.

18

19  Dated:_____

20

21                          _____

22                          SHERYL HILTON MEYER
                            CSR NO. 2852

23

24

25

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

LAWRENCE E. TANNAS, JR.
Junior Party
(Patents 6,204,906 and 6,380,999)

v.

DAVID S. WATSON
Senior Party
(Application 09/529,201)

Patent Interference No. 105,096
Administrative Patent Judge Sally C. Medley



DEPOSITION OF LAWRENCE E. TANNAS, JR.

Newport Beach, California

Wednesday, February 4, 2004

Volume I

Reported by:
SHERYL HILTON MEYER
CSR No. 2852
JOB No. 619068